1    double door, take your immediate right without going on to the

2    landing.  And of course, Mr. Capps, there's a nice room for

3    your people as well.

4        If you gentlemen can leave the courtroom, please, and

5    first witness, come on up.

6        MR. ALLAN:  Your Honor, John Lamontagne is the primary

7    representative of petitioner.  I would ask that he be allowed

8    to remain.

9        THE COURT:  Is he a witness?

10       MR. ALLAN:  He will be a witness.  Yes, Your Honor.

11       THE COURT:  What's your position, Mr. Capps?

12       MR. CAPPS:  If he is designated as the representative

13   of the nonindividual party, he has a right under the rule.

14       THE COURT:  Absolutely.

15       Sir, go ahead and just take a seat.

16       MR. ALLAN:  Aaron, if you would wait outside.

17       THE COURT:  Sir, if you can walk to the front of the

18   courtroom and raise your right hand to be sworn.

19   **JASON FERN, PETITIONER'S WITNESS, SWORN**

20       THE CLERK:  You can come around the front and have a

21   seat on the witness stand.

22       THE COURT:  Sir, make sure you -- when you have a

23   seat, you pull the microphone close enough so everyone in the

24   courtroom can hear everything.

25       Sir, what's your full name?  And please spell each

CHAMBERED CUSTOM FIREARMS-000087

1    name.

2            THE WITNESS:  First name is Jason.  Last name is Fern.

3    First name is J-A-S-O-N.  Last name is F-E-R-N.

4            THE COURT:  Mr. Allan, go ahead.

5                        DIRECT EXAMINATION

6    BY MR. ALLAN:

7    Q.  Mr. Fern, would you please identify your relationship with

8    Chambered Group?

9    A.  I am an owner, one-third.

10   Q.  Okay.  In addition to having an ownership interest, did

11   you -- do you work for -- did you work for Chambered Group

12   during the period covered by this inspection?

13   A.  I did.

14   Q.  And what did you do at Chambered Group?

15   A.  Managed day-to-day operations.

16   Q.  Okay.  And would you please describe what type of business

17   Chambered Group is?

18   A.  We are a FFL, Federal Firearms License.  We deal in license

19   of selling firearms, accessories, gun accessories, that kind of

20   thing.

21   Q.  Okay.  And what type of FFL do you hold?

22   A.  We're an 02, 07.

23   Q.  And why do you hold an 07 license?

24   A.  07, because we do manufacturing.

25   Q.  And when was Chambered Group founded?

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000088

1    A.  Back in September of 2014.

2    Q.  Okay.  And who have the owners of Chambered Group been over

3    the years?

4    A.  At that point in time it was myself, a Cole Kelly, a John

5    Fillman and then in 2018, August, that's when John Lamontagne

6    actually came in, purchased out the other partners.

7        THE COURT:  What was the second name of the person,

8    somebody Kelly?

9        THE WITNESS:  Cole, Cole Kelly, sir.

10        THE COURT:  How do you spell that?

11        THE WITNESS:  C-O-L-E.

12        THE COURT:  Thank you.

13    BY MR. ALLAN:

14    Q.  Are you familiar with the compliance inspection that the

15    ATF conducted beginning in April of 2022?

16    A.  Yes.

17    Q.  Now, the period covered by that inspection was from

18    approximately April 11 of 2021 through April 11th of 2022,

19    correct?

20    A.  Yes.

21    Q.  Would you please identify the employees that regularly

22    worked at Chambered Group during the period covered by that

23    inspection relative to the sale of firearms?

24    A.  It would have been myself, an Aaron Swank, a Jason

25    Lamontagne, a Mike Drewniak.

CHAMBERED CUSTOM FIREARMS-000089

1    Q.  Okay.  Aaron Swank is the gentleman who was here today and

2    is waiting outside?

3    A.  That is correct.

4    Q.  And Jason Lamontagne, is that a different individual than

5    the one who is present today?

6    A.  No.  John Lamontagne is present today.

7    Q.  The one you said was working there regularly, I think you

8    said a Mr. Jason Lamontagne?

9    A.  Oh, correct, yes.

10   Q.  Okay.  So that is a different individual than who is

11   present here today?

12   A.  That is correct.

13   Q.  Okay.  And would you just basically describe the general

14   policies and procedures for the sale of firearms that Chambered

15   Group employed during the period from April 2021 through April

16   2022?

17   A.  Yeah, absolutely.  As far as when an individual actually

18   does come in, once they decide on a firearm that they want to

19   purchase, we go through a standard NICS background check,

20   unless they provide a concealed weapons permit for the State of

21   Arizona, and as long as those dates are valid, we're able to do

22   the sale of the firearm.

23        Individuals that we have to do a NICS check

24   background, we wait for an individual response from NICS,

25   giving us either a form of a proceed, a delay, or denied.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000090

1    THE COURT:  Let me stop you for a minute.  Any time

2    your witness is talking about NICS and all of these terms, I

3    need all of that spelled out so I know what he's talking about.

4    THE WITNESS:  So NICS -- I apologize, Your Honor.

5    THE COURT:  No, that's okay.  You don't know what you

6    don't know.

7    THE WITNESS:  As far as the background check, that

8    takes place with the individual.  We again, once we receive a

9    notification from NICS, it lets us know whether it's a proceed,

10   delay, or a deny.

11   If an individual is a proceed, we allow and follow

12   through with the sale.  If the item is a delay for the person,

13   we take measures in place where NICS provides us a Brady date.

14   That is a Brady date that we go off.

15   And then as far as a deny goes on the individual, if

16   the individual is denied, obviously the individual does not

17   collect the firearm.  And then we store the denied forms in a

18   separate folder so when an audit does take place, we are to

19   provide those forms to the IOI at the form [sic] of the audit.

20   BY MR. ALLAN:

21   Q.  And what were the policies and procedures relative to

22   logging firearms into and out of the A&D records?

23   A.  If the person was actually -- if the person was proceeded,

24   then we proceed through.  We dispo -- do a disposition of the

25   firearm itself.

CHAMBERED CUSTOM FIREARMS-000091

```
1          As far as the firearms coming into the store, we go
2   through and add them into our A&D book, so the acquisition and
3   disposition book.  We add them through into that.
4   Q.  And just to clarify for the record, the references to NICS
5   is an acronym, N-I-C-S, and it stands for National Instant
6   Criminal Background Check System.
7          THE COURT:  Thank you.
8   BY MR. ALLAN:
9   Q.  Part of the period covered by the inspection was during the
10  coronavirus pandemic.  Would you please identify the effect of
11  the coronavirus pandemic on Chambered Group's business?
12  A.  Absolutely.  So we are a small store, total of the
13  storefront is roughly about 1300 square feet.  Of the actual
14  retail space we maintain is 800 square feet.
15         So as far as standard business practices that we have
16  each month, we -- I would almost say 10 X'd in sales during the
17  pandemic period, so for us to amplify the amount of sales and
18  people that we had coming through the door was very exponential
19  and we were doing what we can to mitigate any form of errors
20  that we could.
21  Q.  Were you operating with the same number of employees as you
22  were before the increase in business?
23  A.  Correct.
24  Q.  Did you ever have occasions where you needed to employ, for
25  example, a doorman?
```

CHAMBERED CUSTOM FIREARMS-000092

1    A.  We did actually.

2    Q.  And would you explain the reason behind that?

3    A.  Yeah, so during the pandemic we would have your normal

4    amount of people that would walk through the door, but at this

5    point in time, we actually would have a line around the door

6    that would be four hours long.

