1    THE COURT:  I appreciate that.  That leads me to a

2    question.  Just one moment.  Maybe the witness can answer the

3    question.

4        In your exhibits, Exhibit Number 1, there's a document

5    in there that is from the ATF, it's Form 5300.13.  On page

6    number 4, and I'll give you a chance to get to Exhibit Number

7    1, the entire exhibit, there's the background in terms of the

8    findings of fact, and if you look at page number 4, do you have

9    that yet, Mr. Allan?

10    MR. ALLAN:  Is that the one that has the conclusions

11    of law starting at the bottom?

12    THE COURT:  That is correct.  The -- where it has

13    conclusions of law number 2 that talks about, willful violation

14    is committed when the licensee knows of its legal obligations.

15        So in terms of the definition of willful, as it

16    relates to the ATF, the other three occasions when they visit,

17    met and conferred with the FFL and told them to make

18    corrections, do you know if your client received some type of

19    letter or anything that would tell them that in the future, if

20    you failed to make these corrections, we will consider this as

21    a willful violation and of course we can suspend your FFL?

22    MR. ALLAN:  Your Honor, when there is a warning letter

23    or a warning conference with a follow-up letter, they make

24    references -- a standard reference that future violations may

25    be considered willful and could result in the revocation of

CHAMBERED CUSTOM FIREARMS-000135

```
 1    your FFL, not that future violations automatically are
 2    considered willful.
 3              THE COURT:  Okay.  Thank you very much.
 4              MR. ALLAN:  Unless Your Honor has any further
 5    questions, I will pass the witness.
 6              THE COURT:  Cross-examination.
 7              (Pause.)
 8              THE COURT:  Do you have any cross-examination?
 9              MR. CAPPS:  I do, Your Honor.  Thank you very much.
10              THE COURT:  Can we start, please?  You have two
11    lawyers and we have had a direct examination for an hour, and
12    doesn't look like you are ready to go.
13              Do you need a break?  I mean, what do you need?
14              MR. CAPPS:  Ready to proceed, Your Honor.
15              THE COURT:  Let's go.
16              MR. CAPPS:  Thank you.
17                        CROSS-EXAMINATION
18    BY MR. CAPPS:
19    Q.  Mr. Fern, good morning.  Did you receive a letter from ATF
20    after the warning conference on January 31st, 2020?
21    A.  Not that I recall.
22              MR. CAPPS:  And Your Honor, if I could have permission
23    to display Exhibit 120?
24              THE COURT:  Hold on just one moment, if you would,
25    please.  Let me get to the defense -- I'm sorry -- Respondent's
```

CHAMBERED CUSTOM FIREARMS-000136

1    exhibit list.

2           Mr. Allan, I have Exhibits 101 through 123.  101

3    through 105 have all been stipulated to.  What are your

4    specific objections to the other ones, if any?

5           MR. ALLAN:  If you would give me one second, Your

6    Honor.

7           THE COURT:  Which exhibit were you talking about,

8    Mr. Capps?

9           MR. CAPPS:  120.

10          THE COURT:  Just one moment.  Has the Petitioner had a

11   chance to review all of the Respondent's exhibits?

12          MR. ALLAN:  Yes, Your Honor.

13          THE COURT:  What's your objection to 120?

14          MR. ALLAN:  First my objection is foundation on

15   authentication.  This is an ATF exhibit.  We don't have any ATF

16   witnesses to authenticate the documents.  We also --

17          THE COURT:  You told me an hour ago that you have done

18   a lot of cases dealing with FFLs.  Are you familiar with their

19   letterhead in this documentation?

20          MR. ALLAN:  I am, Your Honor.

21          THE COURT:  Is it consistent with what you have seen

22   in the past?

23          MR. ALLAN:  It is, Your Honor.

24          THE COURT:  It's received.  Go ahead and publish it.

25          (Exhibit Number 120 is admitted.)

CHAMBERED CUSTOM FIREARMS-000137

1    BY MR. CAPPS:

2    Q.  Mr. Fern, if you could please look on your screen, you'll

3    see displayed Exhibit 120.

4              THE CLERK:  Oh, on the computer?

5              MR. CAPPS:  VGA.

6    BY MR. CAPPS:

7    Q.  If you could take a moment, sir, and tell me if you

8    recognize this document?

9    A.  I do not.

10   Q.  Do you know who at Chambered Group would have received this

11   letter?

12   A.  If it's just standard to the store, that one I would not

13   know of.  We receive a lot of mailings.  The only thing that we

14   received as a -- to sign off on it, is just the revocation

15   notices.

16   Q.  Your testimony today, to be clear though, you did not --

17   you do not recall seeing this letter?

18   A.  I do not.

19   Q.  Okay.  You can take that down.

20              I want to go back momentarily to Petitioner's Exhibit

21   Number 3.  Do you recall the discussion you had with counsel

22   concerning this particular document and Mr. Ridley?

23   A.  Uh-huh.

24              THE COURT:  Sir, I need a yes or no, not an "uh-huh."

25              THE WITNESS:  Sorry, yes.

CHAMBERED CUSTOM FIREARMS-000138

1  BY MR. CAPPS:

2  Q.  Can Chambered Group show that it received a proceed from

3  NICS?

4  A.  For this document we cannot.

5  Q.  Based upon your review of the document, what date was the

6  firearm transferred?

7  A.  On the front page here, I can't tell.  I would need page 3.

8  Q.  Okay.

9  A.  So transfer date shows 4-20, 2021.

10  Q.  And the actual transfer date, to be consistent with 102A,

11  would be April 22, correct?

12  A.  What's the question?

13  Q.  Under the -- without a proceed from NICS, which you have

14  testified you can't demonstrate to us, the valid transfer date

15  could not have been prior to April 22, 2021, correct?

16  A.  Correct.

17  Q.  Thank you.  Quick question:  As to the color codes that you

18  were talking about, what date were those -- was that

19  implemented into your system?

20  A.  At the time and date of the audit that we had.

21  Q.  When was that?

22  A.  As far as the dates, I can't recall the dates.  It's the

23  time period that the audit took place.

24  Q.  After the revocation that's at issue in this case?

25  A.  Not after the revocation.  It was during the time of the

CHAMBERED CUSTOM FIREARMS-000139

```
1    audit.

2    Q.  Okay.  Sometime after the notice of initial intent to

3    revoke?

4    A.  Wasn't after, it was during the audit.

5    Q.  Okay.  You attended the revocation hearing, correct, sir?

6    A.  Correct.

7    Q.  And do you remember testifying at the revocation hearing

8    concerning Mr. Swank and his issues with pain and pain

9    medication and issues that had arisen at work and along those

10   lines?

11            MR. ALLAN:  Objection, Your Honor.

12            THE COURT:  What's your objection?

13            MR. ALLAN:  I don't believe there was any testimony

14   specifically regarding pain medication.

15            THE COURT:  Sustained.

16            MR. CAPPS:  Your Honor, I would like to go to the

17   transcript, which is Respondent's Exhibit Number 123.

18            THE COURT:  Okay.  I don't understand why you are

19   getting into an area about pain medication.  What's the

20   relevance of that?

21            MR. CAPPS:  The relevance is --

22            THE COURT:  Are you saying that they had employees

23   that the employer knew had some kind of issues with medication

24   would render them incompetent to serve as employees at a

25   firearms dealership?
```

UNITED STATES DISTRICT COURT

84

1          MR. CAPPS:  There was testimony from this witness,

2     Your Honor, that a portion of the description in paragraph 7 of

3     the final revocation notice was inaccurate when it described

4     past issues with regard to this employee and pain medication.

