1    THE WITNESS:  Thousand.

2    THE COURT:  Okay.

3  BY MR. ALLAN:

4  Q.  How do those numbers compare to prior years?

5  A.  They were slightly down, but not by a lot.

6  Q.  Okay.  And now that the ATF has revoked the license of

7  Chambered Group with the inability to acquire any new firearms

8  since August 1st, and the firearm revocation scheduled to go in

9  into effect on October 1st, what effect has that had on the

10  monthly financials for Chambered Group?

11  A.  So in the very beginning when we still had what would be

12  the normal items, it was pretty normal.  But as time has gone

13  on and we have -- no longer able to acquire the what we call

14  the standard firearms that we sell, Glock, Sig, the guns that

15  people want, it has continued to drop over and over.

16    Each week has been progressively worse.  As of this

17  month, up to date, as of this month, from the 1st to the 19th,

18  we did $30,000 in total sales.

19  Q.  Okay.  So in other words, Chambered Group is unable to

20  acquire new firearms into inventory?

21  A.  Correct.  We have not acquired a firearm since the 1st of

22  August.

23  Q.  How often would Chambered Group typically acquire new

24  firearms?

25  A.  Every day.

CHAMBERED CUSTOM FIREARMS-000184

1  Q.  When you describe -- I think you described your

2  bread-and-butter firearms.  What was the average turnaround

3  process for firearms such as those from when you get them until

4  you sell them?

5  A.  Week.

6  Q.  So --

7  A.  Depending on how many we get, if we were to buy five or six

8  of them, because we would normally stock, say, four P365s

9  because they're -- literally you can sell three or four of them

10 in a single day.

11 Q.  So they basically have a high turnaround time --

12 A.  Correct.

13      THE COURT:  Okay.  Mr. -- sir, you need to make sure

14 that you listen to his question and let him finish.  You are

15 anticipating his question and you start to talk before he is

16 finished.  I can't have two people talking on the record at the

17 same time.

18      THE WITNESS:  Yes, sir.

19      THE COURT:  Go ahead.  Can you ask the question again?

20 BY MR. ALLAN:

21 Q.  So as far as the bread-and-butter firearms, you would

22 normally be reordering them on a weekly basis as you acquire

23 new inventory and sell it; is that correct?

24 A.  We order daily.  So these firearms would be ordered on a

25 daily basis, depending on what we needed.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000185

1    Q.  Okay.  You also mentioned NFA firearms.  Has the revocation

2    of the FFL had an effect on your ability to sell NFA firearms?

3    A.  Yes.  So we have not been able to bring in any NFA items

4    since the initial document, which -- mid-July.  So we were able

5    to release -- they did a -- like an expedited on all these

6    Form 4s that we had to make sure that they cleared the books.

7            But we -- so the ones that were already sold to a

8    person and they were registered to that person, those have been

9    mostly sent out with the customers, but there are a few that

10   are remaining that we are not allowed to sell because they told

11   us no longer to release or sell those because the process takes

12   too long.

13   Q.  Okay.  And can you just describe what a Form 4 is for the

14   court?

15   A.  Form 4 would be an NFA item, so that's a National Firearms

16   Act item.  It would be a suppressor, a short-barrel rifle,

17   select firearm.  Something that's controlled, and it's an extra

18   step that the government takes to make sure that you are not a

19   prohibited person of those items.  And then you are registered

20   through the database for that as well.

21   Q.  Okay.  And to be more specific with the Form 4, is that the

22   form that is used to transfer an NFA item to an individual who

23   does not have a federal firearms license?

24   A.  Correct.

25   Q.  And is there a different form that's used to transfer a NFA

UNITED STATES DISTRICT COURT

1   firearm, for example, to a governmental entity?

2   A.  That would be a -- Form 3 would be from dealer to dealer.

3   Form 2 would be if I was registering to myself through the

4   government.

5   Q.  And there's also another form to transfer to a governmental

6   agency, a Form 5, I believe?

7   A.  Not familiar with that one.

8   Q.  Okay.  Do you normally transfer NFA items to the

9   government?

10  A.  No.

11  Q.  As we sit here today, what types of firearms does Chambered

12  Group have in inventory?

13  A.  So we -- right now we've run through most of what I would

14  call the inexpensive firearms, the firearms that are the ones

15  that average person would purchase in our area of town.  The

16  stuff that is the normal things we would sell on a normal daily

17  basis.

18          What we are left with right now is mostly what we

19  would consider to be the higher-end firearms, the more

20  expensive ones that are not sold very often.  You might sell

21  one a year, but it is something that people expect to see when

22  they come to your store.

23  Q.  And when you are talking "higher-end firearms," can you

24  give an example of the price of these types of firearms?

25  A.  So a Benelli shotgun might run $3,000.  A bolt-action rifle

CHAMBERED CUSTOM FIREARMS-000187

1   like a Barrett MRAD runs $5,000.

2   Q.  So these are firearms that you would not sell on a weekly

3   or daily basis?

4   A.  No, some of them have been there for more than -- years.

5   Q.  Okay.  Since you have the -- lost the ability to acquire

6   new firearms, have you had customers coming into the store

7   asking to buy certain types of firearms?

8   A.  Yes, we have a large list of firearms that people have

9   asked us to purchase, and we have been telling them that we

10  cannot order any firearms or acquisition any firearms until we

11  get a resolution to this case.

12  Q.  Okay.  And you just mentioned ordering.  In addition to

13  people coming in and looking to buy a certain firearm, do you

14  have customers that come in and ask you to order a specific

15  firearm for them?

16  A.  Yes.

17  Q.  And what have you had to do with customers that are seeking

18  to purchase a firearm that you don't have in stock or to

19  special order a firearm since August 1st?

20  A.  We've just had to take the loss of the sale.

21  Q.  And based on your understanding, are those customers just

22  waiting to see what happens with this proceeding, or are they

23  going to another dealer to buy the product?

24  A.  Likely they are not going to wait.  I don't know of anybody

25  waiting as of right now.

CHAMBERED CUSTOM FIREARMS-000188

1  Q.  Right.  And you obviously are not the only firearms dealer

2  in the Goodyear or the Phoenix area, correct?

3  A.  No, there's one about 10 minutes away.

4  Q.  And so the inability to acquire new firearm sales is having

5  an effect not only on your ability to generate income, but also

6  on the reputation of the store; is that correct?

7  A.  Yes.

8  Q.  Do you --

9  A.  People do not want to hear that you can't order a firearm.

10  You are a firearms store and a firearms retailer, you should --

11  they should be able to get firearms.  That's kind of a

12  consumer's general thought I think.

13  Q.  We are in September now, but for August of 2023, which was

14  the last full month, can you approximate the amount of revenue

15  that Chambered Group received?

16  A.  The one previous to the revocation.

17  Q.  No, last month, August.

18  A.  Last month it was about 148, I believe, something around

19  there.

20  Q.  Okay.  And how does that relate to prior months before the

21  revocation?

