1    A.  So it recommends revocation.  That does not mean that we

2    have to revoke that licensee.  We will hold a hearing, if they

3    timely request a hearing, and at that time we will go ahead and

4    hold a hearing and determine whether or not those violations

5    were actually willful or not, and then we can either revoke or

6    not revoke.

7    Q.  Okay.  In regard to issuing the initial notice of

8    revocation, are you required by this policy to issue the notice

9    of revocation simply based on the nature of the violations?

10   A.  So the recommendation is revocation, and at that point, it

11   will go up to our deputy assistant director, and they will put

12   in their recommendation as well, and usually that is

13   revocation, unless there's extraordinary circumstances.

14          That is something that I do not determine.  And in

15   most cases, yes, it will go, revocation is the recommendation.

16   And then the initial notice of revocation will be sent out to

17   the licensee.

18   Q.  And what are the extraordinary circumstances that can

19   justify not proceeding with a revocation hearing?

20   A.  That I do not know.  That is the director of ATF to decide.

21   Q.  To your knowledge, has ATF provided any written guidance on

22   what "extraordinary circumstances" mean?

23   A.  To my knowledge, no.

24   Q.  You obviously attended the revocation hearing, correct?

25   A.  Correct.

CHAMBERED CUSTOM FIREARMS-000232

1  Q.  Okay.  We are going to be showing you what's been marked as

2  Exhibit 1, which is the notice -- the final notice of

3  revocation.

4       Can you just look at that document and see if that

5  looks familiar to you?

6  A.  Yeah, I can only see the top part.  Yes, that's the final

7  notice, part of it.

8  Q.  Does that bear your name on that, as far as the person

9  issuing it and a digital signature?

10  A.  Yes, it does.

11  Q.  And would you take a look at the third paragraph on the

12  next page, the highlighted part and identify who the witness

13  for the ATF was during that hearing?

14  A.  It says Terri Gazda.

15  Q.  Did Terri Gazda testify during that hearing?

16  A.  No.

17  Q.  So that would be an error?

18  A.  Yes.

19  Q.  Was that error willfully made on final notice of revocation

20  to --

21  A.  No.

22  Q.  -- the licensee?

23  A.  No.

24  Q.  Was that simply an error or mistake based on the fact that

25  humans make mistakes?

CHAMBERED CUSTOM FIREARMS-000233

KRISTINA LOUISE BABCOCK - CROSS-EXAMINATION

1  A.  I would assume that, yes.  That's just a mistake.

2  Q.  Okay.  And you obviously heard the testimony of IOI Tara

3  Crubaugh who was representative of the ATF that testified in

4  that hearing, correct?

5  A.  Correct.

6  Q.  Did you disagree with any of the testimony that she

7  offered?

8  A.  No.

9  Q.  Okay.  And are you aware that Ms. Crubaugh testified that

10  the ATF has no concerns with Chambered Group's responding to

11  trace requests?

12  A.  From what I recall, there was not a concern.

13  Q.  And you recall that the ATF -- that Ms. Crubaugh on behalf

14  of the ATF testified that they had no concerns with Chambered

15  Group reporting multiple sale forms?

16  A.  I don't -- I would have to look at the transcripts on that

17  one.

18  Q.  We will pull up the transcript for you momentarily.

19          THE COURT:  What document is that?

20          MR. MALSCH:  123.

21          MR. ALLAN:  This is Exhibit 123.

22          THE COURT:  Thank you.

23          MR. ALLAN:  And we have page 51 on the computer

24  screen.

25          THE COURT:  Thank you.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000234

1   BY MR. ALLAN:

2   Q.  And would you please look at line number 17?

3   A.  Okay.  I've looked at that.  She had no concerns with their

4   multiple sales being reported.

5   Q.  Okay.  And did the ATF have any concerns with the Chambered

6   Group's business practices potentially contributing to the

7   diversion of firearms?

8   A.  I would have to look at what --

9   Q.  If you'd look at lines 19, starting at line 19?

10  A.  So the IOI said no.

11  Q.  You testified that you agreed with her testimony during

12  that hearing, correct?

13  A.  Yes, and I am going to apologize here because I was not

14  recollecting this, but with regard to the violations and what

15  occurred.

16  Q.  Based on the violations that did occur, none of them had a

17  nexus to a prohibited person receiving a firearm, correct?

18          MR. CAPPS:  Your Honor, objection, relevance.

19          THE COURT:  That's overruled.

20          You may respond.

21          THE WITNESS:  Can you repeat the question?

22  BY MR. ALLAN:

23  Q.  Yes.  The violations that were actually cited in the report

24  of violations and on which the FFL was revoked, none of them

25  had a relationship to a prohibited -- person who was prohibited

CHAMBERED CUSTOM FIREARMS-000235

1  by the Gun Control Act from possessing a firearm, actually

2  receiving a firearm, correct?

3  A.  Correct.

4  Q.  And in fact, a background check was conducted on certain

5  individuals where there were violations on the form, correct?

6  A.  I believe so.

7  Q.  And those background checks would have indicated that the

8  person was allowed to possess a firearm, correct?

9  A.  Correct.

10  Q.  And similarly, the ATF did not have any concerns with

11  regard to the diversion or trafficking of firearms by Chambered

12  Group, correct?

13  A.  The IOI did not.

14  Q.  And no concerns about selling to straw purchasers?

15  A.  The IOI, I believe, did not.  I would have to look at the

16  transcript.

17  Q.  Okay.  And can you give me page 54?

18       And again, the IOI was there testifying on behalf of

19  the ATF, correct?

20  A.  She was testifying to her inspection findings, correct.

21  Q.  And if you would look at lines 3 and 11 would have the two

22  questions that I just asked?

23  A.  Yeah, she stated there was no individuals that were

24  prohibited, and she did not identify any concerns with straw

25  purchasing.

CHAMBERED CUSTOM FIREARMS-000236

1    Q.  Okay.  Is there anybody other than IOI Crubaugh who would

2    have been the one to determine whether there was straw purchase

3    issues identified during this compliance inspection?

4    A.  It would be the IOI that was out there, and from my

5    recollection, she was the only one out there.  I would have to

6    look and see if there's any IOIs assisting her, but she is the

7    one that reviewed all of the records, and she did not find

8    anything with straw purchasing.

9    Q.  Okay.  And based on her testimony, it was also her opinion

10   that Chambered Group would be able to maintain -- be compliant

11   and maintain compliance going forward with the Gun Control Act,

12   correct?

13        And that was beginning on line 14.

14        You took it away.

15   A.  Yeah, that was her testimony, yes.

16   Q.  55.

17        Did Ms. Crubaugh also testify that she had no reason

18   to believe that the licensee intentionally made any of the

19   errors identified in the report of violations?

