IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                      Page 10

1   violator, and at that point, that's the sum of our

2   information.  Based on 18 U.S.C. 923, the Director

3   of Industry Operations may reject an application if

4   they find that, one, the applicant has been a

5   willful violator.

6              I have nothing further to present on this

7   particular issue.

8              HEARING OFFICER:  Okay.  Mr. Allan, if you

9   would like to go ahead and offer any information.

10             MR. ALLAN:  Yes.  I just, really, have one

11  question.  Does the ATF have any factual witness to

12  whom we can ask questions, or are you just going

13  through counsel on this?

14             MR. WARE:  We are not intending on calling

15  any factual witness.  The only one who conducted the

16  inspection just clicked the application documents

17  and we submitted those as the other Government

18  exhibits.

19             MR. ALLAN:  Okay.  Mr. Lamontagne, are you

20  ready to proceed?

21             MR. LAMONTAGNE:  Yeah.

22

23                          EXAMINATION

24  BY MR. ALLAN:

25        Q.  Would you please identify yourself for the

CHAMBERED CUSTOM FIREARMS-000319

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 11

1    record.

2         A.   John Lamontagne.

3         Q.   Okay.  What is your relationship to

4    Chambered Custom Firearms, LLC?

5         A.   I'm the organizer and sole member.

6         Q.   And just one thing to clarify is that we are

7    going to be referring to two different entities,

8    both of which start off with Chambered, so just pay

9    attention to which one it is, whether it's Chambered

10   Group or Chambered Custom, because I know that's

11   going to be a little confusing for purposes of the

12   record, but I will try to use the full name for each

13   entity.

14        A.   Yes, sir.

15        Q.   When was Chambered Custom Firearms, LLC

16   organized?

17        A.   2023.

18        Q.   Okay.  And did you submit an application for

19   a Federal Firearms License on behalf of Chambered

20   Custom Firearms, LLC?

21        A.   Yes, in February of 2023.

22        Q.   Okay.  And what was the purpose of Chambered

23   Custom Firearms, LLC submitting an application for a

24   Federal Firearms License?

25        A.   To manufacture assault firearms.

CHAMBERED CUSTOM FIREARMS-000320

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                Page 12

1        Q.  Okay.  And I believe we already testified a
2   little bit about some of the changes that were made
3   to the application for -- the original application
4   for the FFL.  We just discussed that you had checked
5   that you had a Federal Firearms License and that you
6   were not a responsible person, but, in fact, that
7   was vice versa.  You have never personally had a
8   Federal Firearms License, but you are a responsible
9   person on Chambered Group USA's FFL; correct?
10       A.  Yes.
11       Q.  And did the ATF make any other changes to
12  your application for an FFL?
13       A.  Yes.  He made that change from -- I added an
14  01, 07, and he told me I didn't need the 01, just
15  the 07.  So we eliminated the 01 and we went with
16  the application just for 07 manufacturing and
17  selling.
18       Q.  Did Chambered Custom Firearms submit an
19  application for an FFL at the same location as
20  Chambered Group USA?
21       A.  No.  The Chambered Group USA is 15605 West
22  Roosevelt, Suite 113.  Chambered Custom is 520 North
23  Bullard, Suite 37.
24       Q.  And what was the purpose of forming
25  Chambered Custom Firearms submitting an application

CHAMBERED CUSTOM FIREARMS-000321

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 13

1    on its behalf?

2         A.  I was planning on building custom firearms

3    specifically at this location on 520 North Bullard.

4         Q.  Okay.  Did you have any discussions with the

5    ATF as far as whether you would need a Federal

6    Firearms License for that location or whether

7    Chambered Group USA's FFL would allow you to do

8    manufacturing activities at that location?

9         A.  I was informed that if I wanted to start

10   making -- manufacturing custom firearms I should

11   apply for a new FFL for custom firearm manufacturing

12   at a different location.

13        Q.  Okay.  And has Chambered Custom Firearms

14   conducted any business relative to manufacturing

15   firearms yet?

16        A.  No.

17        Q.  And why not?

18        A.  Because I was never given an FFL.

19        Q.  Okay.  And I believe your application for an

20   FFL on behalf of Chambered Custom Firearms was

21   denied on or about August 10th of 2023; is that

22   correct?