7          We had to enforce that policy just simply for the fact

8    to stem the amount of people that were in the room, to actually

9    prevent any form of loss of items, theft, anything of that

10   nature, just because of the small amount of manpower that we

11   had on hand.

12         That also allowed us to get a little bit more of

13   one-on-one time with the individual customer so that way we

14   were not overwhelmed as best we could, when we were usually

15   handling four to five people at a time.  This allowed us to

16   bring it down to more handling one to two people at a time.

17   Q.  Okay.  Have you reviewed the report of violations that was

18   issued by the IOI Tara Crubaugh on April 5th of 2022?

19   A.  Yes.

20   Q.  Did you have a closing conference with Ms. Crubaugh?

21   A.  I did.

22   Q.  And before that closing conference, were you provided with

23   the copy of the report of violations?

24   A.  I was.

25   Q.  Prior to the date of the closing conference --

CHAMBERED CUSTOM FIREARMS-000093

1   A.  No --

2   Q.  -- were you provided --

3   A.  -- I was not.

4   Q.  Did you see the report of violations during the closing

5   conference?

6   A.  I did.

7   Q.  And were you asked to provide responses as to why those

8   violations had occurred?

9   A.  I was.

10  Q.  Based on your discussions with IOI Crubaugh, and I'll just

11  spell that for the record, C-R-U-B-A-U-G-H, did you receive any

12  information on the violations that were cited and whether the

13  ATF considered any one of them to be more serious than the

14  others?

15  A.  Yes.

16  Q.  And what information did you receive in that regard?

17  A.  The individual where the firearm was released before the

18  Brady check date.

19  Q.  Okay.  What about the other violations?

20  A.  The other ones, no.  The other ones were what we have had

21  with prior audits before.

22  Q.  Did you receive any information as to whether the results

23  of that report of violations would differ based on whether that

24  first violation existed or not?

25  A.  No, at the point in time the IOI said that if we didn't

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000094

1    have the issue with that first violation that we would have had

2    a standard audit and did a fantastic job.

3    Q.  The first violation that we are talking about relates to

4    the transfer of the firearm on -- allegedly during the delay on

5    a three-day delay with regard to NICS.  Can you explain what --

6    just basically the possible results is of a NICS check are?

7    A.  So you -- again, you get a proceed, a delay, and a deny.

8    Q.  Okay.  If you get a proceed, are you able to transfer the

9    firearm?

10   A.  Yes.

11   Q.  And if you get a deny, you are not able to transfer the

12   firearm?

13   A.  Yes.

14   Q.  What happens when you receive a delay?

15   A.  So as far as a delay, we have a delay section that we have

16   within the store there, so that way we know we can reference.

17   Because it's not any one person that's handling the same person

18   twice at any point in time.

19          So that way if delay does come back as approved, so

20   our policy in place that we have, so we don't have errors, is

21   that when an individual is approved, we end up calling that

22   individual up to actually come in and acquire said firearm;

23   otherwise, if the person is not approved, then we don't call

24   them up.

25   Q.  Okay.

CHAMBERED CUSTOM FIREARMS-000095

```
 1              MR. ALLAN:  Your Honor, I would like to show the

 2   witness an exhibit.

 3              THE COURT:  I see there's a number of exhibits the

 4   Court has received, but none of them have been stipulated to.

 5              Have the Respondents had a chance to review all of

 6   these exhibits?

 7              MR. CAPPS:  Your Honor, we have, and there are some

 8   stipulations.

 9              THE COURT:  I see the stipulations on the

10   Defendant-Respondent's exhibit list but none on the

11   Petitioner's.

12              Mr. Allan, which items of evidence have been

13   stipulated to?

14              MR. ALLAN:  Give me one second, Your Honor.

15              THE COURT:  Sure.

16              MR. ALLAN:  Your Honor, it's my understanding that all

17   of petitioner's exhibits except for Exhibit 44 have been

18   stipulated.

19              THE COURT:  Is that correct, Mr. Capps?

20              MR. CAPPS:  Yes, Your Honor.  And just to make sure I

21   heard correctly --

22              THE COURT:  He said everything except for number 44.

23              MR. CAPPS:  That's correct.

24              THE COURT:  Very well.  So all of the Exhibits, 1

25   through 43, will be received into evidence.
```

UNITED STATES DISTRICT COURT

1          (Exhibit Numbers 1 through 43 are admitted.)

2          THE COURT:  Mr. Capps [sic], if you need to do so, the

3    ELMO is to the right of you there.  If you plan to publish

4    anything on the ELMO to talk to your witness, just let me know

5    what exhibit you are putting up so we have a record of

6    everything that you are doing.

7          MR. ALLAN:  Okay.  Your Honor, would you prefer that I

8    use the ELMO as opposed to handing the witness a physical

9    document?

10         THE COURT:  It would be easier.  We don't have a jury

11   here, so that would be easier, yes, thank you.  And what

12   specifically is the Respondent's objection to Exhibit Number

13   44?

14         MR. CAPPS:  Your Honor, Exhibit Number 44 is a

15   post-inspection compliance plan, and our position is it's

16   inadmissible.  It's not relevant.

17         THE COURT:  Mr. Allan, why do you believe 44 is

18   relevant?

19         MR. ALLAN:  It simply goes to steps that the licensee

20   is planning to take to prevent future violations and goes to

21   show that it is not plainly indifferent to its obligations

22   under the Gun Control Act and always will try to make amends

23   and take steps to prevent future violations from happening when

24   they're identified.

25         THE COURT:  Mr. Capps?

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000097

JASON FERN - DIRECT EXAMINATION                41

1           MR. CAPPS:  Your Honor, we cited two decisions in the

2    response that go to this specific point that it's too late.

3    Anything that's post revocation, it's remedial action, is not

4    relevant to --

5           THE COURT:  How is remedial action relevant to my

6    decision in this case, Mr. Allan?

7           MR. ALLAN:  It simply goes to whether or not the

8    violations are plainly indifferent and whether the licensee

9    maintains -- takes it obligations under the Gun Control Act

10   seriously or is plainly indifferent to the requirements to

11   comply with those obligations.

12          THE COURT:  Number 44 will not be received or

13   considered.

14          Go ahead.

15   BY MR. ALLAN:

16   Q.  Mr. Fern, I would like to review -- can you see what's been

17   --

18   A.  Yes, I can.

19   Q.  Okay.  You have a screen in front of you?

20   A.  Yes.

21   Q.  Would you please take a look at the document that has been

22   marked as Exhibit 3, and would you identify that for the

23   record?