5          THE COURT:  So how do you get there?  Are you trying

6     to refresh his recollection of something?

7          MR. CAPPS:  If he doesn't recall it, yes, sir.

8          THE COURT:  Or are you trying to impeach him on

9     something, because it's something that doesn't exist in the

10    record because it wasn't gone into?

11         So what theory are you trying to approach with this

12    witness in showing him something about medication?

13         MR. CAPPS:  Testimony that he provided at the

14    revocation hearing.

15         THE COURT:  So you are trying to provide something to

16    impeach him as it relates to what he said at the hearing?

17         MR. CAPPS:  Something he said today.

18         THE COURT:  So you believe he was either lying at the

19    hearing or lying today?

20         MR. CAPPS:  I believe that it was a different

21    response, perhaps inaccurate or inconsistent.

22         THE COURT:  Mr. Allan?

23         MR. ALLAN:  Your Honor, the witness already testified

24    regarding his testimony regarding Mr. Swank and that he was in

25    error and was responding to a leading question by a consultant

UNITED STATES DISTRICT COURT

JASON FERN - CROSS-EXAMINATION                     85

1    who was assisting him during the hearing.

2          And relative to the issue with the pain medication,

3    the actual testimony talks about delays in being -- receiving

4    refills of prescribed medication which could result in pain.

5    The medication at issue is not a pain medication.

6          THE COURT:  Okay.  So how does the pain medication

7    issue, Mr. Capps, deal with the fact that we have these forms

8    that haven't been properly filled out?

9          MR. CAPPS:  Your Honor, this specific inquiry is only

10   with regard to one form, and that's the failure to wait three

11   days, the first willful violation under 102(a).

12         THE COURT:  I will allow it.  Go ahead.

13         MR. CAPPS:  What I would like to do is display --

14         THE COURT:  What's the exhibit again?

15         MR. CAPPS:  123.  This is the hearing transcript from

16   January -- excuse me -- from earlier this year, April 11th --

17   13th, 2022.

18         THE COURT:  Mr. Allan, do you have a copy of the

19   Exhibit 123, which is the final transcript in the case?

20         MR. ALLAN:  Yes, Your Honor.

21         THE COURT:  Do you have any objection to the Court

22   receiving 123?

23         MR. ALLAN:  We would object on the basis of hearsay

24   and the basis that all of the testimony during the ATF hearing

25   was unsworn.

UNITED STATES DISTRICT COURT

JASON FERN - CROSS-EXAMINATION                    86

```
 1            THE COURT:  Why was it unsworn?
 2            MR. CAPPS:  Your Honor, it is an informal -- it is not
 3    taken under oath.  And my response, if I may, concerning the
 4    place of this transcript, this is part of the administrative
 5    record.
 6            THE COURT:  It's received.  Go ahead.
 7            (Exhibit Number 123 is received.)
 8    BY MR. CAPPS:
 9    Q.  On page 106, I would like to direct your attention -- you
10    were answering a question from DIO Babcock beginning at line
11    13; do you have that in front of you?
12    A.  I do.
13    Q.  Take your time and read through, and then we'll carry it
14    over to the top of the next page.
15    A.  Read it out loud?
16    Q.  Read to it yourself, please.
17    A.  You can go to the next page.
18    Q.  Have you read line 1 there?
19    A.  Yes, correction was needed, yep.
20            THE COURT:  Okay, sir, I need you to move the
21    microphone down, it's a directional microphone, and speak up.
22    I can barely hear you so I know counsel can't hear you.
23            THE WITNESS:  Okay.
24            THE COURT:  Go ahead, please.
25
```

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000143

1  BY MR. CAPPS:

2  Q.  Mr. Fern, does that refresh your recollection concerning

3  what you told DIO Babcock during the revocation hearing

4  concerning employee Swank and this particular violation?

5  A.  It does a little bit.

6          THE COURT:  Okay.  Mr. Capps, this is not an exercise

7  in you taking four minutes to find every single question you

8  need to ask.  What I need you to do, if Mr. Torres has a list

9  of questions or issues to bring up he can come up and assist

10  you.  But at this pace we might be here until next February.

11          So I need you to make sure that you know what you are

12  going to ask.  This isn't a time where you sit there and try to

13  find something to ask.  Go ahead.

14          MR. CAPPS:  My apologies, Your Honor.  Understood.

15  BY MR. CAPPS:

16  Q.  Mr. Fern, do you recall when you attended the revocation

17  hearing IOI Crubaugh discussing how many forms were examined as

18  part of the April inspection?

19  A.  I believe over 1900 forms.

20  Q.  And do you recall approximately how many firearms were

21  involved in transactions and memorialized in those forms?

22  A.  I believe over 2,000.

23  Q.  You can take that down, thank you.

24          Prior to the compliance inspection in April of 2022,

25  Mr. Fern, had you ever received a report of violations from

CHAMBERED CUSTOM FIREARMS-000144

JASON FERN - CROSS-EXAMINATION                    88

1    ATF?

2    A.  I believe after the audit I think they sent an email format

3    of the violations that happened.

4    Q.  My question is a little bit different, sir.  And I'm sorry

5    it wasn't clear.

6          How many report of violations had you received in your

7    role at Chambered Group prior to 2022?

8    A.  Collectively?

9    Q.  Yes, sir.

10   A.  I do not know.

11   Q.  Do you recall receiving a report of violations in June of

12   2018?

13   A.  Considering that was over five years ago, I don't recall.

14   Q.  Do you recall receiving a report of violations in December

15   of 2019?

16   A.  Again, I don't recall.

17   Q.  Do you recall receiving a report of violations in March of

18   2021?

19   A.  I don't recall.

20         MR. CAPPS:  Your Honor, if we could display

21   Exhibit 116?

22         THE COURT:  Is there an objection, Mr. Allan?

23         MR. ALLAN:  Your Honor, we would just object to the

24   prior reports of violations based on authentication and

25   relevance.

CHAMBERED CUSTOM FIREARMS-000145

```
 1              THE COURT:  It's received.  You may publish.
 2    Objection overruled.
 3              (Exhibit Number 116 is admitted.)
 4              THE COURT:  Is that 116?
 5              MR. CAPPS:  116, yes, Your Honor.
 6    BY MR. CAPPS:
 7    Q.  You see the first page, Mr. Fern?
 8    A.  Yes.
 9    Q.  And let's go to the second page, please.
10              You see that as well?
11    A.  I do.
12    Q.  And let's go to the next page.
13              Do you recognize any signatures on this form, sir?
14    A.  Yes, my signature.
15    Q.  And what is the date next to your signature?
16    A.  Looks to be 6-6 of 2018.
17    Q.  Does this refresh your recollection as to receiving a
18    report of violations in June of 2018?
19    A.  A little.
20    Q.  Okay.  What was your understanding of the purpose of your
21    signature on this form, sir?
22    A.  To address the errors that we had within the audit.
23    Q.  And this particular form documents a total of eight
24    violations; does it not?
25    A.  It does.
```