22  A.  The month before that was 180.  And as I said, in the

23  beginning of the month we did still have some firearms -- as

24  you watched it, the sales, it just goes down as the firearms

25  get less and less and less that you had.

CHAMBERED CUSTOM FIREARMS-000189

1  Q.  And what is revenue income looking like for this month?

2  A.  So this last Friday and Saturday we did $1600 on Friday,

3  and we did $300 on Saturday.

4  Q.  So are you anticipating that the month of September will be

5  even less than August?

6  A.  Significantly.  At this point, we are probably looking at

7  something around 40, 45,000.

8  Q.  With the current revenue, is that sufficient to cover

9  employee wages and other overhead such as rent?

10  A.  No.

11  Q.  Prior to the notice of -- prior to the revocation and the

12  inability to acquire new firearms, what would the typical

13  income be for a typical Saturday?

14  A.  Generally, Fridays and Saturdays net you somewhere around

15  anywhere between 15 and 20,000.

16  Q.  And who is the person that manages the bank accounts for

17  Chambered Group?

18  A.  I do.

19  Q.  And what is the current balance that are in Chambered

20  Group's bank accounts?

21  A.  As of yesterday?

22  Q.  Approximately.

23  A.  Around $32,000.

24  Q.  And can you approximate the current accounts payable, the

25  amounts owed to manufacturers and distributors from which you

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000190

1   purchase products?

2   A.  So right now Davidsons is about 45,000 owed to, that's one

3   account.  Benelli's around $30,000, that is another account.

4   We have probably another $25,000 in just smaller vendors.

5   Q.  And when are those debts generally due?

6   A.  30 days.

7   Q.  Are some of those coming due or past due already?

8   A.  They are all past due now.

9   Q.  If this Court does not stay the effective date of Chambered

10  Group's -- the revocation of Chambered Group's FFL and allow it

11  to acquire new inventory while this proceeding is pending, will

12  it be able to survive for another four to six months until this

13  proceeding is finally decided?

14  A.  No.

15  Q.  And what would the ultimate outcome be?

16  A.  We will close down on October 1st.

17  Q.  And if you close down, what will happen to the employees of

18  Chambered Group?

19  A.  They will just be unemployed.

20         MR. TORRES:  Objection, Your Honor, relevance.

21         MR. ALLAN:  Your Honor, one of the factors for the

22  preliminary injunction is irreparable injury.

23         THE COURT:  That's overruled.

24         Sir, you may respond.

25         THE WITNESS:  They will have to be let go.

UNITED STATES DISTRICT COURT

1  BY MR. ALLAN:

2  Q.  Based on your understanding, if you have to lay off your

3  employees and close down the business and you ultimately

4  prevail at the end of this proceeding, will you be able to

5  recover the lost money and restart the business?

6  A.  No.

7  Q.  Do you know why that is?

8  A.  One, it's the way in which they make you dispose of the

9  firearms.  Basically, they only give you one option that I

10  think is viable, which is to take a loss.  I know some of the

11  bigger places in town are buying at very low prices when these

12  situations come up that I have heard.

13       You won't be able to recover anywhere near what you've

14  got invested.  Whether -- or even pay off the people that you

15  owe.

16  Q.  As far as the option you said to get rid of the firearms,

17  is it your understanding that you have until October 1st to get

18  rid of the firearms currently in inventory?

19  A.  We have to get rid of them by October 1st or we cannot

20  continue to sell them -- October 1st is our cut-off date to

21  sell a firearm.  From what I was explained, I have no knowledge

22  of, and that is that we have a few additional days after that

23  to turn over like SOT items, things of that nature, to another

24  SOT, I guess, or destroy them.

25  Q.  And how many firearms do you currently have in inventory,

UNITED STATES DISTRICT COURT

1   approximately?

2   A.  My understanding was around 400.

3   Q.  Okay.  And have you been told by the ATF what you can do

4   with those firearms if you don't transfer them to another

5   dealer?

6   A.  Destroy, transfer to ourselves, our personal, or sell to

7   another dealer.

8   Q.  And if you sell -- if you sell it to another dealer, are

9   you going to be getting cost or even what you -- the retail

10  value of the firearms or even when what you paid for them?

11  A.  No.

12  Q.  Have you been informed that if you transferred them to

13  yourself, you are not going to be allowed to sell them for a

14  year?

15  A.  Yes.

16          MR. ALLAN:  No further questions, Your Honor.

17          THE COURT:  Is there any cross-examination?

18          MR. TORRES:  Yes, Your Honor.

19          THE COURT:  Come on up, Mr. Torres.

20                      CROSS-EXAMINATION

21  BY MR. TORRES:

22  Q.  Good afternoon, Mr. Lamontagne.  Am I pronouncing that

23  correctly?

24  A.  Lamontagne.

25  Q.  You testified a few minutes ago that the company has

CHAMBERED CUSTOM FIREARMS-000193

1    $32,000 in the bank; is that correct?

2    A.   Correct.

3    Q.   What was the bank balance six months ago, if you know?

4    A.   I don't know.  It varies quite a bit because it depends on

5    the day in which you ask, 'cause it is a very expensive

6    business to be in.  I don't know how hard it would be to

7    explain it, but it's $20,000 going out one day and coming, you

8    know, is not uncommon.

9    Q.   What's the highest that it's been in the last couple of

10   years?

11   A.   120, 130, maybe.

12   Q.   Was it that high any time recently?

13   A.   It was over 100,000 probably April, May.

14   Q.   Have you made any large withdrawals since receiving the

15   revocation notice?

16   A.   No.

17   Q.   Your name is on the license for Chambered, correct?

18   A.   Yes.

19   Q.   Have you ever applied for any other licenses?

20   A.   Yes.

21   Q.   Can you tell us what those are?

22   A.   I applied for a manufacturing license as Tara, the IOI, had

23   instructed me to.

24   Q.   And what's the status of that?

25   A.   They denied me.

CHAMBERED CUSTOM FIREARMS-000194

1  Q.  Do you have any other licenses pending with -- applications

2  pending?

3  A.  No, sir.

4  Q.  A few minutes ago, before the break, you heard Mr. Fern

5  testify, correct?

6  A.  Yes.

7  Q.  Were you listening?

8  A.  Yes.

9  Q.  Can you remember roughly what he was answering, some of his

10  answers?

11  A.  That would depend on the question.

12  Q.  Do you remember that he was asked if he had received

13  certain paperwork from ATF?

14  A.  Yes.

15  Q.  And what do you remember him -- his general response?

16  A.  His exact response or just -- he said that he did not.

17  Q.  That he didn't?

18  A.  I believe -- I don't know for sure.

19          THE COURT:  Mr. Torres, I am going to ask you to

20  control the witness a little bit.

21          Again, gentlemen, I need you both to listen to each

22  other and try not to talk at the same time.