20   A.  She stated that she can't say for sure, but it doesn't

21   appear as though it was intentional.

22   Q.  And similarly, with regard to the transfer on -- of the

23   firearm to a customer who was on a three-day delay, if the ATF

24   looks at that at the time of the hearing, are you able to

25   determine whether that had turned to a "proceed" at a certain

CHAMBERED CUSTOM FIREARMS-000237

1    time?

2    A.  I would have to review that exhibit.

3    Q.  Are you familiar generally with the policies pursuant to

4    which NICS background checks are conducted?

5    A.  I don't understand the question.  I'm sorry.

6    Q.  Are you generally familiar with the process for conducting

7    background checks using the FBI's NICS system?

8    A.  Yes.

9    Q.  If a result is a "proceed," how long does that remain in

10   the system?

11   A.  I don't believe that is maintained in the system.  It might

12   be 48 hours.  I apologize.  I'd would have to look.  I know

13   that that stuff is not -- does not remain in the system.  It is

14   removed.

15   Q.  Okay.  And therefore, if there was no information on the

16   results of a background check in the system, would that

17   indicate that at some point that it changed to a "proceed"?

18   A.  I would have to review it.

19   Q.  Now, IOI Crubaugh also testified that she did not believe

20   that Chambered Group's operation as a federally firearms

21   license dealer posed any threats to public safety; do you

22   recall that testimony?

23   A.  I do not recall that testimony.

24   Q.  Page 64.

25          And this is page 64 of the transcript, line 9?

CHAMBERED CUSTOM FIREARMS-000238

1    A.  The IOI stated no.

2    Q.  And again, the IOI was the person testifying on behalf of

3    the ATF based on the results of the inspection, correct?

4    A.  Testifying based on her inspection results, yes.

5    Q.  Similarly, IOI Crubaugh testified that she was not aware of

6    any reason to believe that the licensee was involved in any

7    criminal violations of the Gun Control Act, correct?

8    A.  She stated:  Not that I am aware of, no.

9    Q.  And she also testified that based on her experience as an

10   Industry Operations Investigator, she did not believe that

11   Chambered Group had any specific intent to do something that

12   the law forbids, correct?

13   A.  I believe she stated:  No, I don't believe there was an

14   intention to.

15   Q.  And she also testified that based on her time on site at

16   Chambered Group's premises, that it was her opinion that going

17   forward, the licensee is able to be compliant and maintain

18   compliance with the Gun Control Act, correct?

19   A.  That is what she found.

20   Q.  Okay.  And again, she was the witness who was there

21   testifying on behalf of the ATF and who had actually been at

22   the licensee's premises reviewing its records, correct?

23   A.  For that inspection only.

24   Q.  You testified that the licensee could contact the ATF about

25   various concerns, correct?

CHAMBERED CUSTOM FIREARMS-000239

1    A.  Correct.

2    Q.  Are you aware that Chambered Group has in fact contacted

3    the ATF regarding various concerns?

4    A.  That, I am not aware of.  They could have, but there's no

5    log that we keep on that.

6    Q.  If you turn to page 48.

7        And this is a discussion about a time when Mr. Fern of

8    Chambered Group contacted the ATF about a customer who inquired

9    about what the best firearm would be to shoot up a school, and

10   in response to that, he contacted the ATF; do you recall that

11   testimony?

12   A.  I need to review this.  I don't -- if it's here, then it

13   was testified -- I don't recall everything from that hearing.

14   I would have to review this.

15   Q.  Based on the information that you received during the

16   administrative hearing, including the testimony of IOI

17   Crubaugh, do you have any reason to believe that the continued

18   operation of Chambered Group as a federally licensed firearms

19   dealer poses a threat to public safety?

20   A.  I actually do, yes.

21   Q.  What is the basis for that, and why did you not testify

22   that you disagreed with Ms. Crubaugh on that issue when I asked

23   a minute ago?

24   A.  Yeah, and I apologize for that.  That was my mistake.  I

25   was recollecting this as it pertains to the violations, not

CHAMBERED CUSTOM FIREARMS-000240

1   those specific questions, so that is my mistake.

2          They have had multiple repeat violations.  They have

3   stated they were going to be putting double-checks into place,

4   and those double-checks do not appear to have worked.

5          One violation it was stated during the hearing that

6   for the failure to wait the three business days prior to the

7   transfer, that they knew their employee was on some type of

8   pain medication that could have contributed to the issue.

9          And during the hearing, they had stated that they

10  terminated that employee; however, it was two weeks prior to

11  the hearing, but they had allowed this employee to continue

12  working for approximately -- I would have to look -- quite a

13  few months after the ROV was issued and when they had stated

14  that there was a problem with this employee.

15  Q.  Other than the fact that there were violations, some of

16  which were quote, unquote, "repeat violations," and the issues

17  with the employee taking the pain medicines, do you have any

18  other reasons to believe that the continued operation of

19  Chambered Group poses a threat to public safety?

20         MR. CAPPS:  Your Honor, in fairness, given the lapse

21  of time, I believe that the witness should be allowed to review

22  her findings and any other item that she thinks would be

23  helpful to answer that question in context as we sit here, far

24  removed from the date when she was up to speed and well vested,

25  et cetera, into this particular record.

CHAMBERED CUSTOM FIREARMS-000241

1          MR. ALLAN:  Your Honor, the U.S. knew that there was

2    an evidentiary hearing being held today.  They chose not to

3    call any witnesses or to have a witness prepared.

4          THE COURT:  The objection is overruled.

5          Ask the question again, please.

6    BY MR. ALLAN:

7    Q.  Other than what you just testified here with regard to the

8    violations that occurred on the 4473s, some of which were

9    repeat violations, and the issues regarding the employee who

10   was alleged to be on pain medicine, do you have any other

11   reasons to believe that the continued operation of Chambered

12   Group poses a threat to public safety?

13   A.  Well, I would say yes because those were deemed to be

14   willful.  I don't see where they've made any significant

15   improvement, and they have had multiple repeat violations.

16   Q.  Now, with regard to the violations on the Form 4473s, would

17   you agree that those violations all related to either leaving

18   something blank or checking an incorrect box?

19   A.  I would have to look at all of those forms for the report

20   of violations to see.  Because I know some were A&D record book

21   violations.  I can't recall each specific violation.

22   Q.  And my question is limited to the 4473 Form violations.

23   A.  Okay.  I would have to look at those.

24   Q.  Can you put up the report of violations for 2022?

25          THE COURT:  Well, I will tell you what.  Let's do

UNITED STATES DISTRICT COURT

1    this:  Let's go ahead and take our afternoon recess.  Court is

2    in recess until 2:45.  And the witness will have an opportunity

3    to review those documents with Respondent's counsel.