23        A.  Yes.

24        Q.  And are you aware of anything that happened

25   between you initially submitting your application

CHAMBERED CUSTOM FIREARMS-000322

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 14

1   for an FFL on behalf of Chambered Custom Firearms in

2   February of 2023 and when you received the notice of

3   denial on or about August 10th of 2023?

4        A.   Yes.   The revocation was given to Chambered

5   Group.

6        Q.   And were you informed that the -- why

7   Chambered Group's -- Chambered Custom Firearms

8   application for an FFL was being denied?

9        A.   Yes.   It was --

10        Q.   Just one thing.   The court reporter is

11   transcribing everything we say, so it's very

12   important that you let me finish my question before

13   you begin your answer even though you know what I'm

14   probably going to be asking.

15        A.   No.   Actually, I'm glitching out a little

16   bit.   You stopped talking, so we are having a little

17   bit of a delay here in, I guess, my system because I

18   didn't hear -- I thought you stopped talking.   I

19   apologize.

20        Q.   Okay.   And I will reask the question, and

21   maybe just wait a second or two after my question is

22   done in case there is any little lags with the

23   internet.

24            Were you informed why Chambered Customs'

25   application for an FFL was being denied?

CHAMBERED CUSTOM FIREARMS-000323

1          A.  Yes.

2              Q.  And what was the reason you were given for

3      the denial?

4          A.  The revocation of Chambered Group.

5              Q.  Okay.  And was there anything specific about

6      the revocation of Chambered Group?  Did it have to

7      do with the fact that you were the responsible

8      person on Chambered Group's Federal Firearms License

9      and you were listed as a responsible person on the

10     application for an FFL for Chambered Custom

11     Firearms?

12         A.  Yes.

13             Q.  Okay.  Now, I'm going to be switching over

14     entities.  Can you describe what your relationship

15     is to Chambered Group USA?

16         A.  I purchased two-thirds of the Chambered

17     Group in 2018 from two of the three original owners

18     to basically keep that entity in existence.  My

19     understanding was that two of the three were going

20     to just be leaving the -- that particular group and

21     that basically the only remaining person was going

22     to be Jason Fern, and I had been purchasing firearms

23     from Jason Fern for a couple years at that point, at

24     least what it seemed like, and I just decided, you

25     know, I was going to -- I know we entertained the

CHAMBERED CUSTOM FIREARMS-000324

1  idea of building custom firearms, so it seemed like

2  a nice way to segue into that industry.

3       **Q.  Okay.  And was that an existing business**

4  **before you bought it?**

5       A.  Chambered Group was an existing business,

6  yes.

7       **Q.  Okay.  And how did you go about actually**

8  **becoming an owner of Chambered Group?**

9       A.  I bought out Cole Kelly and John Fillman,

10 and then I was -- I purchased their percentages and

11 was put on the LLC, and then Jason Fern put me on

12 the FFL as the responsible person.

13      **Q.  Okay.  Do you know why Jason Fern put you as**

14 **a responsible person on Chambered Group USA's**

15 **Federal Firearms License?**

16      A.  Yes.  He was -- my understanding was that

17 was legally required to be an owner of an FFL.

18      **Q.  Okay.  Could you explain what you mean by**

19 **the owner of an FFL?**

20      A.  Well, to be on that, to be part of that

21 ownership group of the LLC, I had to be added as a

22 responsible person.

23      **Q.  Okay.  At the time when you purchased an**

24 **ownership share in Chambered Group USA in 2018,**

25 **other than being an investor in the business, did**

CHAMBERED CUSTOM FIREARMS-000325

1    you have involvement in setting Chambered Group's

2    policies, procedures, or operating the business on a

3    day-to-day basis?

4         A.  I got some extra feedback right there on

5    that question.  I apologize.  I keep hearing other

6    voices, for some reason.  It's kind of interrupting

7    you.

8              Could you repeat that one more time, please?

9         Q.  Yes.  When you purchased an ownership

10   interest in Chambered Group USA in 2018, other than

11   your financial investment in the company, did you

12   have any involvement in setting its policies and

13   procedures with regard to firearms or operating the

14   business on a day-to-day basis?