24   A.  Yes, it's a 4473 for Mr. Ridley.

25   Q.  Prior to today, are you familiar with this 4473 form?

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000098

1    A.  I am.

2    Q.  And are you familiar with Mr. Ridley?

3    A.  I am.

4    Q.  Can you just give me a little bit of background on who

5    Mr. Ridley is?

6    A.  He's an individual at that --

7            THE COURT:  Just one second.  My apologies, Mr. Allan.

8            Molly, can you make sure that the law clerks have

9    copies of all of this?

10           Go ahead, please.

11   BY MR. ALLAN:

12   Q.  Would you just please explain who Mr. Ridley is?

13   A.  Yes, at the time of purchase he was an active duty Air

14   Force.

15   Q.  Okay.  So you are familiar with that customer?

16   A.  Yes.

17   Q.  Okay.  Do you personally have any recollection of the

18   transaction with Mr. Ridley?

19   A.  I do not.

20   Q.  Okay.  Based on your review of the 4473 form that's been

21   marked as Exhibit 3, and specifically looking for example at --

22   no.  Don't change it.

23           For example, Section A where it has information on the

24   firearm, can you identify this based on the handwriting or

25   discussions with Chambered Group who would have been the person

CHAMBERED CUSTOM FIREARMS-000099

1    who assisted Mr. Ridley when he first came into the store?

2    A.  Yes, that's actually Aaron Swank.

3    Q.    And then if you look on -- this is the second page under

4    item number 23, the certification date.  This is April 17th of

5    2021.  Was that during the period in which the coronavirus was

6    still affecting operations at Chambered Group?

7    A.  Yes.

8    Q.  And now looking at that same page, if you look down to item

9    number 27c, would you please identify when NICS was contacted?

10   A.  4-17 of 2021.

11   Q.  Okay.  And what would the response that was -- the initial

12   response that was received from NICS be?

13   A.  It was delayed.

14   Q.  Okay.  And looking at again in box 27c, is there a date

15   written there?

16   A.  It is 4 --

17   Q.  What's the significance of that date?

18   A.  That's a Brady check date.  So -- I should say the Brady

19   release date.  So if we don't receive a response by that date,

20   then it is up to the discretion of the FFL to release a

21   firearm.

22          THE COURT:  So Mr. Allan, just to make sure I am

23   clear, are you attempting to show that the Petitioners didn't

24   have any errors that the ATF should have had issues with?  What

25   exactly are you trying to establish with these 43 documents?

CHAMBERED CUSTOM FIREARMS-000100

1      MR. ALLAN:  We are not going to be going through all

2  43 of the documents.

3      THE COURT:  Well, I'm glad you picked up on what my

4  question actually was, because I am not doing this 43 times.

5  So what's the relevant stuff in here that you want to bring to

6  my attention so I can do my job and decide this case?

7      Because I'll provide both sides with liberal abilities

8  to provide foundational information if you need to.  You can

9  lead, and I will allow both of you to lead if you need to, just

10  to move this along quite a bit.

11      MR. ALLAN:  Thank you, Your Honor.

12  BY MR. ALLAN:

13  Q.  Would you please take a look at the third page of this

14  transaction --

15  A.  Uh-huh.

16  Q.  -- of this document.  And in box number 36, what is the

17  date?

18  A.  4-20 of 2021.

19  Q.  Okay.  Now, based on -- that date is obviously before the

20  NICS release date, correct?

21  A.  Correct.

22  Q.  Now, based on the signature in box 34, who at Chambered

23  Group would have been the person who actually transferred the

24  firearm to Mr. Ridley?

25  A.  That was myself, Jason Fern.

CHAMBERED CUSTOM FIREARMS-000101

JASON FERN - DIRECT EXAMINATION                45

1    Q.  Would you have transferred the firearm to Mr. Ridley before

2    April 22, 2021 if it was still on a delay?

3    A.  No, we would not.

4    Q.  What is your policy with regard to -- you previously

5    discussed your policy with regard to delay, based on the fact

6    that this firearm was released on April 20th of 2021, what does

7    that indicate to you?

8    A.  Indicates that we actually called and reached out to the

9    customer to let him know that we received a proceed

10   notification from NICS.

11   Q.  And if a NICS delay changes to a proceed before the three

12   full business days is up, are you required to wait or are you

13   allowed to transfer it?

14   A.  No, we are allowed to transfer it.

15   Q.  Okay, page 2.  And if you look at box 27d, you'll see that

16   there's four -- five boxes in there.  Would you please identify

17   what those available options are?

18   A.  First box is listed as "proceed," second is "denied," third

19   is "canceled," fourth is "no response was provided within three

20   business days."  The fifth one was "overturned."

21   Q.  And it looks like there's a mark in the, "no response was

22   provided by three business days," does that appear to

23   potentially be your handwriting?

24   A.  Maybe.  It looks to be.

25   Q.  If you look at item number 24, which was completed by

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000102

1    Mr. Swank, does that seem to be the same type of X or a

2    different type of X?

3    A.  Different type of X.

4    Q.  Okay.  Based on that, is it your position that you

5    incorrectly marked the box in 27d, and it should have been

6    "proceed" instead of no response received for the three

7    business days?

8    A.  Yes.

9    Q.  Did you intentionally check the wrong box in 27d?

10   A.  I did not.

11   Q.  Are you plainly indifferent to the requirement that the

12   correct box in 27d be checked?

13   A.  No.

14   Q.  Are you able to go back and confirm that the NICS check

15   results on Mr. Ridley were changed from a delay to a proceed

16   before April 20th of 2021?

17   A.  No.

18   Q.  And why not?

19   A.  The way the system works for NICS is "denies" stay in the

20   system indefinitely.  "Delays" in the system, if we never

21   receive a response, from my understanding, stay within the

22   system for 88 days.  As far as "proceeds," they stay within the

23   system for 24 hours.

24   Q.  And based on the information that you just provided, are

25   you able to determine that this did in fact change to a

CHAMBERED CUSTOM FIREARMS-000103

JASON FERN - DIRECT EXAMINATION                47

1    "proceed" at some point?

2    A.  Yes.

3    Q.  Is that because if it was a denied, it would still be in

4    the system, and if it was still on delay, it would still be in

5    the system?

6    A.  Deny, yes.  Delay, we can't say considering the date that

7    took place.

8    Q.  Other than the transfer to Mr. Ridley, had Chambered Group

9    previously been cited by the ATF for transferring a firearm

10   before three full business days had expired or when the results

11   of a NICS check were delayed?

12   A.  No.

13   Q.  Is Chambered Group plainly indifferent to the requirement

14   that it wait three full business days when the results of a

15   NICS check remains as delayed?

16   A.  No.

17           (Cell phone rings.)

18           THE COURT:  Let's stop for a minute.  Can everyone

19   pull out your cell phone.  Look at your cell phone.  Make sure

20   that your cell phone will not ring while we are on the record

21   trying to resolve this issue.