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000146

```
 1              THE COURT:  Just one moment, Mr. Allan [sic].

 2              Mr. Capps, go ahead, please.  My apologies.

 3              MR. CAPPS:  Thank you, Your Honor.

 4    BY MR. CAPPS:

 5    Q.  If we could publish Exhibit Number 118?

 6              THE COURT:  118 hasn't been received yet.  I think 116

 7    has been received.

 8              MR. CAPPS:  I'm sorry, Your Honor.

 9              THE COURT:  What's the objection to 118?

10              MR. ALLAN:  Your Honor, the objection to all of the

11    reports of violations were identical.

12              THE COURT:  You said it so fast I have no idea what

13    you said.

14              MR. ALLAN:  Our objections to all of the reports of

15    violations were identical, and I understand you'll be

16    overruling them.

17              THE COURT:  Okay.  What we're going to do, Mr. Capps,

18    the -- all of the items, 101 through 111, 112 through 115, 117

19    through 119, and 121 and 122, are they all basically the same

20    line of questioning and concerns as --

21              MR. CAPPS:  Yes, Your Honor.

22              THE COURT:  -- based on the record at 116 and 120?

23              MR. CAPPS:  Yes, Your Honor.  All those documents

24    relate to pre-April 2022 notice to ATF of issues cited going to

25    their knowledge.
```

CHAMBERED CUSTOM FIREARMS-000147

1          THE COURT:  The Petitioner's objections are noted for

2     the record.  101 through 123 are all received into evidence.

3          (Exhibit Numbers 101 through 123 are admitted.)

4          THE COURT:  When you publish the items, just let me

5     know what you are publishing so we can keep track of what's

6     going on.

7          MR. CAPPS:  Thank you.

8          THE COURT:  You are very welcome.

9          MR. CAPPS:  If we could publish 118, please.

10    BY MR. CAPPS:

11    Q.  And I want to refer the witness specifically to the third

12    page to start.

13          Mr. Fern, do you recognize your signature on this

14    page?

15    A.  It's partially cut out, but it looks to be mine.

16    Q.  Going back to the very first page of this to give you

17    context, this is a report of violations dated December 19th,

18    2019, correct?

19    A.  Correct.

20    Q.  And let's go back to your signature.  What was your

21    understanding, sir, of the purpose and what you were

22    acknowledging when you signed this document for Chambered

23    Group?

24    A.  The errors that took place during the audit.

25    Q.  And if you could also -- strike that.

CHAMBERED CUSTOM FIREARMS-000148

1          Did you also understand by signing this that you
2    understood that it was just a general overview of the
3    violations in the document and that you would be responsible
4    for familiarizing yourself with all of the laws and regulations
5    governing the license of Chambered Group?
6    A.  If it was described to me at that time I believe it would
7    be the case.
8    Q.  Well, sir, look at page 3.  What's the exact language above
9    your signature?  You can read it out loud or you can read it to
10   yourself.
11   A.  It is to what you stated.
12   Q.  Thank you.  I would like to publish Exhibit 121.  If we
13   could go to the second page to start, please.  Thank you.
14          Mr. Fern, do you recognize your signature on this
15   page?
16   A.  It looks to be mine.
17   Q.  And on the first page for context, this is a report of
18   violations issued to Chambered Group on or about March 1, 2021,
19   correct?
20   A.  Correct.
21   Q.  How many total violations cited in this ROV?
22   A.  Four.
23   Q.  And when you signed your name on behalf of Chambered Group
24   on page 2 of Exhibit 121, what was your understanding as to the
25   intent and import of what you were verifying when you signed

CHAMBERED CUSTOM FIREARMS-000149

1    it?

2    A.  The errors that took place during the audit.

3    Q.  Did you also, in signing it, understood that you received a

4    copy for the records and that you understood it was only a

5    general overview of the violations and that you would be

6    responsible for familiarizing yourself with all of the laws and

7    regulations governing Chambered Group?

8    A.  Yes.

9    Q.  Let's go to -- let's go to Exhibit 117, please.

10           Now, after you receive report of violations and you

11   caucus with the IOI, do you typically have an opportunity to

12   interact and to give a response on behalf of Chambered to the

13   IOI?

14   A.  We do have a chance to talk with them.

15   Q.  And with respect to the responses which are before you in

16   Exhibit 117, after the -- or pertaining to the 2018 ROV, do you

17   remember advising the IOI in that instance that Chambered

18   intended to implement a secondary review of the A&D book?

19   A.  I do not recall.

20   Q.  Do you have any reason to doubt the statement in this

21   document before you that the licensee stated he will implement

22   a secondary review of the A&D book?

23   A.  I do not.

24   Q.  Do you have any reason to doubt the entry halfway down that

25   page that the licensee will implement a secondary review of all

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000150

1  ATF Forms 4473 prior to the transfer of the firearm and prior

2  to filing ATF Forms 4473?

3  A.  I do not.

4  Q.  Let's go to Exhibit 119, please.  For the record, this is a

5  licensee response to violations report date generated

6  December 19, 2019.

7       Mr. Fern, do you see on the far right column under the

8  heading, "licensee response"?

9  A.  It's small.  It's hard to read.

10  Q.  Let's --

11       MR. CAPPS:  If you can't read it, Your Honor, I can

12  put this particular document up on the ELMO, but I do need to

13  have them --

14       THE COURT:  I can actually see it over here.  It is

15  very difficult, but --

16       MR. CAPPS:  Let's be fair and let him see it, with

17  your permission, sir?

18       THE COURT:  Sure.

19       MR. CAPPS:  Can we switch over?

20       THE CLERK:  Yes.

21       MR. CAPPS:  Thank you.  This is a working copy.  I

22  have a handwritten 119.

23       THE COURT:  That's fine.  As long as it's just the

24  exhibit number and not your personal notes.  The controls are

25  on the ELMO, not the screen.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000151

1          MR. CAPPS:  I'm sorry.  I am one step ahead of myself

2    here.

3    BY MR. CAPPS:

4    Q.  Mr. Fern, is that easier for you to read, the far right

5    column, "licensee response"?

6    A.  It is.

7    Q.  And what did you -- what is the represented licensee

8    response to each of these violations?

9    A.  It stated that we're moving to an electronic 4473.

10   Q.  What else does it state?

11   A.  That we perform another in-house audit after the sale, also

12   engage in additional employee training to prevent and identify

13   errors.

14   Q.  Turning --

15          MR. CAPPS:  Permission to publish 122, Your Honor?

16          THE COURT:  You may.

17   BY MR. CAPPS:

18   Q.  Can you read the licensee response in the far right column?

19   A.  "Licensee stated that they will try to do their best to

20   conduct a second review of all documents.  This has been an

21   extremely busy year, could not keep up with the foot traffic."

22   Q.  And that was the same response to all of those violations?

23   A.  Correct.

24   Q.  Are you familiar with a form, an ATF form titled,

25   "Acknowledgment of Federal Firearms Regulations"?

CHAMBERED CUSTOM FIREARMS-000152

JASON FERN - CROSS-EXAMINATION    96

1    A.  I am not.

2          MR. CAPPS:  Your Honor, for the record, publishing

3    Exhibit 113.

4          THE COURT:  Thank you.

5    BY MR. CAPPS:

6    Q.  That's the first page, Mr. Fern.  And just for context,

7    it's a two-page document.  I am going to put on the second

8    page.  Do you see that?

9    A.  Yes.

10   Q.  Do you recognize this form?

11   A.  I do not.

12   Q.  Do you recognize any signatures on this form?

13   A.  Yes, my signature.

14   Q.  And what is your understanding of -- as to what you were --

15   as to the import of your signature on this document, sir?  What

16   is the language directly above your signature?