23          Go ahead, please.

24          MR. TORRES:  Can we put up Exhibit 120 on the Elmo?

25

UNITED STATES DISTRICT COURT

1    BY MR. TORRES:

2    Q.  This is Exhibit 120 that I believe was admitted.

3            Mr. Lamontagne, can you take a second to review this?

4    Let me know when you are ready to proceed.

5    A.  Okay.

6    Q.  What does this appear to you to be, from your review?

7    A.  Just what it says, warning conference follow-up.

8    Q.  And who is it addressed from, if you can see?

9    A.  U.S. Department of Justice.

10   Q.  And it's addressed to Chambered Group, correct?

11   A.  Yes.

12   Q.  And is that Chambered's correct address?

13   A.  Yes.

14   Q.  So this appears to be a letter from ATF to Chambered,

15   correct?

16   A.  Correct.

17   Q.  Is this the kind of document that you would hope that

18   Mr. Fern would have received?

19   A.  I guess.

20   Q.  Is this the kind of document that you would hope that

21   Mr. Fern would have paid attention to and taken seriously?

22   A.  I would assume he would, yes.

23   Q.  Is there a hearing coming up in October on a new license

24   that you are aware of?

25   A.  Yes.

UNITED STATES DISTRICT COURT

JOHN LAMONTAGNE - CROSS-EXAMINATION          140

1   Q.  Can you tell us about that?

2   A.  That would be the license that they denied.

3   Q.  The manufacturer's license?

4   A.  Correct.

5   Q.  During the pandemic, demand for firearms significantly

6   increased, correct?

7   A.  Yes.

8   Q.  And Chambered made a lot more sales during the pandemic; is

9   that correct?

10  A.  Yes.

11  Q.  Made a lot more money?

12  A.  No.

13  Q.  Chambered made more sales but didn't make more money?

14  A.  Yeah, we lost $70,000 instead.

15  Q.  What was Chambered's -- before the pandemic, what was

16  Chambered's daily sales, roughly?

17  A.  Sales numbers don't have anything to do with whether you

18  make money or not.  The reality is we --

19  Q.  I'm sorry.

20  A.  I can explain it to you.

21          MR. TORRES:  Your Honor, move to strike.

22          THE COURT:  Whoa, whoa, whoa.  Stop, stop, stop, stop.

23  If you ask a question and the witness is not responding to the

24  question or going on some narrative, the proper objection is,

25  "objection, nonresponsive."

UNITED STATES DISTRICT COURT

1          Sir, what I need you to do, I know you are very

2    emotional.  I understand that.  I need you to listen to the

3    question, and I need you to only respond to the question.

4          Your lawyer Mr. Allan, he is going to have an

5    opportunity to stand up again.  It is called redirect

6    examination.  So any of those things that you would like to get

7    out, I am sure he is taking notes right now, and you will have

8    that opportunity.  But I can't have two people yelling at each

9    other at the same time.

10         Ask the question again, please.

11   BY MR. TORRES:

12   Q.  What were Chambered's daily sales prior to the pandemic?

13   A.  We were somewhere around 160 per month.

14   Q.  160,000 per month?

15   A.  Correct.

16   Q.  And at the height of the pandemic, what was that amount?

17   A.  I would say north of 200,000 per month.

18   Q.  Mr. Fern testified that prior to the pandemic, sales were

19   around 2,000 to 4,000 a day.  Did you hear him testify when he

20   said that?

21   A.  I believe he was speaking of the certain days, correct?

22   You were asking him about a certain day, not -- because

23   obviously on a Friday and a Saturday will be more than a Monday

24   or a Tuesday.

25   Q.  On a Friday and Saturday, prior to the pandemic, what would

CHAMBERED CUSTOM FIREARMS-000198

1  you expect to see, just on a Friday and Saturday?

2  A.  6 to 8,000 dollars probably, before the pandemic.

3  Q.  And during the pandemic?

4  A.  25,000 per day.

5  Q.  So 6 to 8 prior to the pandemic, 25 during the pandemic,

6  correct?

7  A.  Yes, yes.

8  Q.  So was Chambered seeing more customers and foot traffic

9  during that time as well?

10  A.  Yes.

11  Q.  But Chambered didn't staff up to meet that foot traffic

12  demand, correct, yes or no?

13  A.  No.

14  Q.  Chambered could have -- Chambered, during that time of the

15  pandemic, could have just chosen to sell less guns, correct,

16  yes or no?

17  A.  We tried to control that, yes.

18  Q.  Did Chambered sell less guns during the pandemic or --

19  A.  No.

20  Q.  -- did it sell as much as it could?

21  A.  We sold what we could handle.

22  Q.  So you believe that you were able to handle the increased

23  foot traffic and sales like you described with the same amount

24  of staff?

25  A.  That is correct.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000199

1   Q.  And you don't feel that your staff made mistakes during

2   that time?

3   A.  I wasn't there, so I don't know, but I would think that

4   they should -- if they needed -- you know, they -- they were

5   told that they could slow down if they needed to.

6        If a customer was pushing them, they didn't have to go

7   further.  They could tell them, I need you to slow down, I need

8   to take my time.

9   Q.  Did the increases in sales that you saw during the pandemic

10  suggest that they really did slow down?

11  A.  Yes.

12  Q.  Prior to your involvement with -- or since your involvement

13  with Chambered, you are aware that Chambered is required to

14  follow certain ATF regulations, correct?

15  A.  Yes.

16  Q.  And you know that if it doesn't, there are potential

17  consequences, correct?

18  A.  Yes.

19  Q.  And one of those potential consequences of not following

20  the regulations is revocation of a license, correct?  Yes or

21  no?

22  A.  Yes.

23  Q.  And that's even if it causes harm to Chambered's business,

24  correct?

25  A.  I need you to rephrase that question, because I'm not sure

CHAMBERED CUSTOM FIREARMS-000200

1  I understand exactly what you are asking me.

2  Q.  You understand --

3  A.  Uh-huh.

4  Q.  -- that if Chambered doesn't follow certain ATF

5  regulations, one of the potential consequences is revocation of

6  its license, even if it causes harm to Chambered's business,

7  correct?

8  A.  No.

9  Q.  It's not your understanding that you might lose your

10  license?

11  A.  No.

12  Q.  So it's your understanding that Chambered cannot follow ATF

13  regulations and continue with its license, correct?

14  A.  My understanding was nothing -- you asked the question

15  about my understanding of me having to give up my financial --

16  second half of the question you asked.

17  Q.  My question --

18  A.  I am aware you could revoke the license.

19         THE COURT:  Stop, stop, stop, stop, stop, stop.  Just

20  take a deep breath, both of you.

21         Can you ask the question again, please?

22  BY MR. TORRES:

23  Q.  It's your understanding that if Chambered doesn't follow

24  ATF regulations, it could lose its license, even if that harms

25  Chambered's business, correct?

CHAMBERED CUSTOM FIREARMS-000201

1   A.  No.

2   Q.  You testified earlier that Chambered -- about Chambered's

3   financials.  You haven't submitted any of that documentation to

4   this Court, correct, in terms of exhibits here today?

5   A.  Correct.

6   Q.  You haven't provided any documentary proof that you have

7   gone over here in court regarding any alleged harm to

8   Chambered's business, correct?

9   A.  Could you rephrase that or explain to me what you are

10  asking?