4             Court is in recess until 2:45.

5             (Recess taken at 2:25 p.m.; resumes at 2:51 p.m.)

6             THE COURT:  This court will come to order.  All

7    parties present when the court last closed are present again.

8             Please continue your cross-examination.

9    BY MR. ALLAN:

10   Q.  DIO Babcock, before the recess I believe I was asking you

11   whether there were any other violations in the 2022 report of

12   the violation that caused you to believe that the continued

13   operation of Chambered Group was a threat to public safety; is

14   that correct?

15   A.  So all of the violations.  I am not understanding -- can

16   you ask the question again?  I apologize.

17            MR. ALLAN:  Is it possible to get my last question

18   before the recess read back?

19            THE COURT:  We'll see what we can do.

20            (Whereupon, the court reporter read back.)

21            COURT REPORTER:  Question:  Now, with regard to the

22   violations on the Form 4473s, would you agree that those

23   violations all related to either leaving something blank or

24   checking an incorrect box?

25            MR. ALLAN:  Thank you.

CHAMBERED CUSTOM FIREARMS-000243

1    BY MR. ALLAN:

2    Q.  DIO Babcock, have you had a chance to review the 2022

3    report of violations?

4    A.  I've reviewed the 2022 report of violations.

5    Q.  Okay.  And having reviewed that, would you agree that the

6    violations on the 2022 report of violations relative to the

7    Form 4473s all relate to either incomplete entries or incorrect

8    entries on a Form 4473?

9    A.  Again, I would have to look at all of those exhibits,

10   because this does not state right there if those were blanks.

11   Q.  I am showing you what I believe is page 3 of Exhibit 2,

12   which is the 2022 report of violation under the instance

13   details.  It provides information on exactly what each

14   individual violation was.  Did you have a chance to review that

15   document during the recess?

16   A.  No, I did not.

17          THE COURT:  I don't understand.  We took a recess of

18   20 minutes and she didn't have a chance to look at anything?

19          MR. CAPPS:  Your Honor, I think there was a

20   misunderstanding then, and I do apologize.

21          THE COURT:  What was the misunderstanding?

22          MR. CAPPS:  As to the specific document that was to be

23   reviewed.

24          THE COURT:  What did you think we were referring to?

25          MR. CAPPS:  Your Honor, I thought frankly that it was

CHAMBERED CUSTOM FIREARMS-000244

1    the -- her report, the final report of revocation.

2              THE COURT:  Mr. Allan, do you need additional time

3    where we can come back another day so we can continue this

4    hearing, in hopes that you'll have a chance to have a witness

5    that has at least looked at the documents?

6              MR. ALLAN:  Your Honor, we would prefer to proceed

7    today.  As you know, the final effective date of the revocation

8    is October 1st.

9              THE COURT:  Correct.

10             MR. ALLAN:  And without the ability to continue to

11   acquire firearms, they are not going to be in business much

12   longer.

13             THE COURT:  Go ahead.  I will give you some leeway.

14   BY MR. ALLAN:

15   Q.  Ms. Babcock, would you please review exhibit -- page 3 of

16   Exhibit 2 with regard to those specific violations?

17   A.  So the 4473 violations?

18   Q.  Yes.

19   A.  Yes.

20   Q.  Starting with 3 on the far left -- sorry, 4 on the far left

21   column.

22   A.  Yes.  Many of those were blank items.  There was one where

23   the purchaser answered yes to a prohibiting question.  There

24   was an incomplete or incorrect information placed on the form.

25   Q.  Next page.

CHAMBERED CUSTOM FIREARMS-000245

1    Are you done looking at that first page?

2   A.  Yes.

3   Q.  That one.

4    I am showing you now what is exhibit [sic] 6 of

5   Exhibit Number 2, which is the remainder of the instance

6   details?

7   A.  Yes, those are blanks.  Many of those are blanks.  There is

8   incorrect and incomplete as well.

9   Q.  Okay.  To reask my question, would you agree that the 4473

10  violations on the 2022 report of violation all relate to

11  entries that were either blank or incorrect?

12  A.  Blank, incorrect, incomplete, and one "yes" answer to a

13  prohibiting question.

14  Q.  Okay.  On the customers who had an answer to a prohibiting

15  question, I believe you testified that there was a background

16  check conducted on them and none of these were actually

17  prohibited persons, correct?

18  A.  Correct.  There should have been one, yes, correct.

19  Q.  And that means simply that the person would have checked

20  the incorrect box, correct?

21  A.  Well, as I stated before, that could be; however, I have

22  come across an instance where someone did check "yes" and they

23  actually passed a background check and they were prohibited.

24  Q.  Okay.  That was one of my other questions.  You had

25  testified about a NICS-approved transaction where a customer

CHAMBERED CUSTOM FIREARMS-000246

1  indicated that they were prohibited [sic], a background check

2  was conducted, and you said the person was in fact prohibited?

3  A.  Correct.  And this -- I'm sorry.

4  Q.  What basis was that person prohibited?

5  A.  I believe they were a convicted felon; however, this was

6  back when I was an investigator in Wyoming, so that was quite a

7  few years ago.

8  Q.  And approximately when was that?

9  A.  2008, 2009.

10  Q.  Have there been improvements to the NICS system made since

11  that time?

12  A.  That's the only instance that I know that that's happened.

13  I can't say if it's happened since then.  I don't know what had

14  transpired during that time.

15  Q.  Okay.  So the only instance that you are aware of in which

16  a person who indicated that they were a prohibited person and

17  passed a background check was that one instance from 2008 or

18  2009?

19  A.  That's the only one I am aware of, yes.

20  Q.  You testified that certain of the violations did not arise

21  to the level of willfulness, and these were specifically what

22  were marked as Exhibits 106, 108, 109, 110, and 111.

23        Do you recall those exhibits, or do you need to have

24  them put up again?

25  A.  No, those were the ones that -- yeah, I reviewed

CHAMBERED CUSTOM FIREARMS-000247

1    previously.

2    Q.  Now, those violations related to having information blank,

3    correct?

4    A.  Correct or --

5    Q.  You can go ahead.

6    A.  I believe one had -- was -- well, I would have to look at

7    them again, so, yes, I believe most of them were blank.

8    Q.  Okay.  And I believe you testified that you determined that

9    those violations were not willfully committed because it was

10   just a mistake on their part and happens sometimes; does that

11   sound familiar?

12   A.  And because of the number of instances.  It was

13   basically -- I think one violation only had one instance, and

14   the other one I think had three instances.  So it was very

15   minimal on the instances on those.

16   Q.  Okay.  And in that regard, you also testified that they had

17   in most instances filled out those sections, correct?

18   A.  Correct.

19   Q.  And those were the two reasons for finding that those

20   violations were not willful?