15        A.  No.

16        Q.  Okay.  At the time you -- were you aware

17   that the ATF had previously conducted inspections of

18   Chambered Group and issued reports of violations

19   based on those inspections?

20        A.  I was aware that the inspections take place,

21   yes.

22        Q.  Okay.  And how did you learn that those

23   inspections had taken place?

24        A.  From Jason Fern.

25        Q.  Okay.  Now, the compliance inspection that

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 18

```
 1    ultimately led to the revocation of Chambered Group
 2    USA's FFL began in April 2022 and covered a period
 3    from April 2021 through April 2022.
 4            At the time that that compliance inspection
 5    began, did you have any concerns about the manner in
 6    which Jason Fern had been operating Chambered Group
 7    USA?
 8    A.   No.
 9    Q.   And why was that?
10    A.   Because the previous inspection we had made
11    vast improvements on that inspection which gave the
12    indication that things were -- he was running things
13    properly and there was no reason to be concerned
14    when the IOI said that we had done a great job, bang
15    up job, everything was great, and that we needed to
16    keep doing what we were doing, and then just to
17    continue to look for ways to get into the electronic
18    forms, which we did the following year.
19    Q.   Okay.  And was there any reason for the
20    delay in looking into implementing electronic 4473
21    forms?
22    A.   Yes, because at the point in which we were
23    going to go and start looking for them, the place
24    where we would initially start would be SHOT Show,
25    which didn't exist because of the coronavirus, and
```

CHAMBERED CUSTOM FIREARMS-000327

1    then the first SHOT Show we could actually attend we

2    started to proceed to look, but we had been always

3    pursuing trying to find one, but we were having

4    difficulty finding one that fit our needs.

5         **Q.  And did you look at various providers and**

6    **have issues with several of the ones that you looked**

7    **at?**

8         A.  Yes.  They didn't -- they didn't really back

9    their products, nor did they have something that I

10   thought would really prevent human error from

11   happening as much until we found the FastBound

12   system.

13        **Q.  And were you aware that based on the results**

14   **of the 2021 inspection the ATF did not conduct a**

15   **warning conference or take any other administrative**

16   **action like it had done in the inspection before**

17   **that?**

18        A.  Yeah.

19        **Q.  And did that lead you also to believe that**

20   **the policies and procedures that had been adopted**

21   **based on the prior report of violations and the**

22   **warning conference were being successful in making**

23   **improvements?**

24        A.  Yes.

25        **Q.  And how did you learn of the report of**

1   violations that was issued at the conclusion of the

2   2022 compliance inspection?

3        A.  I was contacted by Jason Fern.

4        Q.  And what did he tell you about the results

5   of that inspection?

6        A.  He told me that we had a relatively normal

7   and good inspection according to the IOI with the

8   exception of one violation, and when he informed me

9   of that violation, I immediately started to get more

10  involved with the process of that.  I had a meeting

11  with Jason and we -- I changed all the policies in

12  regard to that to make sure that never happens

13  again.

14       Q.  Okay.  And the policies that you're

15  referencing, is that based on what you testified

16  during the September 19th evidentiary hearing with

17  regard to certain color coding or highlighting?

18       A.  Correct.

19       Q.  And did he tell you that the number of

20  violations had increased from the 2021 inspection?

21       A.  He did not.

22       Q.  Are you familiar with the -- you mentioned

23  one of the violations on the -- one of the

24  violations.  Which one were you specifically

25  referring to?

**IN RE: CHAMBERED CUSTOM FIREARMS, LLC**
ATF FFL Revocation Hearing on 10/19/2023                    Page 21

```
 1        A.   That would be the one where the three-day
 2   period was on the third day, but it was not the
 3   third day of business.
 4        Q.   Okay.  Did you have that -- and I believe
 5   that was the transfer of a firearm to a Mr. Louis
 6   Ridley.  It was alleged that the transfer was made
 7   on an initial NICS delay before -- three full
 8   business days had expired when it was still on a
 9   delay; is that correct?
10        A.   Correct.
11        Q.   Did you have any involvement with the
12   completion of that 4473 form or the transfer of the
13   firearm to Mr. Ridley?
14        A.   No.
15        Q.   Are you generally familiar with the other
16   violations that were cited in the report of
17   violations from the 2022 compliance inspection?
18        A.   I am now.
19        Q.   Okay.  Some of the other violations related
20   to errors in the A & D records.  A & D records.  I'm
21   referring to acquisition and disposition records,
22   short form A & D records.
23             Did you have any involvement with entering
24   those firearms into the A & D records, selling the
25   firearms at issue in the A & D record violations, or
```