22           Again, there's a sign outside of the courtroom that

23   indicates, please make sure that your cell phone doesn't

24   interfere with the hearing.

25           Mr. Allan, my apologies that you were interrupted like

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000104

JASON FERN - DIRECT EXAMINATION    48

1    that.  Go ahead.

2            Mr. Capps, did you have an objection?

3            MR. CAPPS:  I did, Your Honor.  It was pretty quick on

4    the answer.

5            THE COURT:  Okay.  Any time you have an objection,

6    just stand up and say, "Objection," and then we'll stop.  What

7    would be your objection?

8            MR. CAPPS:  It was an objection to the grounds of

9    calls for a legal conclusion when the witness was asked whether

10   he was plainly indifferent.

11           THE COURT:  This Court will not take into

12   consideration that response.  The objection is sustained.

13   BY MR. ALLAN:

14   Q.  Mr. Fern, are you aware of the obligations that the Gun

15   Control Act generally places on Chambered Group and its

16   employees?

17   A.  Yes.

18   Q.  Do you do your best to comply with those obligations?

19   A.  Yes.

20   Q.  Do you disregard those obligations?

21   A.  No.

22   Q.  If you were aware of an error and you see it, do you make

23   sure that it is corrected before a transfer is completed?

24   A.  Yes.

25   Q.  Based on your testimony today, is it your position that

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000105

JASON FERN – DIRECT EXAMINATION                    49

1    when the firearm was transferred to Mr. Ridley, NICS had

2    actually instructed you to proceed with the transaction and it

3    was no longer on delay?

4    A.  Yes.

5    Q.  Did you testify during the April 13th, 2023 hearing before

6    DIO Kristina Babcock?

7    A.  Yes.

8    Q.  And during your testimony, did you explain that the NICS

9    result from Mr. Ridley would have changed to a "proceed" before

10   the firearm was transferred, based on your policies and

11   procedures?

12   A.  No.

13   Q.  Was Chambered Group represented by an attorney during that

14   hearing?

15   A.  We were not.

16   Q.  And who represented Chambered Group during that hearing?

17   A.  John Clark, he is an FFL consultant.

18   Q.  And what does that mean?

19   A.  He is not an attorney.  He just advises us in the course of

20   actions taking place in the hearing.

21   Q.  During the hearing, did he tell you that Aaron Swank had

22   been the seller with regard to the firearm transferred to

23   Mr. Ridley?

24   A.  Yes.

25   Q.  And asked what happened with regard to Mr. Swank?

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000106

JASON FERN - DIRECT EXAMINATION    50

1    A.  Yes.

2    Q.  Based on your testimony today, Mr. Swank assisted

3    Mr. Ridley on April 17th, 2021 when he first came in to

4    purchase the firearm and got a delay, but you would have

5    assisted him on April 20th of 2021 when he returned to pick up

6    the firearm; is that correct?

7    A.  Yes.

8    Q.  Based on your standard practices and procedures, before you

9    transferred the firearm to Mr. Ridley, would you have checked

10   the NICS results?

11   A.  Yes.

12   Q.  And when you testified during the administrative hearing

13   before the ATF with regard to Mr. Swank's medical issues, did

14   they actually have any relevance to the transfer to Mr. Ridley

15   on April 20th of 2021?

16   A.  No.

17   Q.  Did Chambered Group terminate Mr. Swank prior to the

18   April 13th, 2023 hearing before the ATF?

19   A.  Yes.

20   Q.  And why was that done?

21   A.  We were advised by John Clark's office to do so.

22   Q.  Were any other employees terminated?

23   A.  Jason Lamontagne.

24   Q.  And why were they terminated?

25   A.  Since they didn't meet the protocol of the process, John's

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000107

1    process on that was to just terminate since we didn't have a

2    good audit.

3    Q.   Okay.  So he basically instructed you that if anybody had

4    an error on the form, terminate them?

5    A.   Correct.

6    Q.   What subsequently happened with those employees?

7    A.   Considering the time frame, we had to rehire them several

8    weeks later just for the fact that trying to bring on a new

9    person, retrain would have potentially resulted in more errors.

10         Since they were already -- already have an

11   understanding of how to handle a 4473, it was a lot easier to

12   train them up on the errors that were caused during the audit.

13   Q.   Okay.  And looking at the top right-hand corner of Exhibit

14   Number 3, there's a box that lists transferors, sellers,

15   transaction serial number, if any.  Would you please identify

16   the number in that box?

17   A.   Yeah, it's 12,554, I believe.

18   Q.   And what is the significance of that number?

19   A.   That's an internal number, that's for us so when we ever

20   have to locate a firearm due to a trace check, it allows us to

21   find that item a lot faster.  And this one here, it shows that

22   we have processed over 11,000 forms.

23   Q.   So in other words, at the time of this alleged violation,

24   you had processed 11,000 forms without ever having an error

25   with regard to transferring on a NICS delay?

CHAMBERED CUSTOM FIREARMS-000108

1  A.  Yes.

2  Q.  And it's your position that in fact you have never had an

3  error in transferring on a NICS delay; is that correct?

4  A.  Correct.

5  Q.  With regard to the employees that completed 4473 forms that

6  had violations, do you believe that any of those employees

7  intentionally made the errors on the forms?

8  A.  No.

9  Q.  Do you believe that any of them noticed the errors on the

10  forms before the firearm was transferred and transferred them

11  anyway?

12  A.  No.

13  Q.  Do you believe that all those employees take their

14  obligations under the Gun Control Act to comply with all

15  firearm regulations seriously?

16  A.  Yes.

17  Q.  We are going to mark what's been marked as Exhibit Number 1

18  to be appearing on your screen.  That has really nothing to do

19  with Exhibit Number 1, but it has the mark on it?

20         Would you please take a look at Exhibit Number 1 and

21  identify what it is for the record?

22  A.  It's a Final Notice of Denial of Application, Revocation,

23  Suspension, and/or Fine of Firearms License.

24  Q.  Okay.  And did you review a copy of that?

25  A.  Yes.

CHAMBERED CUSTOM FIREARMS-000109

1    Q.  And did you receive -- review the section in paragraph 7 on

2    page 5?  And if you give us a second, we'll put it up for you.

3    Just take a look at that and let me know when you are ready.

4    A.  Required to read it?

5    Q.  You can read it to yourself unless it's familiar with you

6    at the moment already?

7    A.  So it's stating that the intentions that we had were

8    willful violations.

9    Q.  Is the description of how that transfer was -- had occurred

10   in paragraph 7 accurate?

11   A.  No.

12   Q.  Okay.  Did you contact the ATF at any point to advise that

13   that information was not accurate?

14   A.  I was unaware we could.

15   Q.  Okay.  The second and third categories of the violations

16   identified on the report of violations relate to errors in

17   Chambered Group's A&D records.  Can you just give a very brief

18   overview of what an A&D record is?

19   A.  Acquisition and disposition, so it's in the form of when

20   firearms come into our state of address, including your NFA

21   items, it's where we log our serial numbers in.  And then once

22   said serial number are sold to an individual to where they are

23   now disposed.