17   A.  This is a general overview of the regulations, and that I

18   will be responsible for familiarizing myself with the laws,

19   regulations governing licensed firearms business.

20   Q.  That what's you signed June 6th, 2018, correct?

21   A.  Correct.

22          MR. CAPPS:  For the record, publishing Exhibit 114.

23   BY MR. CAPPS:

24   Q.  I'm going to momentarily pause here.  You can see the

25   title, Acknowledgment of Federal Firearms Regulations; do you

UNITED STATES DISTRICT COURT

1    see that, sir?

2    A.  I do.

3    Q.  I'm going to flip to the last page of Exhibit 114.  Do you

4    recognize your signature on that page?

5    A.  It appears to be mine.

6    Q.  And what is the language, underneath the heading

7    "Acknowledgment and signature" where you signed?

8    A.  My signature below certifies on this date, December 19th,

9    2019, that the above information to me answered my questions

10   regarding this information.  I understand I will receive a copy

11   of this for my records.  I understand this is only a general

12   overview of regulations, and I will be responsible for

13   familiarizing myself with laws, regulations governing my

14   licensed business.

15   Q.  And you signed this on December 19th, 2019, correct?

16   A.  That looks to be the case.

17        MR. CAPPS:  Publishing Exhibit 115, Your Honor.

18   BY MR. CAPPS:

19   Q.  Mr. Fern, again, I am going to pause momentarily on the top

20   of the first page, the title, Acknowledgment of Federal

21   Firearms Regulations; did I read that correctly?

22   A.  Yes.

23        MR. ALLAN:  Your Honor, we would just object briefly.

24   There has been no testimony by the witness that they were not

25   aware of any Federal Firearms Laws and Regulations; rather that

CHAMBERED CUSTOM FIREARMS-000154

1    the errors happened, not that they did not know of their

2    obligations.

3             THE COURT:  Mr. Capps, is there anything you would

4    like to place on the record as it relates to Mr. Allan?

5             MR. CAPPS:  Only, Your Honor, that this is all

6    relevant for -- to knowledge and therefore to willfulness.

7    It's relevant, should be admissible.

8             THE COURT:  So is it your intent to continue to go

9    through the documents, have the witness acknowledge that he

10   doesn't recall, and then show me that on the last page he

11   signed the document saying he did receive it?

12            MR. CAPPS:  Yes, Your Honor.

13            THE COURT:  Mr. Allan, by you standing moments ago,

14   are you acknowledging that these will be the responses from

15   your witness?

16            MR. ALLAN:  Your Honor, I have every reason to believe

17   the responses will be identical.

18            THE COURT:  Okay.  Is there any way we can just move

19   on, Mr. Capps?  There's no jury here, so I get it.  I mean,

20   he's going to say "I don't recall," but he signed off on all

21   these different things at different dates.

22            MR. CAPPS:  Yes, Your Honor.  There's only one more I

23   intended to show with the same line of questioning dated from

24   2014.

25            THE COURT:  Go ahead, then.

CHAMBERED CUSTOM FIREARMS-000155

1        MR. CAPPS:  Okay.  Publishing Exhibit 112.

2   BY MR. CAPPS:

3   Q.  Mr. Fern, this is an Acknowledgment of Federal Firearms

4   Regulations form, do you see that?

5   A.  I do.

6   Q.  And flipping to page 2, is your signature, does that --

7   does your signature appear on that document?

8   A.  It does.

9   Q.  Does it appear with someone else signing on behalf of

10  Chambered Group as well?

11  A.  It does.

12  Q.  And do you know -- do you recognize that signature?

13  A.  That appears to be my original business partner Cole Kelly.

14  Q.  What is the date of your signature, sir?

15  A.  11-13 of 2014.

16  Q.  And by signing this document on that date, did you

17  understand that the document presented only a general overview

18  of the regulations that you would be responsible for

19  familiarizing yourself with?

20  A.  Considering the time frame, I don't recall.

21  Q.  That is your signature on this page, though, correct?

22  A.  Yes.

23  Q.  Mr. Fern, were any of the violations cited in 2022 repeat

24  violations of prior ROVs?

25  A.  Some of those violations may have.

UNITED STATES DISTRICT COURT

1    Q.  Are you able to tell without looking at anything, how many

2    were repeat violations as opposed to non-repeat?

3    A.  I cannot tell.

4    Q.  Okay.

5            MR. CAPPS:  Your Honor, if I could have just one

6    moment?

7            THE COURT:  Sure.

8            MR. CAPPS:  Thank you.

9            I appreciate your patience, Your Honor.  I have no

10   further questions.

11           THE COURT:  Thank you very much, Mr. Capps.

12           Mr. Allan, do you have any redirect?

13           MR. ALLAN:  Yes, Your Honor.

14           THE COURT:  Come on up, please.

15                   REDIRECT EXAMINATION

16   BY MR. ALLAN:

17   Q.  Mr. Fern, on cross-examination you were asked several times

18   about the Acknowledgment of Federal Firearms Regulations and

19   your acknowledgment of what is required by federal law; do you

20   recall that testimony?

21   A.  I do.

22   Q.  Is it your position that you and Chambered Group were not

23   aware of what your obligations are under the Gun Control Act

24   relative to completion of 4473 forms?

25   A.  You asking we were not aware?

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000157

1    Q.  That you were not aware.

2    A.  Right.

3    Q.  Is it your position that you were aware of your --

4    Chambered Group's obligations under the Gun Control Act

5    relative to requirements for completing acquisition and

6    disposition records?

7    A.  Yes.

8    Q.  Is it your position that Chambered Group is aware of

9    requirements for transferring firearms after a NICS check if

10   that results in a delay of either waiting until a proceed is

11   received or three full business days have expired?

12   A.  Yes.

13   Q.  Is it your position that despite your knowledge of what is

14   required by the Gun Control Act, certain errors happened as a

15   result of simply human errors or mistakes?

16   A.  Correct.

17   Q.  On cross you stated that you could not prove that the

18   transfer to Mr. Ridley had resulted in a NICS proceed before

19   the transfer was made; do you recall that testimony?

20   A.  Correct.

21   Q.  You did testify, however, on direct that you can review a

22   NICS log or something to that effect; is that correct?

23   A.  Correct.

24   Q.  By looking at the NICS log, can you determine whether or

25   not the NTN for the NICS check performed on Mr. Ridley resulted

CHAMBERED CUSTOM FIREARMS-000158

1    in a denial?

2    A.   It did not.

3    Q.   If that was still in delayed status, would it still appear

4    as delayed on your NICS list?

5    A.   After 30 days it goes away from our NICS list.  But from my

6    understanding, what I was told directly from NICS, it stays in

7    the system for 88 days.

8    Q.   Okay.  And if it had -- obviously if it didn't -- if it had

9    not turned to a deny, at some point it would have been still on

10   delay after three full business days and could have been

11   transferred, correct?

12   A.   Correct.

13   Q.   Based on the policies and procedures adopted by Chamber

14   Custom Firearms, are you able to definitively testify that the

15   customer would not have been called to come up in and pick up

16   the firearm unless the NICS check had turned to "proceed"

17   during the waiting period?