11  Q.  You didn't present the Judge with any documentary proof to

12  support your claims regarding harm to Chambered's business,

13  correct?

14          MR. ALLAN:  Objection, Your Honor, his testimony is

15  proof.

16          THE COURT:  The objection is sustained.  I will not

17  consider the last question.

18          MR. TORRES:  I have no further questions right now,

19  Your Honor.

20          THE COURT:  Thank you very much, Mr. Torres.

21          Any redirect?

22          MR. ALLAN:  Very briefly, Your Honor.

23          THE COURT:  Come on up.

24

25

CHAMBERED CUSTOM FIREARMS-000202

1

2                         REDIRECT EXAMINATION

3    BY MR. ALLAN:

4    Q.  Mr. Lamontagne, I want to clarify your testimony, because I

5    think there was confusion towards the end.

6              Do you understand that if Chambered Group was to

7    willfully violate the Gun Control Act, for example, by selling

8    to somebody off the books without having them complete a 4473

9    form, that its FFL could be revoked?

10   A.  Yes.

11   Q.  Do you understand that its FFL could be revoked in that

12   certain situation, even though that would result in financial

13   harm to Chambered Group?

14   A.  I guess I am not understanding the financial aspect of

15   that.

16   Q.  Okay.  Let me try to explain that.

17   A.  Okay.

18   Q.  If the FFL is revoked, there will be financial harm to

19   Chambered Group, correct?

20   A.  Yes.

21   Q.  You testified previously that without the ability to sell

22   firearms, Chambered Group would be out of business, I think you

23   said, by October 1st?

24   A.  Yes, yes.  I didn't understand exactly what they were --

25   the connection between the financial -- no one has ever told me

UNITED STATES DISTRICT COURT

JOHN LAMONTAGNE - REDIRECT EXAMINATION

1   that you can't -- that if you lose the license what that meant.

2          I have never had a meeting with the ATF.  When I

3   purchased in, it was just sign here for being on -- the

4   responsible person.

5   Q.  Understood.  And so you understand that simply because

6   there would be financial damage to Chambered Group, does not

7   mean that the ATF cannot revoke your FFL if it was willful

8   violations of the Gun Control Act?

9   A.  Yes.

10  Q.  You do understand, however, that it's only proper for the

11  ATF to revoke Chambered Group's FFL if it's established that

12  the violations were willful, not merely that the violations

13  occurred, correct?

14  A.  Correct.

15  Q.  Okay.  You were asked on cross about an application for an

16  07 manufacturer's license; do you recall that testimony?

17  A.  Yes.

18  Q.  Who is the applicant for that 07 FFL?

19  A.  Just myself.

20  Q.  Let me rephrase that.

21          Is Chambered Custom Firearms LLC the applicant for

22  that federal firearms license?

23  A.  The corporation, yes.

24  Q.  Okay.  And you understand that a legal entity is not you?

25  A.  Correct.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000204

JOHN LAMONTAGNE - REDIRECT EXAMINATION    148

1    Q.   Okay.  And so let me ask my question again.  Who is the

2    applicant for the type 7 federal firearms license?

3    A.   The corporation of Chambered Custom Firearms.

4    Q.   Okay.  Had Chambered Custom Firearms ever held an FFL

5    before?

6    A.   No.

7    Q.   Therefore, Chambered Custom Firearms could never have

8    willfully violated the Gun Control Act before, correct?

9    A.   Correct.

10   Q.   Did you complete and sign and submit the application for an

11   FFL for Chambered Custom Firearms?

12   A.   Yes.

13   Q.   Who were the responsible persons that were listed on that

14   application for an FFL?

15   A.   Just myself.

16   Q.   Based -- have you ever been employed or a responsible

17   person for an FFL other than Chambered Group USA?

18   A.   No, sir.

19   Q.   Were you personally involved in any of the transactions

20   that were cited in the report of violations as having errors

21   for which the ATF is seeking -- revoked Chambered Group's FFL?

22   A.   No, sir.

23   Q.   So it is your understanding that neither Chambered Custom

24   Firearms LLC nor John Lamontagne in his individual capacity

25   have ever willfully violated the Gun Control Act?

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000205

1   A.  No, sir.

2   Q.  During cross you were also asked a question about increased

3   sales during the coronavirus but not resulting in increased

4   income.  Was that something that you wanted to further explain?

5   A.  Correct.  So what was explained to me by our chief

6   financial officer who handles our books, was we were not

7   increasing our prices fast enough to overcome the increased

8   cost of the items.

9           So as you sell something for X dollars, if you -- if

10  it's Y dollars of what you are paying to replace it, you have

11  lost money.  We kept our prices the same and low because the

12  items -- we had a margin we were comfortable with working with.

13          So when we buy an item for $10, we wanted to make 20

14  percent, we sold it for $12.  But if it costs 14 when I go to

15  replace it, I have lost two dollars.

16  Q.  During the period covered by the coronavirus, when you

17  maintained your prices the same, did the manufacturers and the

18  distributors from which you were purchasing firearms increase

19  their prices?

20  A.  Yes.

21  Q.  Were those -- were there more than one increase?

22  A.  There were multiple increases by almost every manufacturer.

23  Q.  And were those substantial increases compared to prior

24  years?

25  A.  Yes, ammunition tripled in cost.

CHAMBERED CUSTOM FIREARMS-000206

1    Q.  And what about firearms?

2    A.  Firearms would average somewhere, 25, 35 percent.

3    Q.  So you were paying, if I got it correct, double for

4    ammunition and 20 to 25 percent more for firearms and were

5    selling them at the same price you had been selling them

6    before?

7    A.  Until we got to corrected cost, but we were always a little

8    bit behind on it.  Because we were continually doing that over

9    add over and over again.  We would price ourselves according to

10   20 percent.

11   Q.  Is that the basis for your claim that even though when

12   sales were increased, the profits did not necessarily increase

13   proportionally?

14   A.  Correct.  And like I said, that was the first year we lost

15   money in the store as we were moving on, yes.

16        MR. ALLAN:  Thank you.  No further questions, Your

17   Honor.

18        THE COURT:  You know, sir, I actually have a question

19   for you.  You testified moments ago that you were the majority

20   owner; is that correct?

21        THE WITNESS:  Correct.

22        THE COURT:  When you took possession of ownership as

23   the majority owner, what did you understand your

24   responsibilities were as it relates to FFL requirements?

25        Did you think because another person was running the

CHAMBERED CUSTOM FIREARMS-000207

1    operation that you didn't need to know about FFL requirements

2    or follow them?

3            THE WITNESS:  No, sir.  I knew we had to follow them

4    as a group.

5            THE COURT:  But you chose not to be part of it?

6            THE WITNESS:  I don't have the ability to be there.  I

7    have -- I have three other businesses that I have to operate.

8    And my main living, I don't make anything from the store, zero.

9            THE COURT:  But you understood that as the majority

10   owner --

11           THE WITNESS:  Correct.

12           THE COURT:  -- you had responsibilities to make sure

13   the forms were being filled out correctly?