21   A.  Correct.

22   Q.  And again, those violations simply relate to blanks on

23   certain areas of the 4473s, why then did you conclude that

24   having blanks on other areas of the 4473s were willful

25   violations?

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000248

1   A.  So again, as you had pointed out, that in one instance

2   again, with Terri Gazda, that was a mistake on our part.  And

3   in this instance, there was one instance where they left the

4   alternate permit blank.

5          Out of all those forms, I can easily justify or see

6   where that is just a mere mistake when they completed every

7   other form correctly.

8   Q.  And why would you think that it would not be a mere

9   mistake, for example, if they were to leave the number of

10  firearms transferred blank?

11  A.  I guess that would determine how many forms that that

12  would -- how many forms -- how many instances there were.

13  Q.  Is there -- did there -- did the ATF used to give a

14  consideration to the number of violations on 4473 forms

15  compared to the number of 4473 forms completed during the

16  inspection period?

17  A.  I'm sorry, can you repeat that again?

18  Q.  Yes.  In determining what -- the administrative action to

19  be taken in response to report of violations, did the ATF

20  previously consider the number of violations on 4473 forms

21  compared to the number of 4473 forms completed during the

22  inspection period?

23  A.  Not -- not that I am -- not saying that no one has, I just

24  not -- I don't believe so.

25  Q.  So you are not aware of a prior position by the ATF, for

CHAMBERED CUSTOM FIREARMS-000249

1    example, that if there were errors on less than, you know,

2    one-half of one percent of the 4473 forms that that would not

3    go beyond a report of violations?

4    A.   That I do not know.  But I do know that I believe if there

5    is -- and I would have to go back and review, but if there's

6    maybe on the multiple sales -- I can't say if that's correct or

7    not, but there are a couple of violations where if -- there's a

8    number of instances, so if there's five or more, then that

9    could result in a warning letter, or 10 percent of the

10   licensee's forms -- if there's errors in 10 percent or more,

11   that could result in a warning conference.  There are

12   specifics, but I can't recall offhand.

13   Q.   And that was what I was specifically getting at, was the 10

14   percent of errors on forms leading to a warning conference.

15   Are you aware of the percentage of errors on the forms

16   completed by the licensee during this period?

17   A.   No, I am not.

18          MR. ALLAN:   I apologize, Your Honor.  It will be one

19   minute.

20   BY MR. ALLAN:

21   Q.   DIO Babcock, during the period covered by the compliance

22   inspection, which was from April of 2021 through April of 2022,

23   Chambered Group completed 1,904 -- I'm sorry -- 1,930 Form

24   4473s, and according to the report of violations, had errors on

25   only 24 different of those 4473s, which would amount to a 98.76

CHAMBERED CUSTOM FIREARMS-000250

1    percent of those 4473s not having errors.

2          Prior to the Biden Administration's zero tolerance

3    policy, if the errors on the 4473s were the only violations

4    cited, would this have even justified a warning conference?

5    A.  There are multiple repeat violations, so it could have

6    resulted in a warning conference, or it could have resulted in

7    revocation due to the repeat violations.

8    Q.  If the -- when the report of violations from 2022 was

9    entered into the Spartan database, what recommendation did it

10   make?

11   A.  It was revocation.

12   Q.  And are you aware of what recommendation the Spartan

13   database would have made if that same report of violations was

14   entered prior to being reprogrammed as a result of the Biden

15   Administration's zero tolerance policy?

16   A.  It could have resulted in revocation because there was an

17   increase in violations and the number of instances from the

18   previous inspection.

19   Q.  Doesn't -- does the -- is there like a possibility of how

20   Spartan issues it, or does it issue it one way or the other?

21   A.  I'm sorry?

22   Q.  You said there's a possibility it could have been a

23   recommendation for a notice of revocation.  Does Spartan

24   database, when it gets the information, definitively give an

25   answer of what the recommendation is?

CHAMBERED CUSTOM FIREARMS-000251

1   A.  It will give a recommendation, yes.  It does give a --

2   doesn't say it could be this or that.  I guess what I am trying

3   to say is, I would would have to look -- because of these

4   inspections, the one prior to the 2021 that resulted in a

5   warning conference, that -- if there is no significant -- so in

6   2021 there was significant improvement, but then in 2022 they

7   resulted in more violations and instances, so that right there

8   could result in the recommendation of revocation.

9   Q.  And in regard to looking at increased violations, do you

10  take into account an increase in the number of 4473 forms

11  completed during the period?

12  A.  Yes, that could be taken into account.  And I do believe,

13  and I would have to look at this, but for their 2021

14  inspection, I believe there was an increase in forms as well,

15  if not more, and they had less errors during that inspection.

16  Q.  And to your understanding, was there an increase between

17  2021 and 2022 with regard to the number of firearms transferred

18  and 4473 forms completed?

19  A.  I don't know if there was an increase or not.  I would have

20  to look at that.

21  Q.  Also during the period covered by the 2022 inspection, are

22  you aware that that was during the period of the coronavirus

23  pandemic?

24  A.  Yes, as well as the 2021 inspection.

25  Q.  Okay.  And the 2021 inspection covered -- that would cover

UNITED STATES DISTRICT COURT

1    just part of the beginning of the coronavirus pandemic,

2    correct?

3    A.   Correct.  And during one of the responses for the

4    violations there, they said there was an increase in foot

5    traffic so they were aware that there was an increase in the

6    volume they were doing.

7         So it should have been that if they know that there is

8    an increase, that it would have continued where they would have

9    adjusted to that increase and hopefully with the next

10   inspection, which was 2022, they would have accounted for that

11   increase that they had previously -- that they stated was a

12   cause for some of their violations.

13   Q.   Okay.  Can you explain what you mean by "accounted for that

14   increase"?

15   A.   So what I am trying to say is so they -- in the 2021

16   inspection, one of the issues was that they had stated they had

17   an increase in foot volume.  So they are aware -- so that could

18   have contributed to those violations.

19        So since they're aware of the increase in volume and

20   it continued, that they should have known that they should have

21   put something in place to account for that increase, since they

22   were already made aware, or they had stated that was part of

23   one of the reasons for why the violations occurred in 2021.

24   Q.   And was there anything required by the Gun Control Act that

25   they needed to put in place that they did not?

UNITED STATES DISTRICT COURT

1  A.  No, they just need to be in compliance with the Gun Control

2  Act.

3  Q.  And to be in compliance with the Gun Control Act to avoid

4  revocation, it's not that they have to have a perfect record,

5  it's that they have to have no willful violations, correct?

6  A.  Correct.

7  Q.  While we are putting that up, with regard to whether a

8  violation on a 4473 form is a repeat violation or is not a

9  repeat violation -- not yet -- would you please explain how

10 it's determined whether -- which violation is a repeat

11 violation and which is not, when they all account to either

12 missing or incorrect information on the 4473?