CHAMBERED CUSTOM FIREARMS-000330

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 22

```
 1    receiving at the business certain firearms that had
 2    not been timely logged into the A & D records?
 3        A.  No.
 4        Q.  The remaining violations related to errors
 5    on 4473 forms.
 6            Were you involved in completing any of those
 7    4473 forms with errors?
 8        A.  No.
 9        Q.  During the period covered by the compliance
10    inspection, had you sold any firearms to customers
11    on behalf of Chambered Group or signed any 4473
12    forms on its behalf other than when you were
13    purchasing a firearm?
14        A.  No.
15        Q.  Some of the 4473 forms that have violations
16    list a Jason Lamontagne as the seller.  Is that
17    you?
18        A.  No.
19        Q.  Who is Jason Lamontagne?
20        A.  That is my cousin.
21        Q.  Okay.  And is he an employee of Chambered
22    Group?
23        A.  Yes.
24        Q.  Have you, John Lamontagne, ever personally
25    violated the Gun Control Act or been accused of
```

CHAMBERED CUSTOM FIREARMS-000331

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 23

1    doing so in your individual and personal capacity?

2        A.  No.

3        Q.  Is it your understanding that the

4    application for an FFL on behalf of Chambered Custom

5    Firearms was denied solely because you were an

6    invested owner and, therefore, a responsible person

7    on Chambered Group USA's FFL at the time it had

8    violations of the Gun Control Act?

9        A.  Yes.

10       Q.  And you mentioned just a little bit earlier,

11   but what did Chambered Group do after it received

12   the 2022 report of violations?

13       A.  We reimplemented new procedures.  I brought

14   in another person to look over all the forms.  Go

15   through every -- redetail everything.  Someone to go

16   through the -- all of our books, all of our 4473s.

17   The A & D book.  We moved it to FastBound.  We

18   prepared to do electronic 4473s with FastBound.

19   Once I was aware of the problem, I tried to do

20   everything I could to make sure that these things

21   don't happen in the future.

22       Q.  And did you receive a Notice of Revocation

23   based on that report of violations before the 4473

24   aspect of FastBound was actually implemented?

25       A.  Correct.

CHAMBERED CUSTOM FIREARMS-000332

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 24

1        Q.  Okay.  And I think you just mentioned you're
2    getting involved, but did your involvement in the
3    operation of Chambered Group USA change after it
4    received the report of violation and notice of
5    revocation in 2022?
6        A.  Yes.  Well, it changed when I found out
7    about Mr. Ridley.
8        Q.  Okay.  And --
9        A.  After that, we received the revocation,
10   which, obviously, continued that process.
11       Q.  Okay.  You found out about Mr. Ridley based
12   on the report of violations issued after the 2022
13   compliance inspection; correct?
14       A.  Correct.
15       Q.  Okay.  And once you found out about that,
16   how did your role at Chambered Group change at that
17   point?
18       A.  I started getting involved with Jason Fern
19   about trying to make sure that these mistakes -- we
20   eliminate these mistakes from being able to be
21   possibly made as best as we can.
22       Q.  And what is Jason Fern's current role at
23   Chambered Group USA?
24       A.  Jason Fern has not had a role at Chambered
25   in the last two months since the revocation, this

CHAMBERED CUSTOM FIREARMS-000333

1    revocation process has started.

2        Q.  Okay.  Does he have any involvement in the

3    firearms industry anymore at this point?

4        A.  No.

5        Q.  And can you explain how the manner in

6    which -- again, I'm paging you to these again.  The

7    manner in which Chambered Custom Firearms would

8    conduct business differently than the manner in

9    which Chambered Group had been conducting

10   business -- you were an investment owner before you

11   started being involved in its day-to-day

12   activities -- if the ATF was to issue an FFL to

13   it?