24   Q.  Okay.  And is that a record that you are required to

25   maintain pursuant to the Gun Control Act?

CHAMBERED CUSTOM FIREARMS-000110

1    A.  Yes.

2    Q.  And can you just briefly go over -- you discussed this a

3    bit before, so just very briefly, explain Chambered Group's

4    policies and procedures during the period from April 2021 to

5    April 2022, for entering information in the A&D records?

6    A.  When firearms actually come in through shipment, so we

7    receive them through multiple boxes.  We go through, we pull

8    them out.  We verify the serial numbers are actually on there,

9    log them in, scan them into our system.

10   Q.  Let me stop you for a second.  Can you explain what you

11   mean by scan them into your system?

12   A.  It's a bar code scanner that we have.  All of the

13   serialized items that do come into the store have a bar code.

14   It makes it a lot easier for us to scan.  We scan, verify the

15   serial number, enter into the A&D book.

16   Q.  Okay.  Does the bar code have any information other than

17   the serial number on it?

18   A.  No.  I mean, it varies.  Sometimes it doesn't tell the

19   difference between a UPC code or a serial number or a SKU

20   number.

21   Q.  Okay.  Let me rephrase that.  Are there more than one bar

22   code on the box of firearm?

23   A.  Oh, yes, yes.

24   Q.  When you scan -- when you enter it into your A&D records,

25   you attempt to scan the bar code that corresponds to the serial

CHAMBERED CUSTOM FIREARMS-000111

1   number, correct?

2   A.  Yes.

3   Q.  If you make a mistake and scan the UPC code, will that be

4   entered into the serial number field?

5   A.  It can.

6   Q.  And since we're talking about scanning these in, are you

7   using software as opposed to paper records for your A&D

8   records?

9   A.  We are using an electronic A&D book.

10  Q.  And how -- what is the name of that software?

11  A.  At that point in time we were using EZ FFL.

12  Q.  And you use a bar code scanner to enter the information

13  into it, correct?

14  A.  Correct.

15  Q.  Does the -- I'm sorry, what was the name of the A&D

16  software again?

17  A.  EZ FFL.

18  Q.  And does the EZ FFL have any way to determine whether the

19  numbers that were entered are a serial number or a UPC code?

20  A.  It does not.

21  Q.  Okay.  Are there any -- is there a standard format for

22  which firearms manufacturers use for their serial numbers?

23  A.  There isn't.

24  Q.  Prior to transferring a firearm to a customer, is the

25  physical serial number on the firearm always compared against

CHAMBERED CUSTOM FIREARMS-000112

1    the 4473?

2    A.   Yes.  Before the item actually leaves the store, we verify

3    the serial number that is on the outside of the box to the

4    serial number that is actually on the item itself.

5    Q.   Okay.  And what would happen if in a situation like that

6    you identified an error in the A&D records, for example, the

7    serial number being a UPC code or a SKU number or some other

8    sort of number?

9    A.   We make the correction.

10   Q.   Okay.  Did Chambered Group intentionally enter incorrect

11   information into its A&D records on any occasion cited in the

12   report of violations?

13   A.   No.

14   Q.   Did Chambered Group prior to the information being pointed

15   out by IOI Crubaugh notice that that information was incorrect

16   and decided not to correct it?

17   A.   No.

18   Q.   Is Chambered Group aware of its obligations under the Gun

19   Control Act to maintain complete and accurate A&D records?

20   A.   Yes.

21   Q.   And does Chambered Group do -- use the best efforts that it

22   has to comply with those obligations?

23   A.   Yes.

24   Q.   Some of the firearms in inventory during the compliance

25   inspection had not been entered into the A&D records.  Can you

CHAMBERED CUSTOM FIREARMS-000113

1    please explain how that might have happened?

2    A.  Again, when we receive shipments, especially at that point

3    in time, with the amount of firearms that we were selling, we

4    would get boxes, so there was a lot of times, it's just

5    stacking up the firearms itself, and then we're just going

6    through and scanning.

7            There's a lot of times when you are scanning you're

8    thinking that we've hit the ones that we've hit.  Usually

9    there's one individual that does that so we can minimize the

10   amount of errors we possibly can.

11           But when there's one person checking in, questions

12   being asked, there's some times that we miss it.  But we then

13   catch those errors later on when we realize it's not in the

14   system.

15   Q.  Okay.  And during this period of time, were you actually

16   also receiving more firearms into inventory than normal?

17   A.  Yes.

18   Q.  Okay.  Now, what would happen if a customer sought to

19   purchase a firearm that had not been entered into the A&D

20   records?

21   A.  It would show because we are able to cross-reference them

22   on the 4473 and when we actually log it into our electronic

23   point of sale system.

24   Q.  Okay.  So in other words, you would see that it wasn't

25   entered and make the entry at that time?

CHAMBERED CUSTOM FIREARMS-000114

1    A.  Correct.

2    Q.  Did Chambered Group intentionally not enter information on

3    any firearms into its A&D records?

4    A.  No.

5    Q.  Did Chambered Group realize that it had certain firearms on

6    premises that it had not entered into its A&D records and not

7    add that information?

8    A.  No.

9    Q.  And -- I'll skip that.

10            Now, some of the firearms that Chambered Group had

11   sold during the compliance inspection had not been entered into

12   its A&D records as dispositions.  In other words, looking at

13   the records, it would appear that they were still on the

14   premises.  Can you explain what happened in those instances?

15   A.  From my understanding that was just a few times that it

16   happened, and typically, I think at that point in time, if it

17   is the event that I'm recalling, it was in our disposition log,

18   one of the "denied" records got into our disposition log, so we

19   disposed of the firearm, but then when we later went to sell

20   said firearm, we realized that it was no longer in our

21   disposition book, so then we had to re-add it back into our

22   acquisition book and then dispose of it properly.

23   Q.  And did you also have some firearms that had in fact been

24   disposed of and transferred to a customer that were still open

25   in the acquisition and disposition records?

CHAMBERED CUSTOM FIREARMS-000115

1    A.  Yes.

2    Q.  Okay.  And can you explain how that would have happened?

3    A.  Typically it would have done with the gunsmithing log that

4    we would have.  For whatever reason, our disposition book would

5    show that it was either a pending or an open status, but when

6    you went directly to just the disposition record by itself, it

7    did show that it was disposed.

8    Q.  Okay.  For the ones that were -- when you complete a 4473

9    form, what has to be done at that point to log the firearm out

10   of your A&D records?

11   A.  Can you repeat the question again?

12   Q.  Yes.  When you complete an A&D record -- I'm sorry, a 4473

13   form and you transfer a firearm to a customer, he pays for it

14   at the cash register and leaves the store with it, what has to

15   be done to log that firearm out of the A&D record?

16   A.  We have to go directly to the A&D book, and then find that

17   serial number directly, the item, and then that's how it's

18   disposed out of the --

19   Q.  So that's a separate step you need to take, it's not done

20   automatically, correct?