18   A.   Correct.

19   Q.   And based on your information that this never changed to a

20   "denied" and the policies about calling the customer to pick up

21   a firearm only after it had changed to a proceed, as well as

22   the fact that you would personally check the NICS log prior to

23   transferring a firearm, can you testify that it is more

24   probable than not that the NICS delay had changed to a

25   "proceed" before you transferred the firearm to Mr. Ridley?

CHAMBERED CUSTOM FIREARMS-000159

JASON FERN - REDIRECT EXAMINATION                103

```
 1          MR. CAPPS:  Your Honor, objection; calls for
 2   speculation.
 3          THE COURT:  That's sustained.  I will not take into
 4   consideration the last question.
 5   BY MR. ALLAN:
 6   Q.  You were shown various exhibits with -- regarding responses
 7   to the prior reports of violations.  Based on those reports of
 8   violations, had you begun looking into adopting 4473 software?
 9   A.  Yes.
10   Q.  And we discussed why you have not yet implemented that,
11   correct?
12   A.  Yes.
13   Q.  And we also discussed the implementation of a second check
14   and the fact that you were not able to always do that, correct?
15   A.  Correct.
16   Q.  And even when a second check is conducted, there's no
17   guarantee that all errors are going to be caught; is that
18   correct?
19   A.  Correct.
20          MR. ALLAN:  No further questions, Your Honor.
21          THE COURT:  Mr. Fern, you can go ahead and step down,
22   and you can stay in the courtroom since you have already
23   testified.
24          Next witness, please.
25          MR. ALLAN:  Your Honor, we would ask whether Mr. Fern
```

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000160

1    can be used.

2            THE COURT:  Yes, he may, unless Mr. Capps, you would

3    like to call him during your case.

4            MR. CAPPS:  No, Your Honor.

5            THE COURT:  I'm sorry?

6            MR. CAPPS:  No, sir.

7            THE COURT:  Sir, you are excused.  Have a nice day.

8            THE WITNESS:  You too.

9            THE COURT:  Thank you.

10           Next witness.  Sir, walk all the way to the front of

11   the courtroom and raise your right hand to be sworn.

12        **AARON SWANK, PETITIONER'S WITNESS, SWORN**

13           THE CLERK:  You can have a seat on the witness stand.

14           THE COURT:  Sir, when you take your seat, I need you

15   to move the microphone, it's a directional microphone, speak

16   directly into it.  And, sir, what's your full name, spelling

17   each name, please.

18           THE WITNESS:  Aaron A-A-R-O-N.  Swank, S-W-A-N-K.

19           THE COURT:  Thank you very much, Counsel.

20                      DIRECT EXAMINATION

21   BY MR. ALLAN:

22   Q.  Good afternoon or morning, Mr. Swank.  I'm not sure exactly

23   what time it is.

24           THE COURT:  It's still morning.  It's 11:35.

25

CHAMBERED CUSTOM FIREARMS-000161

1    BY MR. ALLAN:

2    Q.  Good morning, Mr. Swank.

3             Would you please identify where you were employed

4    during the period from April 2021 through April 2022?

5    A.  With Chambered Group.

6    Q.  And what was your position at Chambered Group?

7    A.  Sales.

8    Q.  Okay.  What is involved in being in sales at Chambered

9    Group?

10   A.  I do 4473s, speak with customers, do paperwork to get them

11   out the door.

12   Q.  Okay.  What type of paperwork are you talking about to get

13   them out the door?

14   A.  The 4473, sir.

15   Q.  Okay.  Do you also assist them in like purchasing products?

16   A.  Oh, yes, sir, we talk quite a bit.

17   Q.  Can you just very briefly describe the training you

18   received when you began working at Chambered Group?

19   A.  For quite a while I shadowed another employee, so I was

20   hands off just watching.  And then everything from training on

21   products and product knowledge to procedures and essentially

22   standard operating procedures, and then how to properly fill

23   out 4473, and after it's filled out, what to do.

24   Q.  Okay.  What do you mean by "after it's filled out, what to

25   do"?

CHAMBERED CUSTOM FIREARMS-000162

1    A.  Where to file it.  Where it goes, depending on the result.

2    If it's a -- for instance, if we would get a "delay," we would

3    speak to the customer about the delay.  File that paperwork in

4    the appropriate place.

5           And then if it was a "proceed," then we would handle

6    it accordingly as well.

7    Q.  And based on what you were trained and the policy and

8    practices of Chambered Group, what would you tell a customer

9    who receives a delay in response to a NICS check?

10   A.  I would tell them it's quite common to get a delay.

11   Typically they will ask why they got a delay.  We don't have

12   that information, so I will explain that to them.

13          And then I let them know there's a Brady date, so if

14   we don't hear anything back from the NICS system, we can

15   release that item on or after the Brady date.

16          If it changes from delay, if the status would change

17   before the end of that Brady date, I would let them know that

18   I'll call them right away so that they could come down and at

19   their convenience retrieve their firearm.

20   Q.  And how often do you -- what is it that you would look at

21   to determine whether a NICS check had changed from a "delay" to

22   a "proceed"?

23   A.  Every morning as soon as we are firing up the systems, we

24   go in and check to check the status, because the statuses

25   change all the time.  So we go in and check the status of

CHAMBERED CUSTOM FIREARMS-000163

1    everything that we have in the delay list.

2          If anything at that time has changed from a "delay" to

3    any different status, we would mark that status and handle that

4    particular 4473 accordingly.

5          MR. ALLAN:  I would like to publish what's been

6    previously marked as Exhibit Number 3.

7    BY MR. ALLAN:

8    Q.  And Mr. Swank, you should have that appearing up on your

9    screen?

10   A.  Yes, sir.

11   Q.  Can you just take a look at Exhibit Number 3 and identify

12   what that is?

13   A.  That is a cover sheet of a 4473 form for Mr. Ridley.

14   Q.  And looking at Section A, do you recognize that

15   handwriting?

16   A.  Yes, sir, that's my handwriting.

17   Q.  Okay.  Do you have any personal recollection of dealing

18   with Mr. Ridley on April 21st of 2021 -- or I'm sorry,

19   April 17th of 2021?

20   A.  No, sir, I do not.

21   Q.  If you take a look at the -- the fact that this is your

22   handwriting, you can identify that you were involved in this

23   transaction however, correct?

24   A.  Correct, yes, sir, I can.

25   Q.  I am now showing you page 2 of Exhibit Number 3, which is

CHAMBERED CUSTOM FIREARMS-000164

1    the 4473 form for Mr. Ridley.  Would you please take a look at

2    Section C and identify whether that is also your handwriting?

3    A.  The X on Section C -- all I can see currently on my screen

4    of Section C is number 24.

5    Q.  There you go.

6    A.  So line 24, 26 is my handwriting.  27a is my handwriting.

7    27c is my handwriting.  27 Bravo is also my handwriting.  27

8    Delta is not.

9    Q.  Okay.  Based on the information in box 27c, would you have

10   been the person who conducted the NICS check on Mr. Ridley?

11   A.  Yes, sir.

12   Q.  And what information would you have received from NICS when

13   you entered his information?

14   A.  That would have been a "delay" with a tentative pick-up

15   date of 4-24-21, that would be our Brady date, so our date to

16   release if no further action was given.

17   Q.  And based on your standard policies and procedures, would

18   you have informed Mr. Ridley that he could pick up his firearm

19   on 4-20-22?