14           THE WITNESS:  Correct.

15           THE COURT:  In light of the Court's question, I will

16   let both sides ask one question.

17           MR. ALLAN:  Mr. Lamontagne, even though you were not

18   involved in the day-to-day operations with the business in

19   connection with the sale of firearms, were you aware that it

20   was your responsibility to make sure that Mr. Fern and the

21   other employees who were involved in those sales complied with

22   their obligations under the Gun Control Act?

23           THE WITNESS:  Yes.  I was involved in many of those --

24   as they spoke about, I was the one that came up with the color

25   coding for the -- so each time we would have a violation and

CHAMBERED CUSTOM FIREARMS-000208

JOHN LAMONTAGNE - REDIRECT EXAMINATION          152

1    Jason would tell me that we had a problem, he and I would

2    develop a system to try to prevent it from ever happening

3    again.

4              So I was involved at a higher level than just the

5    day-to-day, but we always tried to comply with every law.

6              MR. ALLAN:  Thank you, Your Honor.

7              THE COURT:  Mr. Torres.

8              MR. TORRES:  Did you make sure that Mr. Fern responded

9    to every inquiry from the ATF appropriately?

10             THE WITNESS:  Trace request?  Is that what you are

11   asking about?  A trace request?

12             MR. TORRES:  I'm sorry, what?

13             THE WITNESS:  Are you asking me if he -- response to

14   every trace request?

15             THE COURT:  He didn't say anything about a trace

16   request.

17             Ask the question slower.

18             MR. TORRES:  Did you personally ensure that Mr. Fern

19   responded to every inquiry and request from the ATF

20   appropriately?

21             THE WITNESS:  What documentation are you referring to?

22             THE COURT:  Explain -- there's a whole -- all day we

23   have been talking about the times that the ATF went to your

24   business, found that you weren't fully complying with many

25   different areas.

CHAMBERED CUSTOM FIREARMS-000209

1        Ask the question again.

2        MR. TORRES:  Did you make sure that Mr. Fern

3   appropriately responded to everything the Judge just mentioned?

4        THE WITNESS:  I apologize.  I am really not sure I

5   totally understand what exactly we're referring to.  Like did

6   I -- what did I not do or do?  I don't know.  I am not sure.  I

7   don't want to misrepresent myself or someone else, because I am

8   not totally sure I understand.

9        THE COURT:  Okay, let's do this.  Mr. Allan, why don't

10  you come up for a moment.  Maybe you can help me out, and maybe

11  you can help your client understand better.

12       Can you clarify what we are trying to get into or what

13  Mr. Torres is asking.

14       MR. ALLAN:  Mr. Lamontagne, when reports of violations

15  were received by Chambered Group from the ATF, would Mr. Fern

16  bring those to your attention?

17       THE WITNESS:  Yes.

18       MR. ALLAN:  Would you work with them to ensure that

19  Chambered Group properly responded to those reports of

20  violations?

21       THE WITNESS:  Yes.

22       MR. ALLAN:  Does that answer the question, Your Honor?

23       THE COURT:  It does, but Mr. Torres, since you haven't

24  had your opportunity, go ahead, please.

25       Mr. Allan, thank you.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000210

JOHN LAMONTAGNE - REDIRECT EXAMINATION    154

```
 1            MR. TORRES:  That will be all, Your Honor.  Thank you.

 2            THE COURT:  Very well.

 3            Sir, you can step down right now.  Thank you very

 4   much.

 5            Next witness, please.

 6            MR. ALLAN:  Your Honor, we have no further witnesses.

 7            THE COURT:  Mr. Capps or Mr. Torres, do you have any

 8   witnesses you plan to call?

 9            MR. CAPPS:  Your Honor, yes.  We would like to call

10   Kris Babcock at this time.

11            THE COURT:  Okay, go ahead.

12            MR. ALLAN:  Your Honor, we would like to put an

13   objection on the record on the basis that Ms. Babcock was not

14   listed as a witness for the ATF for this hearing.

15            THE COURT:  Have you had a chance to look at any of

16   the documents as it relates to Ms. Babcock?

17            MR. ALLAN:  We have reviewed the reports of notice of

18   revocation, yes.

19            THE COURT:  Mr. Capps, do you have any documents in

20   addition to the notices of revocation -- or the notice of

21   revocation?

22            MR. CAPPS:  Nothing beyond perhaps that small number

23   of exhibits that are already in that go directly to some of the

24   questions that the Court was raising this morning.  That's the

25   principal purpose of having Ms. Babcock here.
```

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000211

1      THE COURT:  Very well.  I will allow it.  Please call

2   her.

3      Ma'am, if you will walk to the front of the courtroom,

4   please, and raise your right hand to be sworn.

5      **KRISTINA LOUISE BABCOCK, RESPONDENT'S WITNESS, SWORN**

6      THE CLERK:  You can have a seat on the witness stand.

7      THE COURT:  Ma'am, there's a number of questions the

8   Court had this morning that the lawyers couldn't answer, and

9   they indicated only you had the answers.  I am sure counsel has

10  all of those questions written down.

11     First of all, I need your full name, and if you could

12  spell each name, please.

13     THE WITNESS:  Yes.  Kristina K-R-I-S --

14     THE COURT:  I am also going to need you to move closer

15  to the microphone so everyone can hear you.

16     THE WITNESS:  Kristina, K-R-I-S-T-I-N-A.  Louise,

17  L-O-U-I-S-E.  Babcock, B-A-B-C-O-C-K.

18     THE COURT:  Go ahead, Mr. Capps.

19     MR. CAPPS:  Thank you, Your Honor.

20                   DIRECT EXAMINATION

21  BY MR. CAPPS:

22  Q.  Good afternoon, Ms. Babcock.

23     What is your current position?

24  A.  Director of Industry Operations for the Phoenix field for

25  Bureau of Alcohol, Tobacco, Firearms and Explosives.

CHAMBERED CUSTOM FIREARMS-000212

1   Q.  And how long have you held that title?

2          THE COURT:  Let's take a step back.  I don't know what

3   that means.  What is -- I know the title, but what does it

4   entail?

5          MR. CAPPS:  Of course, Your Honor.

6          THE COURT:  Thank you.

7   BY MR. CAPPS:

8   Q.  As the Director of Industry Operations for the Phoenix

9   field office, what responsibilities -- what do you do in that

10  position?

11  A.  In this position -- there's the criminal enforcement side

12  to ATF and the regulatory side.  I oversee the regulatory side

13  for the Phoenix field division, which covers part of New Mexico

14  and all of Arizona.

15         And I oversee the investigators who conduct compliance

16  inspections, applications inspections of federal firearms

17  licensees or those looking to obtain a federal firearms

18  license, and also the explosive license.

19         We ensure that they are in compliance with the federal

20  firearms laws and regulations as well as the explosive laws and

21  regulations.

22         THE COURT:  Let me stop you for just a moment,

23  Mr. Capps.  Just to make sure the record is clear, any and all

24  discovery that would be related to your witness has already

25  been disclosed to the Petitioner?