13        For example, does the ATF consider it to be more of a

14 violation if there's an error in Section A or an error in

15 Section C?

16 A.  No.  If it's a repeat violation, it's a repeat violation.

17 I guess I am not understanding your question.

18 Q.  Is a repeat violation having a response to a 4473 incorrect

19 or incomplete, or is it having a specific box on a 4473 form

20 incorrect or incomplete?

21 A.  It could be blank.  It could be incorrect.  It could be

22 incomplete.  It depends on the section and the violation.

23 Q.  But would it have to be -- for example, would it have to be

24 on question number 1 being incomplete in one inspection and

25 then incomplete on -- question number 1 incomplete on the

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000254

1   second inspection to be considered a repeat violation?

2   A.  If they are cited under the same regulation, then it's a

3   repeated violation.

4   Q.  Okay.   So in determining whether or not a violation is a

5   repeat violation is dependent upon -- not that there's an error

6   or omission on the 4473 form, but the provision under the Code

7   of Federal Regulations under which the ATF cited the violation,

8   correct?

9   A.  Correct.

10  Q.  And violations on the 4473 can be cited as violations of

11  different sections in the Code of Federal Regulations, correct?

12  A.  Correct.

13  Q.  Okay.  I would like to turn your attention to Exhibit

14  Number 1 and page 5 of that.  And this is the final notice of

15  revocation that was issued after the administrative hearing.

16         And I would like to draw your attention to paragraph

17  number 7.  If you could just briefly read that to yourself and

18  let me know when you are ready to continue.

19  A.  Okay.

20  Q.  In the -- I believe the last sentence of that paragraph,

21  you state that you find no convincing explanation from licensee

22  as to why the violation was not willful as the licensee was

23  aware of the employee had medical and medication issues that

24  likely contributed to the violation.

25         Is it your opinion that this violation was willful

CHAMBERED CUSTOM FIREARMS-000255

KRISTINA LOUISE BABCOCK - CROSS-EXAMINATION        199

1    because that employee was on medication?

2    A.  I believe -- not because he was on meditation per se, but

3    because the licensee knew that he was on medicine -- medication

4    that was not always, I believe, prescribed right and that it

5    would -- caused him -- could have caused these errors -- or

6    that error.

7    Q.  Can you give me the 4473 Form -- 3, I think.

8         And we're talking about the 4473 Form that has a

9    violation with regard to the NICS transfer date, correct?

10   A.  Correct.

11   Q.  And -- give me one second.  This is the form 4473 that was

12   completed for a customer named Ridley.  And during the hearing

13   transcript, I believe there was some testimony regarding

14   medical issues of an Aaron Swank and their potential effect on

15   him; do you recall that testimony?

16   A.  I would have to look at the transcript to get the name.

17   Q.  Give me -- 77.

18        And I am showing you what is page 77 of the

19   transcript.  This is in response to a question by Mr. John

20   Clark, and he states that the seller was Mr. Aaron Swank,

21   correct?

22   A.  Correct.

23   Q.  Okay.  And then there's a discussion of Mr. Swank and his

24   injuries and medical issues, correct?

25   A.  Correct.

UNITED STATES DISTRICT COURT

1   Q.  So that -- Mr. Swank is the employee that you were

2   referring to in paragraph 7 of your final notice of revocation,

3   correct?

4   A.  Correct.

5   Q.  And turning back to Exhibit Number 3, which is the 4473

6   form for Mr. Ridley -- if you can give me page 3.

7           And if you look in box 34 of page 3 of the 4473 form

8   for Mr. Ridley, is that a signature of a Mr. Jason Fern as

9   opposed to a Mr. Aaron Swank?

10  A.  Correct, it is.

11  Q.  If Mr. Jason Fern was the person who actually transferred

12  this to Mr. Ridley, any medical issues by Mr. Swank would have

13  no relevance to the issues in this case, correct?

14  A.  Well, they had stated Mr. Swank did this transaction.

15  Q.  And during this hearing, did you have the 4473 identifying

16  the person who actually did the transaction?

17  A.  I can't recall if that was pulled up or not.

18  Q.  Was that identified as an exhibit during the administrative

19  hearing?

20  A.  Yes, it was.

21  Q.  Okay.  And if in fact this was not transferred on a delay

22  but it had changed to a proceed between April 17th -- page 1 or

23  page 2 -- page 2 -- the customer initially came in on

24  April 17th and received a response of delayed in response to

25  NICS, which would allow the firearm to be transferred on April

CHAMBERED CUSTOM FIREARMS-000257

1  22 of 2021, if it remained on a delay and had not been changed

2  to a denied, correct?

3  A.  I'm sorry, it would -- I'm sorry.

4  Q.  There was a background check conducted on Mr. Ridley on

5  April 17th of 2021, correct?

6  A.  Correct.

7  Q.  And that resulted in a response of "delayed," correct?

8  A.  Correct.

9  Q.  And based on the Brady waiting period, if the NICS response

10  remained as "delayed," that firearm could be transferred on

11  April 22 of 2021, correct?

12  A.  Correct.

13  Q.  But looking at page 3, the firearm was in fact transferred

14  on April 20th of 2021, correct?

15  A.  Correct.

16  Q.  Now, if in fact in between that period the NICS result had

17  changed from "delay" to "proceed," that would have been a

18  proper transfer, correct?

19  A.  Correct.  And it would have been marked in the box on the

20  previous page.

21  Q.  Yep.  And you can go back to page 2.

22       And looking at question 27d, it states, "no response

23  was provided within 3 business days," correct?

24  A.  Correct.

25  Q.  And if in fact this had changed to proceed and simply the

CHAMBERED CUSTOM FIREARMS-000258

1    employee had simply marked the wrong box, would that be a

2    different type of violation?

3    A.   If they received a "proceed" on the 20th, then they could

4    have transferred that firearm.

5    Q.   And in that case they should have marked the box for

6    "proceed," correct?

7    A.   That and put the date.

8    Q.   And if they had done that, this would have been a different

9    type of violation than was cited in the report of violations,

10   correct?

11   A.   Well, if they got a "proceed," then it wouldn't have been a

12   violation.

13   Q.   Assuming they received a proceed?

14   A.   Assuming they received a proceed.

15   Q.   Then the only violation would be marking the incorrect box

16   and not inserting the date in 27d, correct?

17   A.   Oh, correct.

18   Q.   If in fact that this had changed to a "proceed" and it was

19   simply the wrong box that had resulted, would this still have

20   been recommended for a notice of revocation?

21   A.   It could have because of the repeat violations.

22   Q.   Okay.  And can you definitely state one way or the other

23   based on the other violations whether Spartan would have

24   recommended a revocation based on those other violations minus

25   this one 4473 form?