14       A.  I would have direct involvement and

15   responsibility for the day-to-day operations making

16   sure that these -- everything is properly filled

17   out.  We are going to go directly to the FastBound

18   system.  They are A & D as well as they are -- the

19   NFA as well as the 4473, electronic 4473s.  We have

20   all the hardware and the software ready to go day

21   one.

22       Q.  Okay.  So if Chambered Custom was to receive

23   an FFL, it would be starting from day one with

24   electronic 4473 forms in addition to electronic

25   A & D records?

1       A.  Correct.

2       Q.  Do you believe that that would reduce the

3   potential for errors compared to the completion of

4   4473 forms in paper format?

5       A.  Yes.

6       Q.  And do you have any plans to implement any

7   other policies and procedures to ensure errors do

8   not occur other than relying on the computer

9   software?

10      A.  Yes.  We have a compliance person that's at

11  our -- you know, at my -- at the ready if we are

12  given a new license to make sure that this -- these

13  mistakes are looked at every day and properly

14  maintained, all of our records, more accurately.

15      Q.  And will you have -- for example, I think

16  you mentioned a compliance person, but like a

17  manager or supervisor, somebody who's responsible

18  for ensuring all the requirements under the Gun

19  Control Act are satisfied at times when you're not

20  physically located at the store?

21      A.  Correct.

22      Q.  And have you also discussed potentially

23  implementing a -- for example, a firearms

24  transaction checklist to ensure that two people are,

25  in fact, looking for specific issues on a 4473 as

CHAMBERED CUSTOM FIREARMS-000335

1    opposed to just putting initials on it?

2         A.  Correct.

3         Q.  And I believe you testified with regard to

4    the September 19th evidentiary hearing, as well, you

5    also have a policy now of printing out the results

6    from a NICS check?

7         A.  Correct.  Every NICS check is printed out

8    and put in with the 4473.

9         Q.  Now, you mentioned that you became involved

10   in buying Chambered Custom -- I'm sorry, Chambered

11   Group USA because you were a customer of that store

12   and there was going to be issues with its viability

13   based on two of the partners leaving; correct?

14        A.  Yes.

15        Q.  And you also testified that you had applied

16   for an FFL on behalf of Chambered Custom Firearms

17   because you wanted to get involved in manufacturing

18   custom firearms; is that correct?

19        A.  Correct.

20        Q.  Do you have a -- outside of the firearms

21   industry, do you have a background in operating your

22   own businesses and being able --

23        A.  Yes.

24        Q.  And can you just describe a little bit of

25   what that is?

CHAMBERED CUSTOM FIREARMS-000336

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 28

```
 1        A.  I was -- I started my own business in 1996,
 2   and I have been conducting business as -- with that
 3   entity since then, and that's how I actually make a
 4   personal living from that.
 5        Q.  And if Chambered Custom Firearms, LLC is
 6   given an FFL, will you be responsible for making
 7   sure that, like your other business, that it
 8   complies with all requirements of the laws and take
 9   an active role in it as opposed to merely owning
10   shares in another business?
11        A.  Yes.  I have a more direct role here.
12             MR. ALLAN:  Those are all the questions I
13   have for Mr. Lamontagne at this time.
14             HEARING OFFICER:  Okay.
15
16                              EXAMINATION
17   BY MR. WARE:
18        Q.  Mr. Lamontagne, I just have a few questions
19   I want to flesh out on your testimony here.
20             You became involved in Chambered Group --
21   I'm going to shorten it just to Chambered Group to
22   distinguish that from the license application you
23   have right now -- in 2018; correct?
24        A.  Yes.
25        Q.  And counsel kept saying your investment
```

CHAMBERED CUSTOM FIREARMS-000337

1  involvement only, but, in fact, you actually took

2  some active role in filling out 4473s in 2018,

3  didn't you?

4      A.  Correct.  In the very beginning I tried to

5  help Jason, yes, as he was teaching me to run the

6  business.

7      Q.  And that continued through 2019; is that

8  correct?

9      A.  Yes.

10      Q.  So by -- during your testimony from the

11  transcript and Exhibit -- I mean, Government Exhibit

12  8, you said you weren't involved in day-to-day

13  activities.