21   A.  Correct.

22   Q.  Did Chambered Group intentionally not enter information on

23   its A&D records for some of the firearms that it had

24   transferred?

25   A.  No.

CHAMBERED CUSTOM FIREARMS-000116

JASON FERN - DIRECT EXAMINATION                    60

1    Q.  Was Chambered Group aware that some of the firearms it had

2    transferred had not been logged out of its A&D --

3           THE COURT:  Okay.  Mr. Allan, you are starting to

4    speed read again.

5           MR. ALLAN:  Apologies, Your Honor.

6           THE COURT:  Can you just calm down or take a breath

7    every once in a while so we can keep up with you.

8           MR. ALLAN:  Yes.

9           THE COURT:  I take a lot of notes here.

10   BY MR. ALLAN:

11   Q.  Did Chambered Group realize that certain of the firearms

12   that it had transferred to customers had not been logged out of

13   the A&D records and not correct that error?

14   A.  No.

15   Q.  What did Chambered Group do when IOI Crubaugh informed it

16   of the errors that we've just discussed with regard to its A&D

17   records?

18   A.  We made the correction right on the spot.

19   Q.  And how were you able to make those corrections to the A&D

20   records?

21   A.  We're able to go into the book itself, show where the

22   actual item is, make a note in the system of what we actually

23   had or the error that took place, and then we make the

24   correction.

25   Q.  Okay.  For the ones that had not been entered, are you able

UNITED STATES DISTRICT COURT

1    to enter that information based on sales, invoices, and the

2    physical firearm there?

3    A.  Yes.

4    Q.  And the ones that had been disposed, are you able to enter

5    that information based on the information in the 4473 form?

6    A.  Yes.

7    Q.  Okay.  Were there any errors in the A&D records that were

8    not corrected during the course of the compliance inspection

9    itself?

10   A.  No.

11   Q.  Okay.  So all of the errors in the A&D records were

12   corrected before you had the closing conference and received

13   the report of violations, correct?

14   A.  Correct.

15   Q.  The remaining errors cited in the report of violations

16   relate to entries on the 4473 forms that were either incorrect

17   or incomplete.

18          Can you please describe Chambered Group's policies and

19   procedures for completing a 4473 form during the period covered

20   by the compliance inspection, which was from April 2021 through

21   April 2022?

22   A.  The process of reviewing the form?

23   Q.  The process of having a customer complete the form and

24   review the form.

25   A.  Yeah.  So as far as when the customer comes in, once they

UNITED STATES DISTRICT COURT

1    decide on the firearm that they intend on purchasing, 4473 is

2    then provided.  We then ask for the proper credentials that is

3    required to complete a NICS form -- or sorry, 4473 form.

4            Once the customer is in, we then review the form, make

5    sure that the information matches up on the provided

6    credentials.  Then from there we are now going over to NICS, if

7    a NICS is required.

8            We fill out the information required to NICS.  Once we

9    receive response back from NICS, then we go accordingly.

10   Q.  Okay.  Is this a paper form?

11   A.  Yes.

12   Q.  Okay.  Is certain of the information completed by Chambered

13   Group and certain of the information completed by the customer?

14   A.  Yes.

15   Q.  Okay.  We've marked a document as Exhibit Number 16.  I am

16   just going to use this as a general exemplar of a 4473 form.

17   If you see Section A across the top, who completes that?

18   A.  We do, the FFL does.

19   Q.  Okay.  And then you see below that Section B, who completes

20   that section?

21   A.  The customer.

22   Q.  Okay.  Then you'll see there's a Section C.  Who completes

23   that form, that section?

24   A.  Are you able to move the form down?

25   Q.  It's right by the redaction of the seller's signature above

1    category -- above item 24?

2          THE COURT:  Just point to it on the ELMO; it's in

3    evidence.  Just point to it

4          THE WITNESS:  Yeah, we fill that information out.

5    BY MR. ALLAN:

6    Q.  Okay.  And last page.  Point to Section D.  D.

7          Who completes Section D, if applicable?

8    A.  The customer does.

9    Q.  Okay.  And then below that there's a Section E.  Who

10   completes that?

11   A.  We do.  The FFL does.

12   Q.  Okay.  So this is a collaborative process in which the

13   certain sections required to be completed by the Chambered

14   Group employee and certain sections that are required to be

15   completed by the customer, correct?

16   A.  Yes.

17   Q.  During the period covered by the compliance inspection, did

18   Chambered Group sell more or less or about the same number of

19   firearms as during a typical year?

20   A.  Significantly more.

21   Q.  Can you explain what you mean by "significantly"?

22   A.  So prior to COVID taking place, as far as just kind of

23   general sales, it's the easiest way I can do the explanation

24   of, we would do anywhere from 2 to 4,000 of sales a day.

25         Once COVID and the pandemic hit, we were averaging

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000120

64

1   anywhere from 8 to 12 and even $15,000 days.

2   Q.  Did Chambered Group have more employees to assist it with

3   these increased sales during that period?

4   A.  No.

5   Q.  And what effect did the coronavirus pandemic have on

6   Chambered Group's staffing and ability to assist customers with

7   completing those 4473 forms?

8   A.  It was difficult.

9   Q.  Were you generally -- can you explain a little bit what you

10  mean by "it was difficult"?

11  A.  Due to the amount of sales and volume that we were actually

12  having within just the small footprint of our storefront, it

13  was making it hard to -- I shouldn't say "keep track" of the

14  individual customers, but we were doing what we can to make

15  sure we were being attentive to not only the 4473 but also the

16  customer itself.

17  Q.  And would you have multiple customers completing 4473 forms

18  at the same time?

19  A.  Yes.

20  Q.  And you testified earlier that you had a doorman and a line

21  of people outside the door, was this generally a very stressful

22  time in which people were, you know, wanting the customers to

23  hurry up and complete it so they could get their guns?

24  A.  Yes.

25  Q.  Can you get page 1 again?

CHAMBERED CUSTOM FIREARMS-000121

1          This is Exhibit Number 16.  Can you just identify it

2    for the record?

3    A.  Yes, it's a 4473.

4    Q.  And is it completed by a certain person?

5    A.  Yes, completed by the customer and an employee of the

6    store.

7    Q.  And what is the name of the customer in exhibit 9 -- in box

8    9?

9    A.  Mr. Nitz.

10   Q.  If you turn to page 2 of the 4473.  You will see that

11   question 21.1.1 is highlighted.  Can you please read question

12   21.1.1 and Mr. Nitz' response?

13   A.  Yes.

14          Are you an alien who has been admitted to the United

15   States under a nonimmigrant visa?

16   Q.  And what was the response?

17   A.  None was marked.

18   Q.  Can you please turn back to page 1?  Would you please

19   look -- take a look at question number 11 on page 1 of

20   Mr. Nitz' response.

21   A.  Birthplace is showing Phoenix, Arizona.

22   Q.  And would you please look at question 19 and Mr. Nitz'

23   response?