20   A.  I would have told him he can pick it up on the 22nd unless

21   we get an answer, at which time I would give him a call and let

22   him know that the status has changed.  Worst-case scenario, if

23   you don't hear anything from me, come back on the 22nd and

24   that's when we can release it.

25   Q.  Now, showing you page 3 of the 4473 for Mr. Ridley?

CHAMBERED CUSTOM FIREARMS-000165

1    A.  Yes, sir.

2    Q.  Based on box 36, can you determine when that firearm was

3    transferred to Mr. Ridley?

4    A.  Yes, sir, that would be 4-20-2021.

5    Q.  And based on box 31, does that also have the same date?

6    A.  It does.

7    Q.  All right.  To your knowledge, were you involved in

8    transferring this firearm to Mr. Ridley when he returns on 4-20

9    of 2021?

10   A.  To my recollection, no.  I honestly don't remember from two

11   years ago.  The handwriting on 34, 35, 36, is not my

12   handwriting.  So at the time of the actual transaction of

13   picking it up, I can't say for certain I was a part of that.

14   That's not my handwriting.

15   Q.  If you look at box 34, does that have the name of the

16   seller who actually transferred it?

17   A.  Yes, sir.

18   Q.  What information does it say in that box?

19   A.  Jason Fern, sir.

20   Q.  Does that indicate to you that it was Mr. Fern who actually

21   did the transfer to Mr. Ridley on April 20th of 2021?

22   A.  Yes, sir.  Given our -- just our standard operating

23   practices, it's signed when it goes out the door.  So it would

24   have been at the time it was being transferred.

25   Q.  Now, Mr. Swank, certain of the 4473 forms the ATF has

UNITED STATES DISTRICT COURT

1   identified as having violations, to the extent you completed a

2   4473 form, would you have intentionally transferred the firearm

3   knowing that there was an error or omission on the 4473 form?

4            MR. TORRES:  Objection, Your Honor, relevance.

5            THE COURT:  That's overruled.

6            You may answer.

7            THE WITNESS:  Absolutely.  I would never let something

8   go with knowing it had any kind of mistake, absolutely not.

9   BY MR. ALLAN:

10  Q.  And similarly, if you saw that there was an error or

11  omission on the form before you transferred it, would you have

12  allowed that firearm to go out the door?

13  A.  Absolutely not, sir.

14  Q.  Do you understand your obligations as an employee of

15  Chambered Group and Chambered Group's obligations under the Gun

16  Control Act?

17  A.  Yes, sir.

18  Q.  Do you do everything possible to comply with those

19  obligations and ensure that firearms are transferred in

20  accordance with all requirements to the best of your ability?

21  A.  In every way possible, sir.

22  Q.  Okay.  Can you give us a little bit of background before

23  you came to work for Chambered Group, what your personal

24  history is?

25  A.  Yes.  I am retired from the United States Army, joined

CHAMBERED CUSTOM FIREARMS-000167

1    right after high school.  Done four tours overseas, three of

2    them which were combat tours, including the invasion of Iraq.

3              After medically retiring from the military, I drove a

4    truck for a little bit in the civilian world.  I worked for --

5    driving a truck for the post office, and then eventually went

6    into the retail firearms world.

7    Q.  And you said you were medically retired from the Army.

8    What was the basis of your medical retirement?

9    A.  It was a couple of things.  I developed -- when I was down

10   range or overseas, I developed some issues with my lungs, as

11   well as right before the invasion of Iraq, my appendix burst

12   and was misdiagnosed and untreated for a couple of years, so

13   when they finally caught it I -- my appendix was calcified, so

14   they had to take out about a foot and a half of my small

15   intestine, bottom of my colon, so it left me unfit for duty,

16   for active duty.

17   Q.  Do you take any medications for those conditions?

18   A.  I do, sir.

19   Q.  And what type of medication is that generally?

20   A.  It's called buprenorphine.  It just kind -- the way it was

21   explained to me, essentially it takes the edge off.  I have --

22   it's called adhesions.  I am no doctor, but what was told to me

23   when they disconnected what they disconnected and then put it

24   back together, part of the healing process it healed to the

25   walls of what was around it.  So it's quite painful at times.

CHAMBERED CUSTOM FIREARMS-000168

1    So it helps in a non-narcotic non-pain medication type way, it

2    helps to numb out that area, I guess.

3    Q.  Does that have anything to do with stomach enzymes?

4    A.  Um, I honestly couldn't tell you.

5    Q.  But to your understanding, this is not a pain medication or

6    a narcotic?

7    A.  Correct.

8    Q.  Based on the medication that you take, does that affect

9    your judgment?

10   A.  Negative.

11   Q.  Does it have any ability on your -- does it have any effect

12   on your ability to complete 4473 forms and review them the same

13   as any other employee who is not on that type of medication?

14   A.  No change.

15   Q.  What happens if you cannot -- if your medication is not

16   timely refilled, however, does that result in a painful

17   condition?

18   A.  Um, it will result in some discomfort, and if anything, I

19   am probably not in the best of moods, but it wouldn't make me

20   miss work or perform any differently.

21   Q.  And have you -- did you provide a general overview of your

22   medical issue to Mr. Fern and Chambered Group?

23   A.  Oh, yeah, not into great detail, but through the course of

24   the years we've discussed it.

25   Q.  And the revocation hearing that was held at the ATF, were

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000169

1    you physically present for that hearing?

2    A.  No, sir.

3          MR. ALLAN:  No further questions for this witness,

4    Your Honor.

5          THE COURT:  Is there any cross-examination?

6          MR. TORRES:  Yes, Your Honor.

7          THE COURT:  Mr. Torres, come on up, please.

8          MR. TORRES:  Thank you, Your Honor.

9          THE COURT:  You're welcome.

10                    CROSS-EXAMINATION

11   BY MR. TORRES:

12   Q.  Good morning, Mr. Swank.

13   A.  Good morning, sir.

14   Q.  At the time -- can you remind us when you were employed by

15   Chambered?

16   A.  During the periods in question.

17   Q.  Until when?

18   A.  Until 20 -- well, May, June, 2022, '21.  '21.  Yeah, that

19   part honestly don't know.

20          THE COURT:  Sir, I am going to ask you to move closer

21   to the microphone and speak up.  Everyone needs to hear you.

22          THE WITNESS:  Yes, sir.

23   BY MR. TORRES:

24   Q.  At the time you worked at Chambered, were you aware of

25   Chambered having systems in place to prevent errors on 4473s?

CHAMBERED CUSTOM FIREARMS-000170

1    A.  What type of systems, sir, as far as what?  Like our own

2    systems and procedures?  Or like --

3    Q.  Yes.  Did Chambered have any systems or procedures to

4    prevent errors on 4473s?

5    A.  Yes, sir.

6    Q.  When you filled out the exhibit that you discussed on

7    direct for Mr. Ridley, did you bypass any of those systems or

8    procedures?

9    A.  Negative, sir.

10   Q.  The system just didn't catch the error, correct, the

11   systems and procedures?

12   A.  Yes, sir, it was a mistake.

13   Q.  The mistake slipped through the systems --

14          MR. ALLAN:  Your Honor --

15   BY MR. TORRES:

16   Q.  -- and procedures that were in place?

17          THE COURT:  I'm sorry, there's an objection.

18          MR. ALLAN:  Objection, Your Honor.  The witness

19   testified he was not involved in the ultimate transfer to

20   Mr. Ridley.

21          THE COURT:  Well, he also testified that during the

22   course of his employment, when he first started there, he

23   testified he didn't say the words "on-the-job training," but

24   that was his testimony.  So your objection is overruled.