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000213

1           MR. CAPPS:  Your Honor, there's been no discovery in

2     this case.  This case --

3           THE COURT:  Well, I mean, as it relates to just this

4     hearing.  Has anything been provided, with the exception of the

5     documents that we have in evidence?

6           MR. CAPPS:  Nothing in addition to the administrative

7     record.

8           THE COURT:  Okay.  Very well.  Thank you.

9     BY MR. CAPPS:

10    Q.  Ms. Babcock, how long have you been in the DIO position?

11    A.  Approximately two years.

12    Q.  When you mentioned in your prior answer, you used the term

13    "investigators," I believe, in the context of compliance

14    inspections.  Are those also known as IOIs?

15    A.  Industry Operations Investigators, and they are called

16    IOIs.

17    Q.  Thank you.  What is the goal of a compliance inspection?

18    A.  So the goal of the compliance inspection is to ensure that

19    the licensees are in compliance with the federal firearms laws

20    and regulations as it relates to the firearms licensees.

21          Also, when we're out there, if we see any issues or

22    any violations, we attempt to address -- well, we do address

23    those with the licensees and try to get them into compliance.

24    Q.  Does the ATF assist the licensee that is under

25    investigation in obtaining compliance or understanding

CHAMBERED CUSTOM FIREARMS-000214

1    shortcomings at that time and what they need to do to correct

2    it?

3    A.  Yes, they do.  Usually what will happen is they will do a

4    compliance inspection, review the records.  And at the end, if

5    there are any violations, they will issue a report of

6    violations.

7        And during that time, what they should be doing is

8    they should be going over each of those violations with the

9    licensee, ensuring that they understand what that regulation

10    states and what they need to do.

11        And normally what they'll do during that time is,

12    they'll assist in, you know, possibly providing suggestions to

13    help them ensure compliance.

14        The licensees at that time may not realize that there

15    was actually an issue, and so -- or they may have thought that

16    they were doing it correctly and then not realize they were not

17    doing it correctly.  And so they will also offer up to us what

18    they are going to do to ensure that they come into compliance.

19        And during that, we call the ROV, report of

20    violations, also known as ROV, during that time it's considered

21    a closing conference, and we also go over -- it's called an

22    acknowledgment of federal firearms laws and regulations, and

23    that is where we do a brief overview of the regulations with

24    the licensee each time we do visit them.

25        We do let them know it's a brief overview, but we

CHAMBERED CUSTOM FIREARMS-000215

1    provide contact information there.  And also what we try to do

2    is after the inspection's done, that's not where they end their

3    communications with us.

4         We would like them to contact us if they have issues,

5    you know, throughout the year, not just when we come out there

6    to do a compliance inspection.  We also offer seminars to

7    assist licensees as well to ensure that they are in compliance.

8         But we do -- I know the investigators that are in the

9    Phoenix field division, they do remain in contact with a lot of

10   these licensees throughout the year.

11   Q.  Thank you.  Can you provide the Court a general description

12   of the process that ATF takes in administrative action

13   vis-a-vis, a FFL and the compliance inspection?

14   A.  So I can give a general overview.  So what will happen is

15   we will go out and we'll do a compliance inspection.  Depending

16   on the violations found, it could result in -- or if it's their

17   first, second, or third inspection, it could result in a report

18   of violations, which all that is is just an ROV that we provide

19   to the licensee to let them know, okay, these are the

20   violations that we found, and that does stay with ATF.

21        If we go back out and do another inspection, if we

22   don't see any improvement or if it's gotten worse, it could

23   result in a warning letter, again depending on the violation.

24        And a warning letter is basically -- it's incremental.

25   Everything is usually incremental.  We don't just go right out

CHAMBERED CUSTOM FIREARMS-000216

1    there and, you know, go to warning conference and revocation.

2            But what we will do is -- so they will get a warning

3    letter.  That warning letter just lets them know -- they will

4    also get a report of violations, but they'll get a warning

5    letter.  And that warning letter can let them know that, hey,

6    we're putting you on notice that there's some issues that we're

7    still seeing.

8            And then if we go back out and do another inspection,

9    if it's not any better, if it's significantly worse, it could

10   result in a warning conference.

11           And at that time, we will have the licensees come in

12   and either meet with the area supervisor, or they could meet

13   with me.  Because at that time, if there's no improvement, we

14   want to ensure that we can get them into compliance.

15           So what we'll do is we'll follow that up with a letter

16   stating basically what was discussed during the warning

17   conference, and we do let them know at that time that there

18   will be another inspection, because we will be doing a recall

19   inspection.

20           And if we go back out and do that recall inspection,

21   if there is no improvement again, and it's still the same or

22   worse, then that could result in revocation recommendation of

23   their license.

24   Q.  What information did you have before you in the capacity of

25   DIO presiding over the revocation hearing in July of 2023 -- or

CHAMBERED CUSTOM FIREARMS-000217

1    excuse me, the hearing was in April of 2023 -- let me reask the

2    question.

3           What information did you have at your disposal when

4    you conducted that revocation hearing in April of 2023?

5    A.   So for that hearing, I had all the previous inspections,

6    the results of those previous inspections, any administrative

7    action that was taken.  So basically I had information of all

8    their previous inspections.

9    Q.   Would this include ROVs from 2018, 2019, and 2021?

10   A.   Yes, as well as the acknowledgments that they signed with

11   ATF.

12   Q.   Would it also include the specific responses from the

13   licensees with regard to each of those separate ROVs?

14   A.   Yes.

15   Q.   There were some questions, fair questions asked by the

16   Court this morning, Ms. Babcock.  And the first question is:

17   Can you explain why ATF did not revoke the license based on the

18   2018, 2019, or 2021 inspections?

19   A.   So for those inspections, I was not involved in those, so I

20   cannot answer specifically to why they were not.  I can give a

21   general again, the overview of the process that we usually do

22   when it comes to inspecting licensees.

23   Q.   What was your understanding as DIO and looking at the

24   record that you've described for us, including these prior

25   ROVs, as to why the license wasn't revoked in those earlier

CHAMBERED CUSTOM FIREARMS-000218

1    years?

2    A.  So when the violations occurred, they'd give them the

3    report of violations the first time.  They tried to get them

4    into compliance.  And after, you know -- so we went back out

5    and did another inspection.  We basically went out there, and

6    there were repeat violations found, so that drove the level of

7    administrative action.

8         I don't know if that's answering the question that --

9    I apologize.  I am not quite sure what you want me -- or not --

10   Q.  To be clear, while you weren't personally involved, did you

11   have an understanding based upon your experience as DIO and in

12   conducting these types of -- supervising people conducting

13   investigations, et cetera, as to what factors may have been

14   behind a decision not to revoke in 2018, 2019, or 2021?

15   A.  Yes.

16   Q.  Okay.  And that -- is your testimony based upon the general

17   description of the ATF's administrative process?

18   A.  Yes.

19   Q.  Do you know why there was -- why there was no warning

20   letter or warning conference for the 2018 or 2021 inspections?