CHAMBERED CUSTOM FIREARMS-000259

1   A.  So I would have to look at the dates of the -- so the

2   inspection that resulted in a warning conference was in 2019;

3   is that correct?

4   Q.  That is correct.

5   A.  It could have resulted in revocation because there was not

6   significant improvement within inspections in the last five

7   years, so it could have.

8   Q.  And again, with regard to the inspections, was there a

9   significant improvement between the 2019 and the 2021

10  inspection?

11  A.  With that one, yes.

12  Q.  Okay.  You testified previously that the continued

13  operation of Chambered Group is a threat to public safety, and

14  one of the two reasons you gave was the employee on the

15  medication.

16        If in fact he was not involved in a violation and

17  had -- the medication he was taking is not even pain

18  medication, would that eliminate one of the reasons why you

19  believe the continued operation of Chambered Group is a threat

20  to public safety?

21  A.  Well, they have multiple repeat violations and they've

22  had -- one of those violations too was under the 478.102,

23  failure to do a background check.

24        And during the warning conference in 2019, or during

25  that inspection, there was two instances under 10 -- 478.102 in

CHAMBERED CUSTOM FIREARMS-000260

1    which they failed to do a background check and -- I'd have to

2    look because I know there was two, there is two subsections

3    there.

4         And then again in this inspection, there was a failure

5    to -- they didn't wait the three business days, so that's

6    another violation under the 478.102.

7         So we're lucky that it did not get transferred to

8    prohibited individuals, but that's not to say if this -- the

9    violations continue, which they show they've had multiple

10   repeat violations, that this would not be transferred to a

11   prohibited individual.

12        And we don't need to wait for it to be transferred to

13   a prohibited individual in order to revoke a license.  This is

14   based on multiple repeat violations, and that the licensee

15   stated that they were going to put certain things into place,

16   and this current inspection showed that either those didn't

17   work or they did not put that into place.

18   Q.  Assuming the licensee never put anything into place, as far

19   as additional steps, is that a ground for revocation?

20   A.  If they continue with the repeat violations, yes.

21   Q.  Okay.  So it's the existence of the violations not whether

22   or not certain steps are implemented that is the basis for

23   revocation, correct?

24   A.  Well, I guess -- yes.  But normally when we're out there

25   and we do these compliance inspections, we ensure that the

CHAMBERED CUSTOM FIREARMS-000261

1    licensee understands these violations.  And we assist them in

2    trying to get something into place to ensure that they won't

3    happen again.

4              So I can only speak for myself that each time I've

5    done inspections, or I've seen these inspections here, we don't

6    leave those premises without ensuring that those licensees have

7    something in place or to assist them with suggestions to put

8    something into place to ensure that these violations don't

9    happen again.

10   Q.  What do you mean by, you don't leave the premises unless

11   they have something in place?

12   A.  When I say -- sorry, go ahead.

13   Q.  Obviously, IOI Crubaugh left the premises at the conclusion

14   of this.  Does that mean the ATF determined that Chambered

15   Group had sufficient steps in place at that time?

16   A.  Correct.  I mean, we are going to leave the premises, but

17   during the warning conference, we don't just issue the ROV and

18   say, okay, bye, we're out of here.

19             We go ahead and ensure like if they have questions on

20   those violations that we assist them in -- you know, giving

21   suggestions as a way to ensure that those don't occur again.

22             I know with this licensee that they did state that

23   they were going to be putting in in-house audits, second

24   checks, maybe third checks.  I believe there was an overlay

25   they were going to use.

CHAMBERED CUSTOM FIREARMS-000262

1    So those sound -- those are good things to do in order

2  to ensure that the violations are not repeated, but in this

3  case, even when those were stated, there's still multiple

4  repeat violations by the licensee.

5    THE COURT:  Just one moment, Mr. Allan.

6    Go ahead, please.

7  BY MR. ALLAN:

8  Q.  Just to clarify, you said one of the violations was no

9  background check conducted, in violation of 27 C.F.R. 478.102,

10  correct?

11  A.  Yes, it was a subsection of that, yes.

12  Q.  And with that one, are you talking about the transfer to

13  Mr. Ridley?

14  A.  So I was talking about the 2019 inspection there was two

15  violations under the 102, and then the one with Ridley, yes.

16  Q.  Okay.  So the background check violation on the current

17  inspection is the one for Mr. Ridley?

18  A.  Correct.

19  Q.  And the ones on the prior background check violations, that

20  was not related to not waiting three days on a NICS delay,

21  correct?

22  A.  I believe no, that was not waiting on the three days.

23  Q.  Okay.  So that would not have been considered a repeat

24  violation, correct?

25  A.  It fell under the same regulation, just a different

CHAMBERED CUSTOM FIREARMS-000263

1   subsection.

2   Q.  So in determining whether something is a repeat violation,

3   you stated that it's based on the regulation.  Is it -- how far

4   into the subsections do you go?  Is it, you know, 27 C.F.R.

5   478?  Is it the first three digits?

6   A.  It's usually the subsections, yes.

7   Q.  So if it's going into the subsections, that would not have

8   been a repeat violation, correct?

9   A.  Correct.

10  Q.  Okay.  And just to go back to where I was getting earlier,

11  you testified that the two reasons for public safety was the

12  repeat violations and the employee on the pain medicine.

13        And when I asked that question about the -- Mr. Swank

14  not being involved in the transfer, not being on pain medicine,

15  whether that would eliminate one of the reasons, you didn't

16  respond to that question.  You gave me the answer of, the other

17  reason for public safety.

18        Based on Mr. Swank not being involved in the transfer

19  to Mr. Ridley when he picked the firearm up, and assuming he

20  was not even on pain medicine, would that remove his presence

21  at Chambered Group as one of the reasons you believe it's a

22  threat to public safety?

23  A.  I guess it could.

24  Q.  And with regard to the repeat violations, if, for example,

25  a customer was to leave a question blank asking whether they

UNITED STATES DISTRICT COURT

1  are a citizen of the United States or that they indicate that

2  they were born in the United States and have never renounced

3  their citizenship such that we can determine that they are in

4  fact a United States citizen, do you believe that that poses a

5  threat to public safety?

6  A.  What poses a threat to public safety is the multiple repeat

7  violations and the fact that a licensee is stating they are

8  going to put something into place and they don't.  That goes to

9  willfulness, and that could affect public safety.

10  Q.  So you are stating that certain violations could affect

11  public safety.  My question is specifically:  The violations

12  for which Chambered Group was cited, do any of those

13  specifically affect public safety?

14  A.  They could.  I mean, if something's left blank and it's not

15  answered, it could possibly be, yes.

16  Q.  Okay.  If I was to leave a blank the number of firearms

17  transferred and that exact same information can be obtained

18  from Section A of the 4473, would that be a threat to public

19  safety?