14          Were you limiting that to more recently you

15  weren't involved in day-to-day activities, whereas

16  you were in 2018 and 2019?

17      A.  Correct.  I stepped away to start a machine

18  shop to make parts in 2021 and I no longer had

19  anything to do with the operation of Chambered Group

20  gun store.

21      Q.  So it's fair to say that in 2018 when you

22  joined as a responsible person, you did participate

23  in day-to-day activities at the licensee and

24  understood how they were functioning in filling out

25  forms; is that correct?

CHAMBERED CUSTOM FIREARMS-000338

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 30

```
 1        A.  I was -- yes.  I was learning at the same

 2   time.  Obviously, I didn't have any experience in

 3   that industry.  I was behind Jason Fern.

 4        Q.  I understand that.  Jason Fern was the

 5   primary actor, but you were there occasionally;

 6   correct?

 7        A.  Correct.  Yeah, I wasn't there all the time.

 8   I still did have my own businesses to run, but I

 9   would go in on a regular basis, yes.

10        Q.  And then in 2019 Chambered Group was --

11   received an inspection report of violations and you

12   were still working at least part time in the

13   day-to-day operations at that group at that time,

14   weren't you?

15        A.  Correct.

16        Q.  So you were aware of the violations that

17   occurred in 2019 and that you had to do a better job

18   collectively as Chambered Group to ensure you didn't

19   have those violations in the future?

20        A.  Correct.

21        Q.  And you testified that you applied for a new

22   license in February of 2023 because you wanted to

23   break off and start doing custom firearms, so you

24   formed this LLC, Chambered Customs; is that

25   correct?
```

CHAMBERED CUSTOM FIREARMS-000339

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 31

```
 1          A.  So at the -- when I was speaking to -- we
 2    were manufacturing at Chambered Group.  I was
 3    informed by IOI Tara -- I apologize, I don't know
 4    her last name, that if I wanted to continue and take
 5    the manufacturing process a little bit more
 6    seriously that I should -- I should get myself a new
 7    FFL to start manufacturing at my other machine shop
 8    rather than making them at Chambered Group gun
 9    store.
10          Q.  Okay.  So you were thinking about making
11    custom firearms -- instead of taking your time to go
12    back over to Chambered Group, you thought you could
13    just start manufacturing with a new license at a
14    different place; is that accurate?
15          A.  I'm not sure I totally understand the
16    question the way you --
17          Q.  I'm sorry.  Let me make it simpler.  So you
18    chose to form a new LLC to manufacture custom
19    firearms instead of adding that as part of Chambered
20    Group?
21          A.  Chambered Group already had an 07.
22          Q.  All right.  So you decided --
23          A.  We were manufacturing firearms at Chambered
24    Group, but she advised that we start a new FFL if I
25    wanted to continue making custom firearms and beyond
```

CHAMBERED CUSTOM FIREARMS-000340

1    just maybe an occasional one here or there.

2        **Q.   Okay.  I understand.  I'm just trying to**

3    **figure this out because you said you weren't really**

4    **involved in the day-to-day activities of**

5    **manufacturing or selling firearms of Chambered**

6    **Group, yet, you decided somewhere between this time**

7    **frame of 2019 and 2023 that you did want to become**

8    **more actively involved in custom making of firearms;**

9    **is that accurate?**

10       A.   Not necessarily, because I stepped away to

11   manufacture parts for guns before that.

12       **Q.   So February of 2023 you decided you wanted**

13   **to become actively involved in manufacturing custom**

14   **firearms which is why you applied for a new**

15   **license?**

16       MR. ALLAN:  If I can clarify, I think a

17   little bit of the confusion might be the different

18   scope of manufacturing under the ATF's definition.