24   A.  Yes.  Check box marked as United States of America, country

25   of citizenship.

UNITED STATES DISTRICT COURT

1  Q.  And would you please take a look at question 21j and

2  Mr. Nitz' response.

3  A.  Have you ever renounced your United States citizenship.

4  Q.  What is his response?

5  A.  "No."

6  Q.  Based on the responses to questions 11, 19, and 21j, are

7  you able to determine whether or not Mr. Nitz was an alien

8  admitted to the U.S. under a nonimmigrant visa?

9  A.  Repeat the question again.

10  Q.  Yes.  Based on Mr. Nitz' responses on that 4473 form to

11  questions 11, 19, and 21j, are you able to determine whether or

12  not Mr. Nitz was an alien who was admitted to the United States

13  under a nonimmigrant visa?

14  A.  Yes.

15  Q.  And how were you able to determine that?

16  A.  Contingency within the form there showing that he was born

17  in the U.S. and then also showing he did not renounce his

18  citizenship.

19  Q.  Okay.  Just so clarify that, you are saying that he is not

20  an alien admitted to the United States under a nonimmigrant

21  visa, correct?

22  A.  Correct.

23  Q.  Okay.  Would you please identify Exhibit 17 for the record?

24  A.  It's a 4473.

25  Q.  Okay.  And who is the customer whose name is on that 4473?

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000123

1    A.  Mr. Dursteler.

2    Q.  And if you look on that, question 19 is highlighted.  Would

3    you please read question 19 and Mr. Dursteler's response?

4    A.  Country of citizenship.  But no box was marked.

5    Q.  And would you please read Mr. Dursteler's response to

6    question 11?

7    A.  Ogden, Utah.

8    Q.  And what is question 11?

9    A.  Place of birth, U.S. city and state.

10    Q.  Okay.  And would you please read question 21j of

11    Mr. Dursteler's response?

12    A.  Have you ever renounced your United States citizenship?

13    No.

14    Q.  Based on Mr. Dursteler's responses to questions 11 and 21j,

15    are you able to determine whether he is a United States

16    citizen?

17    A.  Yes.

18    Q.  Would you please review the -- 18.

19           Please review the document that's been marked as

20    Exhibit Number 18 and identify it for the record?

21    A.  Yes, it's a 4473.

22    Q.  And who is the customer whose name is on it?

23    A.  Mr. Zayas.

24    Q.  Question 6 is highlighted.  Would you please read question

25    number 6 and the response?

CHAMBERED CUSTOM FIREARMS-000124

1    A.  Total number of firearms to be transferred.

2    Q.  What is the response?

3    A.  None.  None provided.

4    Q.  Page 2.  And question number 24 is also highlighted.  Would

5    you please read question number 24 and the response?

6    A.  24 says, Category of firearm to be transferred, check all

7    that apply.

8    Q.  Okay.  Page 1.  What is the response on that, sorry?

9    A.  None was marked.

10   Q.  Okay.  Going back to page number 1, would you please review

11   the information in items 1 to 5 in Section A?

12   A.  Yes.  First question is stating the manufacturer is a

13   SilencerCo.  The model is an Omega 45K.  Serial number is

14   blanked out.  Type is a silencer.  Caliber is .45.

15   Q.  Okay.  Based on the information in that section, are you

16   able to determine how many firearms were transferred to

17   Mr. Zayas on April 3rd, 2021 that should have been listed in

18   response to question 6?

19   A.  Yes.

20   Q.  Are you able to identify the category of firearm that was

21   transferred to Mr. Zayas and should have been listed in

22   response to question number 24?

23   A.  Yes.

24   Q.  Are the errors identified in these three 4473 forms typical

25   of the errors cited in the report of violations?

CHAMBERED CUSTOM FIREARMS-000125

1    A.  Commonly, yes.

2    Q.  Did the employees of Chambered Group who completed the 4473

3    forms with those errors, to your knowledge, intentionally make

4    incomplete or incorrect entries on them?

5    A.  No.

6    Q.  Do you have any facts to suggest that the employees who

7    completed the 4473 forms with errors realized that there was

8    incorrect information or information that had not been

9    completed and still filed them away without having that

10   information corrected?

11        MR. CAPPS:  Your Honor, objection; calls for

12   speculation.  Foundation.

13        THE COURT:  Mr. Allan?

14        MR. ALLAN:  I can have him address it with his own and

15   go through the other employees if --

16        THE COURT:  Sustained on foundation and speculation.

17   I will not take into consideration the last question.

18        MR. ALLAN:  Okay.

19   BY MR. ALLAN:

20   Q.  With regard to any errors that you may have completed on a

21   4473 form cited, did you intentionally make the errors?

22   A.  No.

23   Q.  To your knowledge, did you notice any of those errors and

24   file them away without having the errors corrected?

25   A.  No.

CHAMBERED CUSTOM FIREARMS-000126

1    Q.  Based on your experience and your interactions with the

2    employees of Chambered Group, are the employees generally aware

3    of their obligations under the Gun Control Act?

4    A.  Yes.

5    Q.  Do they generally take those obligations seriously and do

6    what they can to ensure that they correctly and fully complete

7    4473 forms?

8           MR. CAPPS:  Your Honor, objection.  Again, calls for

9    speculation.

10          THE COURT:  That's sustained.  You can testify as to

11   what you do, but you can't generally comment on a group of

12   individuals.  Sustained.  I will not take into consideration

13   that last question.

14          Go ahead, please.

15   BY MR. ALLAN:

16   Q.  Can you explain why the errors that we discussed on those

17   4473 forms and the similar errors on the other 4473 forms cited

18   in the report of violations would have occurred?

19   A.  Just through the process of going through, answering the

20   questions for the customers while they are filling out the

21   4473, it's typically common to have a customer ask a question

22   when in the process of filling out the paperwork and then

23   mistakenly miss it.

24   Q.  During prior compliance inspections Chambered Group had

25   also been cited for having errors on the 4473 form such as

CHAMBERED CUSTOM FIREARMS-000127

1    having something blank or having something incorrect.  And it

2    still had errors during the last inspection in 2022; can you

3    explain why?

4    A.   We are human at the end of the day.  So the amount of forms

5    that you tend to process through, you are trying to make sure

6    that everything is, but eventually some forms just start to

7    blend in with other forms.  So we do what we can, the best we

8    can trying to get a second or third set of eyes on those forms

9    and make sure we are not making these mistakes.

10   Q.   Okay.  During the period covered by this compliance

11   inspection, were you able generally to have a second or third

12   set of eyes on these forms?

13   A.   Sometimes no.

14   Q.   Is that because of the coronavirus pandemic?

15   A.   Correct.

16   Q.   And the increased [sic] staffing?

17   A.   Correct.

18   Q.   Did you also have situations in which only one employee

19   would be working and completing forms?

20   A.   Yes.

21   Q.   And in a situation like that, there's no way to have a

22   second or third set, correct?