25          Can you ask the question again, please?

UNITED STATES DISTRICT COURT

1          THE WITNESS:  Could you repeat the question, sir?

2          THE COURT:  Whoa, whoa, whoa, stop, stop, stop.  You

3    don't ask the questions, okay?  You just listen to the lawyer

4    ask the question and you respond.

5          Can you ask the question again, please?

6          MR. TORRES:  Thank you, Your Honor.

7    BY MR. TORRES:

8    Q.  You didn't bypass any systems or procedures with the Ridley

9    4473, the system or procedures simply didn't catch the error,

10   correct?

11   A.  The portion of the 4473 that I completed was correct, so

12   the systems and procedures up until that point were correct and

13   working.  After the fact when it was transferred --

14         THE COURT:  Counsel, when you have a witness that goes

15   on a narrative instead of answering the question, just object,

16   "nonresponsive."  Sustained.

17         Can you ask the question again?

18         Sir, I am going to ask you, Mr. Swank, to just listen

19   to the question and just answer the question.  I don't need

20   this narrative, okay?

21         Can you ask it again, please?

22   BY MR. TORRES:

23   Q.  With regards to the Ridley 4473, you didn't bypass any

24   systems or procedures.  The systems and procedures simply did

25   not catch the error that ultimately happened on that 4473, yes

CHAMBERED CUSTOM FIREARMS-000172

```
 1    or no?
 2              MR. ALLAN:  Your Honor, same objection.  He is
 3    assuming there's an error on that 4473, and based on
 4    Mr. Swank's testimony, there were no errors up and to the point
 5    he was involved with that 4473.
 6              THE COURT:  The objection is overruled.
 7              You can respond, Mr. Swank.
 8              THE WITNESS:  Sir, I honestly don't understand.
 9              THE COURT:  I'll tell you what.  Let's do this,
10    Mr. Torres, if you would.  I think the confusion is, you have a
11    somewhat of a compound question, so if you could break it up
12    into two parts, that might be helpful.
13    BY MR. TORRES:
14    Q.  You didn't make any mistakes on the Ridley 4473?
15    A.  Correct.
16    Q.  The system just failed, correct?  Yes or no?
17              MR. ALLAN:  Same objection, Your Honor.
18              THE COURT:  That's overruled.
19              THE WITNESS:  Honestly, I don't know.
20    BY MR. TORRES:
21    Q.  Did you come up with the systems and procedures that were
22    in place at Chambered?
23    A.  No, I did not.
24    Q.  Do you know who did?
25    A.  I would imagine Jay Fern did, sir.
```

CHAMBERED CUSTOM FIREARMS-000173

1    Q.  You stopped working for Chambered sometime in 2022; is that

2    right?

3    A.  I did.

4    Q.  How did you find out you were being terminated?

5    A.  I'm sorry?

6    Q.  How did you find out you were being terminated?

7    A.  I spoke to Jay Fern.

8    Q.  What did Jay tell you?

9    A.  Essentially what had happened, and that a part of fixing

10   what happened was I would no longer be able to work on that

11   paperwork in that capacity.

12   Q.  Did he terminate you, or did he just say you couldn't work

13   on that paperwork?

14   A.  No, I was let go at the time, sir, yes, sir.

15   Q.  Did you have a reaction when you heard that news?

16   A.  No.

17   Q.  You had no reaction to being terminated?

18   A.  I wasn't happy, but, no.

19   Q.  You were unhappy being terminated, correct?

20   A.  Disappointed.

21   Q.  Any other emotions?

22   A.  No.

23   Q.  So you were unhappy and disappointed at being terminated,

24   correct?

25   A.  Yes, sir.

CHAMBERED CUSTOM FIREARMS-000174

1    Q.  Why?

2    A.  Do you want a narrative?

3    Q.  Did you think it was fair you were being terminated?

4    A.  I don't have any -- no feeling either way.

5    Q.  You were being terminated for an error that you didn't

6    cause, correct?  That was your understanding?

7    A.  No, sir.  At the time that -- I didn't know exactly the

8    details of the situation or the 4473 or what had happened.  I

9    didn't have clarity on any of it.

10   Q.  What did Mr. Fern tell you was the reason you were being

11   terminated?

12   A.  Because there was errors on a 4473 that my name was

13   attached to, and the guidance or advice that he was given, me

14   going was a way to fix it.

15   Q.  What did he tell you about the guidance that he was given?

16   A.  Can you clarify?

17          THE COURT:  You can lead, Counsel.

18   BY MR. TORRES:

19   Q.  Did he tell you that he was told that -- instructed to let

20   you go?

21   A.  I don't know if it was put exactly like that, no.

22   Q.  Was it sort of like that?

23   A.  In the discussion it was a course of the corrective action.

24   Q.  Did he tell you who gave him that advice?

25   A.  No, sir.

CHAMBERED CUSTOM FIREARMS-000175

1   Q.  So as far as you know, you were being terminated because of

2   the fact that their license had been revoked, correct?

3   A.  No.

4          MR. ALLAN:  Objection, Your Honor, mischaracterizes

5   the facts.  The license had not been revoked at the time.

6          THE COURT:  Overruled.

7          You may respond.

8          THE WITNESS:  No.

9   BY MR. TORRES:

10  Q.  In your mind, did you think that it was fair that you were

11  being terminated, yes or no?

12  A.  Like I said, I honestly didn't think about it one way or

13  another whether or not it was fair.

14  Q.  You were unhappy and disappointed, correct?

15  A.  Disappointed for sure.

16  Q.  Unhappy for sure?

17  A.  Disappointed for sure.

18         MR. ALLAN:  Your Honor, I would object --

19         THE COURT:  Let's --

20         MR. ALLAN:  -- to relevance and being asked and

21  answered.

22         THE COURT:  -- just move on.

23  BY MR. TORRES:

24  Q.  How long was it from the time that the error on the 4473

25  happened until you were terminated?

CHAMBERED CUSTOM FIREARMS-000176

1    A.  That I don't remember; I honestly don't know.

2    Q.  Are you currently working for Chambered in any capacity?

3    A.  No.

4    Q.  Do you hope to work for them in the future?

5    A.  Yes.

6            MR. TORRES:  Nothing further right now, Your Honor.

7            THE COURT:  Is there any redirect?

8            MR. ALLAN:  Yes, Your Honor.

9            THE COURT:  Come on up, please.

10                    REDIRECT EXAMINATION

11   BY MR. ALLAN:

12   Q.  Mr. Swank, would you please carefully listen to the

13   question.  The last thing that you were asked on

14   cross-examination is:  Are you currently working for Chambered

15   Group in any capacity?

16   A.  Oh, yes, sir.

17   Q.  You answered no.

18   A.  I'm sorry, yes, sir.  Yes, sir.  I do work for Chambered

19   Group.

20           THE COURT:  Let's stop for a moment.

21           Mr. Swank, I understand you are very excited to now

22   understand the question.  There's a lady in front of you and in

23   front of me.  She's a court reporter.  She's one of the best in

24   the country.  She can't do her job if people are yelling over

25   each other.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000177

1          So what I need you to do is just listen to Mr. Allan's

2    question.  Let him finish, and then respond if you can, okay?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Can you ask the last question again,

5    please?  I didn't get it.