21   A.  No, I do not know why.

22   Q.  Do you know why the three violations found not to be

23   willful -- that you found not to be willful in April of 2022

24   did not rise to the level of willfulness?

25   A.  From my recollection on those, one of them, it was just one

163

KRISTINA LOUISE BABCOCK - DIRECT EXAMINATION

1    instance, which could be viewed as a mere mistake.  And I

2    believe the other two were just two or three instances, and I

3    did not see those as rising to the level of willfulness.

4    Q.  Can you give the Court any examples of inadvertent

5    recordkeeping mistakes that have resulted in harm?

6    A.  Yes.  So some recordkeeping mistakes.  They could on the

7    ATF Form 4473, they could incorrectly identify the firearm

8    being transferred, and that right there, if that firearm is

9    used in a crime, it could impede law enforcement's ability to

10   work that crime.

11        There has also been -- if there's -- they contact the

12   National Instant Criminal Background Check System, and the

13   person is delayed, if they -- and they transfer that firearm

14   within the three days, they could potentially be transferring

15   it to a prohibited individual.

16        From my own experience, I had one where a purchaser

17   filled out a form and actually answered yes to a prohibiting

18   question; however, the licensee did not review those

19   prohibiting questions and did contact NICS, which is the

20   background check system, and unfortunately, NICS approved that

21   transaction.

22        So had the licensee had reviewed that form, they would

23   have known that this person gave them cause to believe that

24   they are prohibited and should have stopped the sale at that

25   time.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000220

1    Q.  Do you recall the specific violations that you found to be

2    non-willful in April of 2022?

3    A.  I believe one was, they did not put all the information for

4    a alternate permit in lieu of a background check.  Again, I'd

5    have to review that exhibit to see specifically.

6    Q.  Would it help your memory if you had an opportunity to

7    review that exhibit?

8    A.  Yes, it would.

9    Q.  With regard to the failure to record NICS alternate permit

10   information, can we display Exhibit 108, please?

11        Are you able to see that or do we need better quality?

12   A.  I can see the front page.  I just need to see where the

13   NICS information goes -- or excuse me, the alternate permit

14   information.  I believe the second page.

15        Go to the next page, please.

16        Yeah, so on that one, they did not record the permit

17   number, so they had the partial information in there, but they

18   did not have the permit number in there.

19   Q.  And are you -- the box that's been highlighted now for you?

20   A.  Correct.

21   Q.  Okay.  And with respect to the -- your finding as to

22   non-willfulness as to the failure to verify or record an

23   identification document, can we look at Exhibit 106, please?

24   A.  I'm sorry, this one I'm looking at?

25        THE COURT:  I think she's waiting for a question or

1    something from you.

2            THE WITNESS:  Is this the identification document?

3    BY MR. CAPPS:

4    Q.  Yes.

5    A.  Okay, I'm sorry.  This one it looks like there was no

6    identification -- it's left blank.

7    Q.  Which box number are you looking at?

8    A.  26a.

9    Q.  Okay.  And there was a second occurrence deemed by you to

10   be non-willful in this same section.  If we could look at

11   Exhibit 107, please.

12   A.  That one it looks like they failed to put the number, the

13   driver's license number on the form.  So part of it was there,

14   but it was missing the number.

15           MR. ALLAN:  Your Honor, are we referring to

16   Exhibit 107?

17           THE COURT:  I don't believe so, because the one I have

18   is different.  What exhibit is up on the screen?

19           MR. CAPPS:  107.

20           MR. ALLAN:  Your Honor, the number of identification

21   is redacted as it is on every other form.

22           THE COURT:  Correct.

23           MR. CAPPS:  We can move on to the next question, Your

24   Honor.

25

CHAMBERED CUSTOM FIREARMS-000222

1  BY MR. CAPPS:

2  Q.  With respect to the violations found by you to be

3  non-willful for failure to sign or date, 478.124(c)(5), can we

4  see Exhibit 109, please?

5  A.  Is that the next page?  And this was -- I'm sorry.

6  Q.  124(c)(5), failure to sign/date?

7  A.  Can you go up to the certification date of the purchaser?

8  Q.  Back one page.

9  A.  So on this one, it looks like they certified it on June

10  29th.  NICS was contacted on June 29th, but if you go to the

11  transfer date on the next page, it shows it was transferred on

12  September 17th.  I believe this one was an error on the date

13  that was written in there.

14  Q.  Okay.  And with respect to your finding of non-willful

15  violation for the same provision, 124(c)(5), can we look at

16  Exhibit 110?

17  A.  This one is blank.

18  Q.  Are you able to tell as you sit here today specifically

19  what the violation was and --

20  A.  I -- yes, I am sorry.

21  Q.  -- whether it was non-willful?

22  A.  I would have to look at the transcripts again to see if

23  this one was specifically addressed, but out of the number of

24  forms, I can see this one as just being a mistake on their part

25  for failing to complete that section, as it happens sometimes.

CHAMBERED CUSTOM FIREARMS-000223

1    Q.  And last, with respect to the last 124(c)(5) violation

2    found to be non-willful, if we could look at Exhibit 111?

3    A.  Again, this one they left those blank as well, but they had

4    in most instances filled out those sections.

5    Q.  Are you able to tell without looking at any documentation

6    why you found six of the nine violations in the April 2022 ROV

7    as willful?

8    A.  Yes.  I know most of those were repeat violations, and on

9    the repeat violations, they had been cited in the past

10   inspections.  And in those past inspections, the licensee had

11   stated that they would do double-checks or do in-house audits;

12   however, the violations continued even after we issued a report

13   of violations.

14          We even had a warning conference with them to go over

15   that, and again, in this current inspection, they had the

16   repeat violations.

17          MR. CAPPS:  Your Honor, I have no further questions.

18   Of course if you do, you are welcome.

19          THE COURT:  Thank you very much.

20          Cross-examination.

21          MR. ALLAN:  Yes, Your Honor.

22          THE COURT:  Come on up, please.

23                          CROSS-EXAMINATION

24   BY MR. ALLAN:

25   Q.  You testified that if there was no improvement from a prior

CHAMBERED CUSTOM FIREARMS-000224

KRISTINA LOUISE BABCOCK - CROSS-EXAMINATION

1   report of violations, that could result in a revocation; is

2   that correct?

3   A.  It could, correct.

4   Q.  Does the Gun Control Act require that a violation be

5   willful in order for a revocation?

6   A.  I would have to review what the actual Gun Control Act

7   states.

8   Q.  Okay.  Did you -- in making the decision to revoke

9   Chambered Group's FFL, did you make a decision that they had

10  willfully violated the Gun Control Act?

11  A.  Yes, I did.

12  Q.  And what standard did you use to determine whether a

13  violation was willful?

14  A.  The repeat violations, that can be shown as plain

15  indifference.  We had discussed that with them.  They had in

16  past inspections stated that they were going to do in-house

17  audits.

18          Obviously those audits were not effective if they were

19  put into place, and after multiple repeat violations.  That is

20  where I deemed those as willful.