20  A.  No, that might not be, but if you don't put the full

21  information for, let's say, a NICS alternate permit, you don't

22  get all of that information, we don't know is that person --

23  did they actually have a permit?  That could be a risk to

24  public safety if they don't have that permit.

25  Q.  And I believe you're talking about one of the violations

1    that you determined was not willful, correct?

2    A.  Correct.

3    Q.  And did you actually check that person to see whether they

4    had an Arizona concealed carry permit?

5    A.  That one -- I believe that was checked, yes.

6    Q.  And did they in fact have an Arizona concealed carry

7    permit?

8    A.  I believe they did, yes.

9    Q.  Therefore, that was not a threat to public safety, correct?

10   A.  Correct.

11   Q.  If in fact you believe that the continued operation of

12   Chambered Group was a threat to public safety, why did the ATF

13   wait eight months between the conclusion of the inspection in

14   which it uncovered these violations before issuing the notice

15   of revocation?

16   A.  That's how long the process did take in this place.  I

17   can't say why it took actually eight months.

18   Q.  And if the ATF actually believed this was a significant

19   threat to public safety, such as a dealer who was selling off

20   the record to gang members, the ATF has the ability to go into

21   federal court and seek an injunction to immediately cease sales

22   by that dealer, correct?

23   A.  That would be a criminal enforcement aspect as well.

24   Q.  Okay.  And was Chambered Group referred to the ATF's

25   criminal enforcement section?

1    A.  No.

2    Q.  So based on the violations, the ATF did not believe it

3    posed a significant threat to public safety to seek

4    intervention by a federal court, correct?

5    A.  Correct.

6    Q.  I apologize if I asked this question already, but if the

7    information from the 2022 report of violations had been entered

8    into the Spartan system prior to 2021, do you know what its

9    recommendation would have been?

10    A.  So after the 2019 inspection?

11    Q.  No.  I am thinking I may have asked that question already.

12    A.  You did, I believe so.

13          MR. ALLAN:  No further questions, Your Honor.

14          THE COURT:  Any redirect?

15          MR. CAPPS:  Briefly, Your Honor.

16          THE COURT:  Come on up, Mr. Capps.

17                    REDIRECT EXAMINATION

18    BY MR. CAPPS:

19    Q.  Ms. Babcock, if we could go back to your conclusion in the

20    July 11th, 2023 final notice of revocation.  Can we put that

21    up?  That's Exhibit Number 1.  And go to page 7.  Upper left.

22          I want to direct your attention to paragraph 14.  What

23    do you do in paragraph 14?  Do you cite the specific willful

24    violations by implementing regulation?

25    A.  Yes.

CHAMBERED CUSTOM FIREARMS-000267

KRISTINA LOUISE BABCOCK - REDIRECT EXAMINATION     211

1   Q.  I want to draw your attention specifically to three of

2   those and that is, the 123(b), the 124(c)(1), and the

3   478.21(a).  And if we could go specifically to Exhibit

4   Number -- go to Exhibit Number 2, please.

5          So with respect to the report of violations from April

6   of 2022, how many instances of violation were noted with

7   respect to 123(b)?

8   A.  I believe that says four.

9   Q.  And at a prior point in time, Ms. Babcock, was the

10  regulation that is embodied in subsection b as of 2022 embodied

11  in subsection d as in Delta?

12  A.  Yes.

13  Q.  Okay.  So four instances of violation of 123(b) in 2022,

14  correct?

15  A.  Correct.

16  Q.  And then how many instances of violation for 123(a) in

17  2022?

18  A.  I believe -- eight.

19  Q.  And how many violations for the violation of 124(c)(1)?

20  A.  26.

21  Q.  If we could go please to Exhibit Number 121.

22         For the record, this is report of violations for 2021.

23         How many violations for 124(c)(1) in 2021?

24  A.  Two.

25  Q.  So between 2021 and 2022, there was a dramatic increase in

UNITED STATES DISTRICT COURT

1    the number of instances cited, correct?

2    A.  Correct.

3    Q.  Two up to 26 the next year, right?

4    A.  Correct.

5    Q.  And with regard to the number of instances cited for

6    478.21(a) in 2021, how many instances?

7    A.  Six.

8    Q.  And how many instances, if you recall -- you can look at it

9    if you don't -- cited for that same violation in 2022?

10   A.  I need to look at it again.

11   Q.  Okay.  If we can go back to Exhibit Number 2.  For 2021?

12   A.  I believe it's 16.

13   Q.  16.  So again, another increase -- more than 50 percent

14   increase from 2021 to 2022, correct?

15   A.  Correct.

16   Q.  Two examples of violations you found to be willful based

17   upon an increase year to year, correct?

18   A.  Correct.

19   Q.  There was some testimony earlier today, and you were not in

20   the room, and if I mispronounce the name, my apologies in

21   advance for Mr. Lamontagne, Lamontagne, are you aware of that

22   name?

23   A.  Yes.

24   Q.  Okay.  My specific question is:  Are you aware, as you sit

25   here today, whether Mr. Lamontagne has filed an application in

UNITED STATES DISTRICT COURT

KRISTINA LOUISE BABCOCK - REDIRECT EXAMINATION    213

1    his own name for a federal firearms license?

2            MR. ALLAN:  Your Honor, objection.  This is going

3    beyond the scope of the direct examination and

4    cross-examination.

5            THE COURT:  How is this relevant?

6            MR. CAPPS:  Your Honor, this is relevant to the

7    irreparable harm facet of the preliminary injunction standard.

8            THE COURT:  I'll allow it.  Go ahead.

9            THE WITNESS:  He's associated with that application,

10   yes.

11   BY MR. CAPPS:

12   Q.  Was that application, to your knowledge, initial

13   application, denied?

14   A.  The initial denial was sent out, yes.

15   Q.  Okay.  Is that application still pending though?

16   A.  It is still pending.

17   Q.  And what is the next step in that process?

18   A.  They requested -- timely requested a hearing, so there will

19   be a hearing held on that.

20   Q.  And do you know the date of that hearing offhand?

21   A.  I believe it's October 11th.

22   Q.  And what will be the purpose of that hearing?

23   A.  To determine if that application will actually be denied.

24   Q.  Will the applicant have an opportunity at that hearing to

25   show that he's not a willful violator.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000270

1    A.  Yes.

2            MR. CAPPS:  No further questions.

3            THE COURT:  Ms. Babcock, thank you very much for

4    coming in this afternoon.  You're excused.

5            MR. ALLAN:  Your Honor, I would just request brief

6    recross on the new testimony that was elicited regarding the

7    new application for an FFL.