19   Kind of a different scope of manufacturing --

20       MR. WARE:  Mr. Allan, I will let you have an

21   opportunity to fully explain that further.  I'm just

22   trying to get my questions through and then, of

23   course, you'll have an opportunity to explain

24   anything, and if you think it's unfair or confusing,

25   I welcome your input then.

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                Page 33

```
 1        Q.  BY MR. WARE:  Mr. Lamontagne, I'm going back
 2    to -- so your application for Customs -- Chambered
 3    Customs is because you wanted to make custom
 4    firearms under your LLC at a different location than
 5    where Chambered Group was at; is that correct?
 6        A.  Yes.
 7        Q.  And you plan on, if you were to receive this
 8    license, to be actively involved in that license,
 9    Chambered Customs?
10        A.  Yes.
11        Q.  You don't plan on becoming just an
12    investment owner and letting someone else do all the
13    business and you just attempt to make profits off of
14    it?
15        A.  I don't make very many custom firearms.  I
16    make very few custom firearms, and, yes, that I make
17    every one of them.
18        Q.  And was it your intent if you receive this
19    license, Chambered Customs, to purchase or take over
20    the inventory from Chambered Group?
21        A.  Yes.
22        Q.  So in addition to making custom firearms,
23    you're also going to sell off firearms and act as an
24    01, as well?
25        A.  As of the current situation, yes.
```

CHAMBERED CUSTOM FIREARMS-000342

IN RE: CHAMBERED CUSTOM FIREARMS, LLC
ATF FFL Revocation Hearing on 10/19/2023                    Page 34

1        Q.   Now --

2        A.   It was not my intention when I filed it

3    originally, but that would be my intention now,

4    yes.

5        Q.   And I just want to understand the timing.

6    When you applied for this license in February of

7    2023, you were aware that ATF had issued a notice to

8    revoke Chambered Group in December of 2022;

9    correct?

10        A.   Yes.

11        Q.   And you being a responsible person on

12    Chambered Group's license, you had to respond to

13    that along with Mr. Fern while you were applying for

14    a new license in a different location?

15        A.   Yes.

16        Q.   And it's your testimony that had no impact

17    on your desire to get a whole separate license and

18    divorce yourself from Mr. Fern or Chambered Group?

19        A.   No.

20        Q.   All right.  Now, in your testimony, the

21    Court asked you -- and if you need to refer to it,

22    Mr. Allan, go to page 151 of Exhibit 9.  You seem to

23    indicate that you weren't really involved in the

24    business very much, Chambered Group, and when the

25    Court asked you did you understand your

CHAMBERED CUSTOM FIREARMS-000343

1    responsibilities, you responded yes, that you

2    understood that you were responsible as a

3    responsible person for the actions of the employees.

4    I'm not reading it directly, but do you understand

5    that portion of testimony as a responsible person

6    that you would be responsible for all the employees

7    in a corporation or an LLC?

8         A.  So what you're asking -- directly asking me

9    is do I realize that I was responsible for every

10   employee and all their mistakes?  I just want to

11   make sure I'm clear on the question.

12        Q.  I want to be clear.  Was it your position

13   back then, or has it changed since that time frame,

14   that as a responsible person on a license that

15   you're responsible for the lawful compliance of the

16   Gun Control Act of all the employees underneath the

17   Federal Firearms License?

18        A.  So I apologize.  I want to make sure I'm

19   understanding exactly what I'm answering.  I know I

20   was -- I do realize that, yes, I was responsible for

21   any -- as of right now, what happened at Chambered

22   Group.  That's what I have been told, yes.

23        Q.  And I guess to make it clear, is it your

24   testimony then that you know that now, but back when

25   you were a responsible person in 2018, 2019, 2020,

1    2021, you didn't understand that?

2        A.  I did understand that I was a responsible

3    person on the license, yes.

4        Q.  And you understand that being a responsible

5    person means that you have to ensure that the

6    employees and those people acting on behalf of the

7    license were complying with the law?

8        A.  Yes.

9        Q.  I ask it because there is a lot of focus on

10   whether you personally took actions if you failed to

11   fill out a proper form from this 2022 time frame,

12   2021 to 2022, and your response is that you weren't

13   there, so, obviously, you didn't make any of those

14   personal acts.

15           Are you saying as a responsible person you

16   shouldn't be held accountable for the actions of

17   your employees?

18       A.  So the employees were under direct --

19   directly underneath Jason Fern, my business partner,

20   co-owner.  With us having a good inspection, like a

21   really, really good inspection in '21 with a

22   tremendous amount of forms and very, very, very few

23   mistakes, I honestly just had no concern that he was

24   doing anything that would be of any concern of ours

25   other than, hey, we are proceeding to try to find