23   A.   Correct.

24   Q.   To your knowledge, is -- were any of those errors on the

25   4473 -- withdraw that.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000128

1    What changes has Chambered Group made since the 2022

2    compliance inspection?

3    A.  Considering the main one, the main violation that took

4    place, our policy that we had in place we thought was actually

5    good enough at the time, we've actually we'll say furthered the

6    process through now.

7    So if an individual is a "proceed," we print out the

8    NICS page saying that it has been proceeded.  We do mark in a

9    green highlighter on that page, as well as to the 4473 to

10   clearly indicate that it is a green, proceed to go.

11   Delays are marked as a highlighted mark.  We then

12   print out the NICS page stating on the Brady date and the

13   delay.  That goes into the 4473 until we receive the

14   appropriate response.

15   If it comes back as a deny or we receive a deny, at

16   that point in time we use a red highlighter to indicate that

17   this is a denied form.  That denied paperwork is also printed

18   out.  We tuck it in, and then that goes into a separate filing

19   for any future audits.

20   THE COURT:  All right.  It's 10:30 right now.  We will

21   take our morning recess until 10:45.  It's hot on the landing,

22   so I will allow the parties to stay in the courtroom.  However,

23   you can't come past the lectern there.  We have the marshals

24   monitoring the courtroom.

25   Also, these microphones are hot and they go back to

CHAMBERED CUSTOM FIREARMS-000129

```
 1    chambers, so be careful what you're saying while you're in the

 2    courtroom.

 3            Court is in recess until 10:45.

 4            (Recess taken at 10:30 a.m.; resumes at 10:48 a.m.)

 5            THE COURT:  This court will come to order.  All

 6    parties present when the court last closed are present again.

 7            Mr. Allan, please continue.

 8            MR. ALLAN:  Thank you, Your Honor.

 9            THE COURT:  You're welcome.

10    BY MR. ALLAN:

11    Q.  Mr. Fern, when we adjourned you were discussing, I believe,

12    a color-coding system you had adopted for the NICS results?

13    A.  Yes.

14    Q.  And you had addressed green for proceed and red for denied.

15    What are the -- any other colors that you used?

16    A.  Yellow we used for delays, just to signify that it is a

17    delay.  And then blue, when we don't receive a response from

18    NICS and the firearm is released after the Brady NICS date.  We

19    do indicate that it is blue so that way we know that was a

20    firearm that we never received a response back from NICS.

21    Q.  Okay.  And you're now keeping copies of those printouts?

22    A.  Correct.

23    Q.  So if there was a situation similar to like this occurred,

24    you would be able to provide concrete proof regarding whether

25    or not it had changed to a proceed in the interim within the
```

CHAMBERED CUSTOM FIREARMS-000130

1   three days on a delay?

2   A.   Correct.

3   Q.   Okay.  Has Chambered Group also retained a compliance

4   person?

5   A.   Yes.

6   Q.   And who is that?

7   A.   As of now, Jillian Harris.

8   Q.   And what is her role at Chambered Group?

9   A.   She's a sales associate, but her primary function at the

10  store right now is handling the A&D book.

11  Q.   And does she also have responsibility for reviewing 4473

12  forms?

13  A.   That she does.

14  Q.   There had been discussion, I believe, in response to the

15  closing conference and the prior reports of violations about

16  the potential adoption of the electronic 4473 software.  Can

17  you explain why Chambered Group did not previously adopt

18  electronic 4473 software?

19  A.   Current software at that point in time, or even prior to

20  that, none of the software was, we would say, we were confident

21  in using.  Any issues that would arise on our audit, if we had

22  to recall to the company that provided the electronic 4473 for

23  us, they would not back their product up.  So we didn't have

24  the confidence in it.

25         We also wanted to make sure that the electronic 4473

CHAMBERED CUSTOM FIREARMS-000131

1   actually coincided with the A&D book so that way it makes a

2   smoother process.

3   Q.  Okay.  So you are using, I believe FFL Boss for the A&D

4   software, and you wanted to make sure that whatever software

5   you used for the 4473s works with it?

6   A.  The EZ FFL.

7   Q.  Correct.

8   A.  Was the software, correct.

9   Q.  As of today, has Chambered Group adopted electronic 4473

10  software?

11  A.  We have not.

12  Q.  Have you located a provider that you are willing to use?

13  A.  We have.  We actually have one that's actually in process

14  right now.  So we switched over to a new A&D book that has

15  better software, but as well as backup in case we have any

16  questions that have any errors that occur with the 4473 itself,

17  that company is FastBound.  They provide electronic 4473.

18          We have already reached out to them and let them know

19  that we're in the process of wanting to switch over to

20  electronic.  That was all processed through May -- May, June.

21          THE COURT:  Just one moment, Mr. Allan.

22          Mr. Allan, go ahead, please.

23          MR. ALLAN:  Thank you, Your Honor.

24  BY MR. ALLAN:

25  Q.  Relative to the FastBound software that you described, do

CHAMBERED CUSTOM FIREARMS-000132

1    you have the physical hardware and everything necessary to

2    implement that?

3    A.  We do.

4    Q.  If the Court was to decide to stay the effective date of

5    your revocation of your FFL, are you ready -- are you able at

6    this point to pay the associated fees and begin using that

7    system today?

8    A.  Yes, correct.

9    Q.  In response to some of the prior inspections, there was a

10   discussion that Chambered Group made a representation that it

11   was going to start using the 4473 form software; is that

12   accurate?

13   A.  Prior to other inspections?

14   Q.  Yes, during earlier inspections.

15   A.  Yes, we made that comment that we'd be looking into

16   electronic 4473s.

17   Q.  And was that suggestions that the IOIs have made to you?

18   A.  Correct.

19   Q.  And was your response that you would look into it as

20   opposed to definitively stating that you would adopt it?

21   A.  Correct.

22   Q.  After the compliance inspections for Chambered Group, when

23   the IOI held a closing conference, did you attend each of those

24   on behalf of Chambered Group?

25   A.  Yes, I did.

CHAMBERED CUSTOM FIREARMS-000133

1   Q.  Okay.  And during each of those, had you seen the reports

2   of violations prior to the day on which the closing conference

3   was held?

4   A.  I did not.

5   Q.  Did the IOI require you to provide a response to each of

6   the violations identified on each report of violation

7   immediately then and there?

8   A.  Yes.

9   Q.  Were you given an opportunity to develop a reasoned

10  response to the violations?

11  A.  No.

12  Q.  Did you ever receive a copy of the report of violations

13  containing a column for the licensee's responses?

14  A.  I believe we did.

15  Q.  And when do you recall receiving -- do you recall receiving

16  that after the compliance inspections or as part of this ATF

17  revocation hearing?

18  A.  After the inspections.

19          MR. ALLAN:  And just to clarify one thing for the

20  record, Your Honor, on the exhibits we were showing for 16, 17,

21  and 18, where there was information highlighted, that was

22  information, my understanding, was highlighted by the ATF for

23  use during the revocation hearing not that had been highlighted

24  by the licensee at the time or noticed it or anything along

25  those lines?

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000134