6          MR. ALLAN:  Yes.

7    BY MR. ALLAN:

8    Q.  On cross-examination you just testified that you were not

9    currently working for Chambered Group; was that incorrect?

10   A.  I am sorry, yes, sir.

11   Q.  As of today, are you an employee of Chambered Group?

12   A.  Yes, sir.

13   Q.  Approximately how long were you away from Chambered Group

14   after your employment was terminated?

15         THE COURT:  Wait a minute.  Now I am confused.  During

16   cross-examination wasn't it it your testimony that you wanted

17   to go back and work for Chambered Group?

18         THE WITNESS:  In the capacity that I was, sir.

19         THE COURT:  Okay.  Go ahead.

20   BY MR. ALLAN:

21   Q.  After you were terminated from Chambered Group,

22   approximately how long was it before you were rehired at

23   Chambered Group?

24   A.  Gosh, maybe a year.

25   Q.  So it's your position that you were terminated and then

CHAMBERED CUSTOM FIREARMS-000178

1 became employed by Chambered Group again after approximately a

2 year, correct?

3 A.  And not in the same capacity, but, yes.

4 Q.  Okay.  Would you please explain what you mean by what you

5 are referring to as "capacity"?

6 A.  So I don't work as a sales guy doing 4473s constantly.  I

7 have a much more hands-off role.

8 Q.  What is your role at Chambered Group currently?

9 A.  I help in any way that I can, every task that you can think

10 of, from taking out the trash, sweeping floors, cleaning, try

11 to fix whatever I can.  We have been -- gosh, there's a lot

12 that's been changing so --

13 Q.  Okay.  Now, on cross-examination you were asked the reason

14 for your termination.  Were you told that you were being

15 terminated specifically because of the Ridley 4473 or because

16 of errors on 4473 forms in general on that report of

17 violations?

18 A.  Errors in general.

19 Q.  Was there any specific discussion of the Ridley 4473 form

20 with regard to your termination?

21 A.  No, sir.

22         MR. ALLAN:  No further questions, Your Honor.

23         THE COURT:  Subject to re-call, Petitioner?

24         MR. ALLAN:  No, Your Honor.

25         THE COURT:  Respondents?

UNITED STATES DISTRICT COURT

1        MR. TORRES:  Just mild, very short recross, Your Honor

2   if I may?

3        THE COURT:  There's no recross.  Do you want to call

4   him in your case in chief?

5        MR. TORRES:  No, Your Honor, I don't believe so.

6        THE COURT:  Mr. Swank, thank you so much for coming in

7   this morning.  You are released from your subpoena or request

8   to testify.  You can step down, sir.  Have a nice lunch.  And

9   thank you for your service.

10        THE WITNESS:  Thank you, sir.

11        THE COURT:  It's 12:00 right now.  We typically take

12   lunch from 12:00 to 1:00.  Unless the Petitioners have some

13   witness they are trying to get on, I would much rather start it

14   back over at 1:00.

15        MR. ALLAN:  Your Honor, we only have one more witness.

16   We are happy to wait until 1:00 to call them.

17        THE COURT:  Okay.  Court is in recess until 1:00.  If

18   you have anything on counsel desk there that you don't want

19   someone to potentially look at, make sure you take it with you.

20   The back door is going to be locked until approximately 12:55.

21        Everyone have a wonderful lunch.

22        (Recess taken 11:59 a.m.; resumes at 1:00 p.m.)

23        THE COURT:  This court will come to order.  All

24   parties present when the court last closed are present again.

25        Mr. Allan, please call your next witness.

CHAMBERED CUSTOM FIREARMS-000180

1        MR. ALLAN:  Thank you, Your Honor.  Petitioner would

2   like to call John Lamontagne.

3        **JOHN LAMONTAGNE, PETITIONER'S WITNESS, SWORN**

4        THE COURT:  Sir, you have been in the courtroom all

5   morning, so I know you understand I need you to speak directly

6   into the microphone.  Tell me your full name and spell each

7   name, please.

8        THE WITNESS:  John Lamontagne, L-A-M-O-N-T-A-G-N-E.

9   John, J-O-H-N.

10       THE COURT:  Go ahead, Counsel.

11                      DIRECT EXAMINATION

12   BY MR. ALLAN:

13   Q.  Mr. Lamontagne, would you describe your relationship or

14   connection with Chambered Group?

15   A.  Majority owner.

16   Q.  When did you become a majority owner of Chambered Group?

17   A.  August 2018.

18   Q.  Okay.  Was that an existing business when you became an

19   owner?

20   A.  Yes, sir.

21   Q.  And did you purchase it from somebody?

22   A.  Two individuals, correct.

23   Q.  Okay.  Other than being an owner prior to April of 2022,

24   what role did you have at Chambered Group?

25   A.  I don't have anything to do with daily operations.  I have

CHAMBERED CUSTOM FIREARMS-000181

1   to do with management.  I just basically watch over the money

2   from a -- I don't go there.

3   Q.  So you are not personally involved in the completion of

4   4473s or the sale of firearms to customers on a regular basis?

5   A.  No, sir.

6   Q.  Okay.  Would you please just briefly describe your

7   background?

8   A.  I was U.S. Coast Guard and -- for a bit.  Then I -- now I

9   have been a mechanic on trucks for the last 27 years.

10  Q.  Okay.  And what made you get involved as becoming an owner

11  of Chambered Group?

12  A.  My understanding was, from the owners of Chambered Group,

13  they were going to shut down the business due to conflict

14  between the three owners.  Jason was the gentleman I had been

15  dealing with at that store since its inception.

16        And I just said, hey, I'll purchase the other two

17  gentlemen out, and you -- if you are willing to continue being

18  the manager and run the store with -- you know, as the owner.

19  Q.  Okay.  And has your role in the day-to-day operations of

20  Chambered Group changed since the notice of the revocation and

21  the revocation hearing?

22  A.  Yes, sir, because Jason has stepped away.

23  Q.  Okay.  Do you know why Jason has stepped away?

24  A.  He is not interested in being in the firearms industry

25  after this incident.

CHAMBERED CUSTOM FIREARMS-000182

1    Q.  Okay.  Who is the person that is responsible for the

2    financials of Chambered Group?

3    A.  I am in charge of the financials.

4    Q.  Okay.  During the first quarter of 2023, can you describe

5    the inventory of firearms that Chambered Group would typically

6    have in stock?

7    A.  We would be somewhere -- usually around a thousand,

8    serialized items.

9    Q.  Can you explain what you mean by "serialized items"?

10   A.  That would be firearms, NFA items.

11   Q.  Okay.  And by "NFA," do you mean National Firearms Act --

12   A.  Correct.

13   Q.  What percentages of Chambered Group's business is the sale

14   of firearms, including NFA items, compared to the sale of other

15   products such as ammunition or accessories?

16   A.  I would say about 80 percent firearms related.

17   Q.  Would Chambered Group be able to survive as a business

18   entity without the ability to sell firearms?

19   A.  No.

20   Q.  What was the typical monthly revenue for Chambered Group

21   during the first quarter of 2023?

22   A.  Average monthly, usually around 180 to 240.

23   Q.  Okay.  And that was for the first quarter of this year?

24   A.  Per month, correct.

25          THE COURT:  Sorry, 180 to 240 what?

CHAMBERED CUSTOM FIREARMS-000183