21  Q.  After the warning conference was held, there was another

22  compliance inspection report of violations, correct?

23  A.  Correct.

24  Q.  And they had significantly improved from 2019 to 2021,

25  correct?

CHAMBERED CUSTOM FIREARMS-000225

1    A.  Correct.

2    Q.  And in fact, based on the improvement, there was no

3    administrative action taken beyond the closing conference,

4    correct?

5    A.  I would have to look at the record for that one.  I am not

6    sure.  I know they were issued a report of violations.  I can't

7    say offhand if there was anything else issued.

8    Q.  Are you familiar with something called a Spartan database?

9    A.  Yes.

10    Q.  Would you please explain what it is?

11    A.  The Spartan database is the database that ATF utilizes to

12    house all of our inspections and our inspection results.

13    Q.  When a report of violations is completed, does the ATF IOI

14    enter information on the violations into the Spartan database?

15    A.  Yes.

16    Q.  Based on the information entered, does the Spartan database

17    provide a recommendation as to whether it should be closed with

18    a warning conference from the report of violations, a warning

19    letter, a warning conference, or a notice of revocation?

20    A.  Yeah.  So what it does is it requires the investigator to

21    put in inspection findings, and so they will check those

22    inspection findings, and then Spartan will generate a

23    recommendation, a suggested recommendation, yes.

24    Q.  Okay.  Does Spartan always provide a suggested

25    recommendation?

CHAMBERED CUSTOM FIREARMS-000226

1    A.  Yes.

2    Q.  Okay.  The Judge had a question as far as why the 2018

3    report -- yeah, 2018 report of violations did not issue --

4    result in a notice of revocation.  Would that be because based

5    on the violations being entered into the Spartan database, it

6    did not recommend that a report of violation -- that a notice

7    of revocation be issued?

8    A.  That could be it.

9    Q.  Based on -- are you familiar with the 2018 report of

10   violations?

11   A.  I would have to look at it again.

12   Q.  Okay.

13          Can you pull it up?

14   A.  If I can ask, was that their first inspection?

15   Q.  It was the first inspection, correct.

16   A.  Okay.

17   Q.  Okay.  This is the first page of the 2018 report of

18   violations?

19   A.  Okay.

20   Q.  Let me know when you have had a chance to review that.

21   A.  I have looked at that.

22   Q.  Okay.  And this is the second page.

23   A.  Okay.

24   Q.  And the third page?

25   A.  Okay.

CHAMBERED CUSTOM FIREARMS-000227

1    Q.  Is one of the reasons that the ATF uses the Spartan

2    database to ensure that the recommendations for administrative

3    action and revocations are consistent throughout the various

4    field divisions?

5    A.  Yes.

6    Q.  Okay.  Based on having reviewed the 2018 report of

7    recommendations now, what, based on your understanding, what

8    would the administrative action be recommended in response to

9    that initial report of violations?

10   A.  So on this inspection here, this ROV looks like it came

11   from our old system, the Inspect system, so I would have to

12   double-check that.

13           But based on the ROV that I see here, and that this is

14   their first inspection, this would be appropriate just to be a

15   report of violations issued to the licensee.

16   Q.  Can you do the 2019?

17           We will publish what is the the 2019 report of

18   violations.  And if you could just take a look at that once it

19   is put up.

20           And while you're looking at that, Inspect was the

21   ATF's database that was used before Spartan, correct?

22   A.  Correct.

23   Q.  And does it serve the same basic purpose?

24   A.  Yes.

25   Q.  Okay.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000228

KRISTINA LOUISE BABCOCK - CROSS-EXAMINATION

1   A.  I looked at that.

2   Q.  Based on your review of this 2019 report of violations,

3   which was the second compliance inspection of the licensee,

4   what is your understanding of what response the ATF would

5   normally take in response to that report of violations?

6   A.  This one, there was a significant increase in the

7   violations and the instances as well, and then also there

8   was -- it looked like there was a failure to do a background

9   check.  So this could have resulted in a warning conference.

10  Q.  Is that the typical recommendation that would be provided

11  by either Inspect or this Spartan database?

12  A.  So Inspect never provided a recommendation.  Spartan --

13  again, I would have to see what was checked.  It appears that

14  it would be a warning conference.  Just because Spartan

15  recommends a warning conference doesn't mean that we are held

16  to that.

17  Q.  Understood.  Now, you said one of the violations on that

18  was failure to conduct a background check, correct?

19  A.  Correct.

20  Q.  And despite the fact that there was a failure to conduct a

21  background check, the ATF still issued a warning conference

22  instead of a notice of revocation, correct?

23  A.  Correct.

24  Q.  Can you give me 21?

25          We are showing you now -- do you know what exhibit

UNITED STATES DISTRICT COURT

KRISTINA LOUISE BABCOCK - CROSS-EXAMINATION

1    this is?

2              MR. MALSCH:   121.

3    BY MR. ALLAN:

4    Q.  Exhibit 121, which is the 2021 report of violations.  And

5    this is a single page.

6    A.  So in this one, I would say this would just be a report of

7    violations.  There was significant improvement in the number of

8    violations as well as the instances.  So this would not rise to

9    the level of another warning conference or revocation, since

10   there was significant improvement.

11   Q.  When you are determining what the appropriate level of

12   administrative action is, do you normally look at the results

13   from the last report of violations or all of them in tandem?

14   A.  I'm sorry?

15   Q.  When the 2022 report of violations was conducted, would you

16   compare that to the results of the 2021 report of violations,

17   or all of the previous ones?

18   A.  Oh, I look at everything.  I look at all of the previous

19   inspections.

20   Q.  Okay.  Are you -- are you familiar with the Biden

21   Administration zero tolerance policy?

22   A.  Yes.

23   Q.  Will you please briefly explain what that is for the Court?

24   A.  So basically there is enhanced regulatory policy that there

25   are -- I believe there are five specific violations that have

UNITED STATES DISTRICT COURT

1    found warrant revocation.

2    Q.  And that's -- they warrant revocation simply by their

3    existence, regardless of any determination of whether or not

4    they were willfully committed, correct?

5    A.  Correct.

6    Q.  And, for example, is one of those five violations failure

7    to conduct a background check?

8    A.  Yes.

9    Q.  So if the Biden Administration zero tolerance policy was in

10   effect in 2019, instead of a warning conference, which was the

11   ATF's standard response to those types of violations, it would

12   have been required to revoke, correct?

13   A.  Correct.

14   Q.  Are you aware that in response to the Biden

15   Administration's zero tolerance policy, the Spartan database

16   was reprogrammed to change its recommendations for certain

17   violations?

18   A.  Yes.

19   Q.  And what was the basis for changing those recommendations?

20   A.  It was based on the presidential -- the enforced

21   enhancement act -- well, not act, but based on President

22   Biden's --

23   Q.  So the ATF has now been instructed to issue a -- to revoke

24   an FFL if certain categories of violations have occurred simply

25   based on the fact that they have occurred, correct?

CHAMBERED CUSTOM FIREARMS-000231