8            THE COURT:  I will give you two questions.

9            MR. ALLAN:  Thank you, Your Honor.

10                        RECROSS-EXAMINATION

11   BY MR. ALLAN:

12   Q.  Ms. Babcock, the October 11th hearing is with regard to an

13   application for an FFL by Chambered Custom Firearms LLC,

14   correct?

15   A.  Correct.

16   Q.  And the current effective date of the revocation of

17   Chambered Group U.S.A. is -- the entity we are here today on --

18   is October 1st, by which date they have to have disposed of all

19   firearms in their records, correct?

20   A.  I believe so.

21           MR. ALLAN:  Thank you, Your Honor.

22           THE COURT:  Ma'am, you may step down.  Thank you.

23           THE WITNESS:  Thank you.

24           THE COURT:  Next witness?

25           MR. CAPPS:  Your Honor, no more witnesses.

UNITED STATES DISTRICT COURT

215

1          THE COURT:  This Court is prepared to hear closing

2     arguments if you have any at this point.  I will allow the

3     Petitioners five minutes, the Respondents five minutes, and a

4     rebuttal closing of two minutes for the Petitioner.

5          Go ahead and step up, only if you feel you need to

6     make one.

7          MR. ALLAN:  Your Honor, very briefly.  As you

8     recounted at the beginning of this hearing, there's four

9     factors that we're required to establish in order to show

10    entitlement to a preliminary injunction under the law of the

11    Ninth Circuit.

12         The first factor is whether Chambered Group is likely

13    to succeed on the merits.  Based on the testimony today, we

14    believe we have satisfied that standard.

15         The primary violation on which the report of -- notice

16    of revocation was issued is, more probably than not, not

17    actually a violation.

18         With regard to the violations on the A&D records, they

19    were corrected during the course of the compliance inspection

20    and were simple errors based on logging firearms in or out of

21    the records or having the wrong information caught by the

22    scanner gun when they were entered into the records in the

23    first place.

24         Similarly, with regard to the errors on the 4473

25    forms, the violations that were found to be willfully committed

UNITED STATES DISTRICT COURT

1    were no different in substance than the violations that were

2    found to be not willfully committed.

3         All of them were instances in which an employee simply

4    missed an incorrect answer or, in the majority of instances,

5    forgot to complete a particular section on a 4473 form.

6         These are the results of mere human error, which under

7    the standard of the Ninth Circuit, would amount to no more than

8    negligence at best and does not rise to the required level of

9    willfulness required to revoke an FFL.

10        The requirements of willfulness was specifically added

11   by Congress in 1986 in response to the ATF revoking federal

12   firearms licenses based on errors similar to those that were

13   discussed today.

14        In response to the directive issued by the President

15   under the zero tolerance policy, the ATF has essentially

16   reverted to its prior practices and is simply treating

17   violations as willful based on the mere fact that they have

18   occurred.

19        Even with regard to violations that had never occurred

20   before, under the ATF's current operating procedures, it takes

21   the position that it can establish willfulness based on the

22   fact that the licensee previously completed forms or specific

23   questions without violations, or it's simply that it received

24   the information from the initial application inspection when

25   the acknowledgment of the federal firearms licenses was

CHAMBERED CUSTOM FIREARMS-000273

217

1    reviewed.

2         With regard to the second criteria, whether Chambered

3    Group is likely to suffer irreparable harm in the absence of

4    preliminary relief.  Mr. Lamontagne has already testified with

5    regard to the effect on the business of being unable to acquire

6    firearms since August 1st, and the fact that they will not be

7    able to continue in business much longer unless a stay is

8    issued.

9         Even today, we still have an FFL which is used only

10   for the disposition of firearms and is being used to dispose of

11   the approximately 400 firearms in inventory.

12        If a stay is not issued come October 1st, Chambered

13   Group will essentially be required to transfer those firearms

14   to another federally licensed firearms dealer at essentially

15   liquidation prices or transfer them into the possession of

16   Mr. Lamontagne, with the position then taken by the ATF that he

17   is not allowed to transfer those firearms and simply has to

18   keep possession of them for a year before he's allowed to do

19   anything with them.

20        Based on those factors, the balance of equities, we

21   believe, tips soundly in favor of the issuance of a preliminary

22   injunction.

23        The ATF is relying on violations that occurred more

24   than 18 months ago and waited more than eight months after

25   discovering the violations before he even issued the report of

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000274

218

1    violations.

2         There is no reason to go ahead and put this

3    defendant -- the Petitioner out of business at this time before

4    it has the right to a de novo determination.

5         Second, with regard to whether the injunction is in

6    the public interest, this is a dealer that has been conducting

7    business since 2014.  It is a member of the community that

8    employs people.

9         None of the violations cited, according to the ATF's

10   own witness, affects public safety.  And according to the ATF's

11   own testimony during the hearing, there was no concerns

12   regarding the diversion of firearms to the criminal market.

13        THE COURT:  Counsel, let me stop you for a moment.

14        I do believe there was testimony as it relates to

15   public safety concern over failure to conduct background

16   checks; do you recall that?

17        MR. ALLAN:  Yes, Your Honor.  That is with regard to

18   the transfer to Mr. Ridley.  And there was testimony by

19   Mr. Fern this morning that that would have actually been a

20   transfer after there was a proceed received from the NICS

21   system.

22        THE COURT:  So you believe that was a one-time thing?

23        MR. ALLAN:  That was the only occasion in which that

24   is cited in this case.  That is also the only occasion which

25   we've been cited for transfer during the three-day delay on

UNITED STATES DISTRICT COURT

219

1    NICS.

2          THE COURT:  Sir, I certainly appreciate your

3    arguments.  You will have a chance to argue two more minutes in

4    five minutes.  Thank you.

5          MR. ALLAN:  Thank you.

6          THE COURT:  Mr. Capps.

7          MR. CAPPS:  Yes, Your Honor.  I will be brief.  I know

8    the Court has studied the underlying briefing carefully.

9          With respect to the comment as to the IOI's personal

10   opinions expressed during the testimony at the April 20,

11   2022 -- excuse me -- April 2023 revocation hearing, her belief

12   about whether this particular licensee posed a threat or

13   what -- basically asked -- speculating about what's in their

14   mind and whether she felt it was intentional or whatnot.

15         She was there only as to present her findings of fact.

16   Nothing more.  She is entitled to her opinions, but that

17   doesn't carry the day.  That was certainly considered by DIO

18   Babcock along with a host of other information in her analysis

19   that's set forth and memorialized in her final findings.

20         With respect to the -- putting this into context, for

21   the year at issue here, April 11th, 2021 to April 11th, 2022,

22   there were, I believe, 1930 approximately, Form 4473s that were

23   reviewed.  And carrying that and putting that into context for

24   the amount of time, that is approximately 176 transactions per

25   month.

UNITED STATES DISTRICT COURT

CHAMBERED CUSTOM FIREARMS-000276